UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL FUND MANAGEMENT
S.A., DEKA INTERNATIONAL S.A.
LUXEMBURG, DEKA FUNDMASTER
INVESTMENTGESELLSCHAFT MBH, DEKA
INVESTMENT GMBH, BAYERNINVEST
KAPITALANLAGEGESELLSCHAFT MBH,
HANSAINVEST HANSEATISCHE
INVESTMENT-GMBH, METZLER
INVESTMENT GMBH, NORD/LB
KAPITALANLAGEGESELLSCHAFT AG,
SWISS LIFE INVESTMENT MANAGEMENT
HOLDING AG, and CITY OF RICHMOND *ex
rel.* CITY OF RICHMOND RETIREMENT
SYSTEM,

        Plaintiffs,

    vs.

CITIGROUP INC., CHARLES PRINCE,
VIKRAM PANDIT, GARY CRITTENDEN,
JOHN C. GERSPACH, STEVEN FREIBERG,
ROBERT DRUSKIN, THOMAS G. MAHERAS,
MICHAEL STUART KLEIN, and KPMG LLP

        Defendants.

Civil Action No. _____ 09 CV 8755

**COMPLAINT**

**DEMAND FOR JURY TRIAL**



**GRANT & EISENHOFER P.A.**
Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
David A. Straite
Natalia Williams
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ...................................................... 1

II.     JURISDICTION AND VENUE ............................................................................ 8

III.    THE PARTIES ..................................................................................................... 9

        A.      Plaintiffs ...................................................................................................9

        B.      Defendants .............................................................................................15

                1.      Citigroup ....................................................................................15

                2.      Individual Defendants ................................................................15

                3.      KPMG LLP .................................................................................19

IV.     BACKGROUND ............................................................................................... 20

        A.      Subprime Mortgages Become Attractive To Lenders ............................20

        B.      The Proliferation Of Financial Instruments  Backed By U.S. Residential
                Mortgages ...............................................................................................21

        **C.**      Citigroup's Involvement In Mortgage-Related Activities .....................25

                1.      Subprime Lending Fuels Citi's Bottom Line..............................25

                2.      Citi's Mortgage Portfolio Included  Large Volumes Of Subprime
                        and Other Risky Loans................................................................26

                3.      Citigroup's CDOs ......................................................................26

        D.      Citigroup's SIVs ....................................................................................28

        E.      Citigroup's ARS.....................................................................................29

        F.      Indicators That Mortgage Markets Were Deteriorating By 2005........30
        G.      Indicators That Secondary Markets For  MBS And CDOs Were
                Deteriorating By February 2007 ...........................................................32

V.      DEFENDANTS' FRAUDULENT SCHEME ..................................................... 35

        A.      Defendants Concealed Citi's Risky Lending Practices .........................35

        B.      Defendants Concealed The Nature And Extent Of Citi's CDO Exposure ...........37

**C.**   Citi Creates Off-Balance-Sheet Entities To Conceal Additional Subprime Risk .................................................................................................40

    1.   Citi Establishes SIVs To Generate Off-Balance Sheet Cash ....................41

    2.   Risks Associated With Citi's SIVs .............................................42

    3.   Accounting Treatment For SIVs .................................................43

    4.   Defendants Concealed Material Information  Regarding Citi's Commitment To Its Affiliated SIVs .........................................45

D.   Defendants Failed To Disclose And  Accurately Account For Auction Rate Securities ...........................................................................47

    1.   Citi's ARS Involvement..........................................................48

    2.   The ARS Market Is Hit By The Credit Crisis, And Citi Is Increasingly Challenged In Efforts To Support The ARS Auctions..........49

    3.   Citi Allows Auctions To Fail ...................................................52

    4.   Defendants Continue To Conceal The Full Impact Of The ARS Market Failure.................................................................53

E.   Defendants' False And Misleading Statements Concerning Citi's Losses Are Used To Prop Up Financial Results And  Falsely Assure Investors Of Its Financial Health ...........................................................................55

VI.   THE TRUTH BEGINS TO EMERGE ......................................................... 57

A.   October 2007:  Citigroup Makes Partial But Incomplete Disclosures Concerning Its Growing Losses And Subprime Exposure ...................................57

    1.   October 1:  Citi Issues Pre-Earnings Release .............................57

        (a)   Overall Financial Picture ............................................. 57

        (b)   Subprime Lending.................................................... 58

        (c)   CDOs................................................................. 60

    2.   October 15, 2007:  Citi Announces Third Quarter Results........................61

B.   Early Fall 2007:  Citi Makes Partial But  Incomplete Disclosures Regarding Its SIV Exposure .........................................................62

C.    November 2007:  Citi Makes Partial But Incomplete Disclosures
      Regarding Additional CDO Exposure And Massive Write-Downs, And
      Shakes Up Its Management Team ...................................................................66

      1.    November 4, 2007 Press Releases ................................................66

            (a)    Citi's Overall Picture; Prince "Resigns" ......................... 66

            (b)    CDOs.................................................................................. 66

      2.    Citi Discloses Support Of SIVs In Form 10-Q For Third Quarter
            2007..............................................................................................72

D.    December 2007:  Citi Admits Obligation To Consolidate SIVs...........................72

E.    January 2008:  Citi Discloses Additional Write-Downs.....................................73

      1.    Citi Reports Record Losses ..........................................................73

      2.    CDOs.............................................................................................73

      3.    Consumer Lending, Including Mortgages ...................................75

F.    April 2008:  Citi Reveals New Sources Of Problems...........................................77

      1.    First Quarter Results Show Improvement, But Continued Problems........77

      2.    Additional Write-Downs In Markets & Banking.........................77

      3.    First Mention of Significant Exposure Of Alt-A Loans ..........................78

      4.    Partial But Incomplete Disclosures Regarding ARS ................................78

G.    July 2008:  Citi Takes More Write-Downs............................................................79

H.    August 2008:  SEC Announces ARS Settlement; Citi Is Forced To
      Disclose ARS Exposure Stemming From Client Losses .......................................79

I.    September 2008:  Citi Attempts To Reassure Market Of Its Viability,
      Despite Financial Sector Turmoil .........................................................................80

J.    October 2008...........................................................................................................81

      1.    First TARP Installment ................................................................81

2.      Third Quarter Results Show Still More Write-Downs, With SIVs And Alt-A Securities As Primary Sources ................................................ 82

K.      November 2008 ...................................................................................... 83

1.      Citi Discloses Reclassification Of $80 Billion In Assets .......................... 83

2.      Citi Announces Plan to Dismantle SIVs and Purchase Remaining $17.4 Billion, Yet Reasserts Strength ....................................................... 83

3.      Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion ........... 84

L.      December 2008:  SEC Files Complaint Regarding ARS, Revealing Citi's Knowledge Of ARS Exposure As Early as Mid-2007 .......................................... 85

M.      January 2009:  Details of Bail-Out Reveal True Weaknesses of Mortgage-Related Assets and Contents of $80 Billion Recategorized in November ............. 86

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 87

A.      Citigroup's Financial Statements During The Relevant Period Were Materially False And Misleading And Violated GAAP ....................................... 88

1.      Citigroup Reported Materially Understated Loss Reserves In Violation Of GAAP ................................................................................ 89

2.      Citigroup Failed To Disclose A Concentration Of Credit Risk From Subprime-Related Exposure In Violation of GAAP ...................... 94

3.      Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP ................................................................................ 97

4.      Citigroup Overstated The Fair Value Of Its CDOs  With Direct Subprime Exposure In Violation Of GAAP .............................................. 99

5.      Citigroup Failed To Consolidate Its SIVs On Its Balance Sheet In Violation Of GAAP .............................................................................. 105

6.      Citigroup Overstated the Fair Value Of  Its Total Assets In Violation Of GAAP .............................................................................. 107

7.      Citigroup Overstated Its Capital Adequacy ........................................... 109

B.      Defendants Prince, Pandit And Crittenden Signed False Sarbanes-Oxley Certifications ........................................................................................ 110

C.     KPMG's Audit Reports Were Materially False And Misleading ....................... 110

D.     Additional False And Misleading Statements And Omissions During The Relevant Period ........................................................................................... 111

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 139

A.     The Citigroup Defendants Knew That Citi's Mortgage Portfolio Contained High-Risk Subprime Loans That Would Lead To Large Losses ......................... 140

B.     The Citigroup Defendants Knew Citi Was Exposed To Losses Via Its Subprime Holdings ............................................................................... 143

      1.     The Citigroup Defendants Knew The CDOs Were Not Structured To Withstand The Collapse Of The Housing Market ............................. 144

      2.     The Citigroup Defendants Knew Citi's CDOs Were Not Immune To The Market Downturn ...................................................... 145

            (a)    Citi Publicly Acknowledged Risks Associated With CDOs ....... 145

            (b)    Aware of Market Developments, Citi Tried To Protect Itself .... 146

C.     The Citigroup Defendants Knew Citi Was Obligated To Consolidate The Off-Balance Sheet Entities .................................................................... 146

      1.     The Citigroup Defendants Knew Citi Would Not Let The SIVs Fail, And Therefore That Citi Was Required To Consolidate Them Once Trouble Emerged ........................................................... 146

      2.     The Defendants Knew Citi Was Obligated To Consolidate The Commercial Paper CDOs .......................................................... 147

D.     Government Investigations Create A Strong Inference Of Defendants' Scienter ....................................................................................... 148

      1.     The SEC's Investigation Into Citi's Accounting Practices ................... 148

      2.     The SEC And New York Attorney General Recovered More Than $7.3 Billion From Citi On Its Clients' Behalf ......................... 149

E.     Citi's Numerous Violations Of GAAP Support An Inference Of Scienter ........ 150

F.     Motive And Opportunity:  The Citigroup Defendants Avoided The Necessary Disclosures, Write-Downs, And Reserve Increases In Order To Preserve Citi's Tier 1 Capital Ratio ................................................... 151

G.     Motive And Opportunity:  KPMG ................................................... 152

IX.  LOSS CAUSATION.........................................................................................153

X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................................161

XI.  PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE..........161

XII.  TOLLING OF THE STATUTE OF LIMITATIONS.....................................................162

XIII.  COUNTS...................................................................................................163

COUNT ONE.........................................................................................163

COUNT TWO.........................................................................................165

COUNT THREE.......................................................................................166

JURY DEMAND ...........................................................................................167

PRAYER FOR RELIEF .......................................................................................167

Plaintiffs International Fund Management S.A., Deka International S.A. Luxemburg, Deka FundMaster Investmentgesellschaft mbH, Deka Investment GmbH, Bayerninvest Kapitalanlagegesellschaft mbH, HansaInvest Hanseatische Investment-GmbH, Metzler Investment GmbH, Nord/LB Kapitalanlagegesellschaft AG, Swiss Life Investment Management Holding AG, and City of Richmond *ex rel.* City of Richmond Retirement System (collectively "Plaintiffs"), by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents, press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by the defendants. Plaintiffs make the following allegations against Citigroup Inc. ("Citigroup" or "Citi" or the "Company"), Charles Prince, Vikram Pandit, Gary Crittenden, John C. Gerspach, Steven Freiberg, Robert Druskin, Thomas G. Maheras, Michael Stuart Klein, and KPMG LLP (collectively, the "Defendants"). Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a case about a titan of the banking system, which went from being the largest financial firm in the world, to a shell of its former self, within less than two years. This bank, Citigroup, now limps along after a government bail-out, a prime example of a bank nearly destroyed by the excesses of Wall Street and irresponsible risk taking. Meanwhile, investors like Plaintiffs, who purchased Citigroup's securities at prices that were artificially inflated due to the

Company's understatement and concealment of its risk exposures, have seen the value of their investments drop dramatically.

2.      Citi's near-demise had its genesis in the Company's increasing willingness to take on risks for the sake of profit, without regard for – and without disclosing – the magnitude of the downside exposure it faced if those risks materialized.  As the housing industry heated up in the early 2000s, Citi had ramped up its residential mortgage lending, both through its own sales force and through correspondent channels.  But in order to sustain the desired growth, Citi needed to lower its standards.  In 2005, Citi specifically chose to grow by expanding into the segment known as subprime, which includes borrowers with poor credit histories or those taking out risky loans.  Such subprime mortgages (whether originated by Citi or another lender) were then packaged into residential mortgage-backed securities ("RMBS"), and sold to investors, or to banks such as Citi which packaged the subprime-based RMBS into collateralized debt obligations ("CDOs").  This expansion of subprime lending spurred Citi's growth, both through its lending activities and through the CDOs Citi created and sold.

3.      By mid-2007 as the housing market declined, Citi had accumulated a large portfolio of loans at a high risk of default, as well as bundles of CDOs it could not sell.  While other banks began to show signs of trouble, Citi touted its ability to withstand the downturn.  Citi concealed the fact that it had been unable to sell many tranches of the CDOs it had created, leaving it holding assets that were losing value as the housing market deteriorated.

4.      By the fall of 2007, Citi's loan loss reserves had dropped to a precariously low level, due to the mounting losses incurred in the Company's mortgage portfolio.  On October 15, 2007, Citi released its third quarter earnings and disclosed that it had increased its reserves by $2.24 billion, a belated yet still inadequate step.  The earnings release focused on the increased

credit costs stemming from its lending activities.  Citi mentioned approximately $11.4 billion in recently-packaged CDOs and warehoused loans awaiting securitization, but continued to conceal an additional $54 billion of CDOs it was holding.  In reaction to this partial disclosure, Citi's stock price began its long decline, closing at $44.79, down from $46.24 the day before.

5.      In late October 2007, the rating agencies downgraded numerous CDOs.  Because these ratings directly impacted Citi's holdings, Citi had no choice but to take write-downs.  On Sunday evening, November 4, 2007, the Company disclosed the existence of an additional $43 billion in CDO exposure on Citi's balance sheet, on top of the previously-disclosed $11.4 billion (which the Company indicated had grown to $11.7 billion).  Citi also stated that it expected to take write-downs of between $8 billion and $11 billion in relation to these CDOs.  These disclosures shocked the market, with analysts noting that "the majority of the exposure . . . has never been disclosed before . . . which is very surprising," and that the sudden write-downs were "unsettling . . .com[ing] only 3 weeks after the company released 3Q07 earnings."

6.      In particular, Citi revealed that it had repurchased $25 billion in CDOs, due to a liquidity put it had written when it structured and sold those CDOs.  Because of the liquidity puts, Citi was required to retain these CDOs on its balance sheet when they were issued.  Further, analysts questioned why Citi had delayed in taking the $8 to $11 billion in write-downs on CDOs with a face value of nearly $55 billion, given that the turmoil in the underlying housing market had caused reverberations in the RMBS and CDO market since the beginning of 2007.

7.      In light of these dramatic developments, CEO and Chairman Charles Prince announced his resignation.  In reaction to these developments, Citi's stock fell 4.85% to $35.90 at the close on November 5, 2007.  By the end of the week, on November 9, the stock closed at $33.10.

8.      Citi's loss in the fall of 2007 was not limited to the CDOs and increased loan loss reserves.  Citi had sponsored certain off-balance-sheet entities, known as structured investment vehicles ("SIVs"), which sold short-term debt and then invested in longer-term instruments such as RMBS and other subprime-related assets.  Citi did not clearly identify the SIVs in its public filings until the third quarter of 2007.  However, during the summer of 2007, as the credit markets tightened, SIVs found it difficult both to issue new commercial paper to refinance their operations and to sell off their assets, whose value had become questionable.

9.      Throughout the fall of 2007, market concern increased regarding Citi's obligation to support its SIVs.  News reports discussed how banks could face liabilities for the SIVs they sponsored, and in mid-October, word leaked of a potential rescue fund that a group of banks was working to create.  In the meantime, Citi had taken small steps to support its SIVs.  While it disclosed these efforts, it maintained the position that it was not contractually obligated to support the SIVs and therefore did not have to consolidate them on its balance sheet.

10.      In mid-December 2007, after rating agencies downgraded the debt of several SIVs and Citi had conceded that the total assets of its SIVs were worth $66 billion, not the $83 previously reported, the Company announced that it would "provide a support facility" for its SIVs.  Belatedly, Citi consolidated the SIVs on its balance sheet, as it should have when the SIVs were first created.

11.      On January 15, 2008, Citi reported record-breaking losses for the fourth quarter of 2007 – a staggering $9.83 billion, resulting from write-downs of $18.1 billion and increased credit costs of $12.7 billion.  Citi disclosed another $10.5 billion in CDO exposures, which Citi had hedged through contracts with monoline insurers.  In total, Citi eventually disclosed over $65 billion in CDO exposure.  However, even when Citi disclosed its CDO exposure, it

continued to misrepresent the quality and value of its remaining holdings. In constructing its valuation model, Citi disregarded market information, industry knowledge, and even its own internal analysis as to how these assets should be valued.

12. Along with its fourth quarter results, Citi announced various efforts undertaken to raise capital, including roughly $11.8 billion that had already been secured. Thus, while the results were dismal, Citi gave its investors the impression that it was taking the necessary steps to reverse course. Still, the market reacted sharply. On January 15, 2008, the stock closed down over 7%, from $29.06 to $26.94. By the end of that week, Citi's stock price had fallen to $24.40.

13. What investors did not know is that the massive losses announced in January 2008 – as bad as they were – were actually understated. If Citi had taken the appropriate write-downs and increased its loan loss reserves earlier, its losses would have been materially greater and its Tier 1 capital ratio – which measures a bank's capital as a percentage of its risk-weighted assets – would have been reduced. Because Citi was highly leveraged, even a small increase in losses among its riskiest assets would have sent its Tier 1 capital ratio below the 6% threshold required by regulators for a "well capitalized" bank. Falling below this threshold would have triggered regulatory scrutiny and set off an alarm to investors, putting the bank at risk of insolvency.

14. For the first two quarters of 2008, Citi misled the market by issuing public statements to the effect that the Company had turned a corner, with losses decreasing each quarter. For example, when Citi announced its first quarter results on April 18, 2008, those losses were lower than those from the fourth quarter of 2007, with lower write-downs and a smaller increase in loss reserves. However, as would later be revealed, Citi was required to take much more substantial write-downs and to increase its loss reserves by a greater amount during

the quarter.  Had it done so, its results would have painted a far less rosy picture.  In truth, Citi's loan loss reserves continued to be inadequate in light of its mounting mortgage defaults, and it still failed to take adequate write-downs on the CDOs it had retained.

15.     In August 2008, further bad news arrived.  The SEC and the New York Attorney General announced a settlement with Citigroup in relation to its involvement in the auction rate securities ("ARS") market.  ARS are investments that had been sold as alternatives to money market funds, supposedly with the same degree of liquidity.  However, unbeknownst to investors, Citi had been propping up the market during the summer and fall of 2007, in order to provide liquidity when demand fell short.  In February 2008, Citi could not continue supporting the auctions and the market seized.  Floods of customer complaints ensued, and various regulatory entities immediately launched investigations.  It turned out that Citi had been holding ARS, acquired when it was supporting the auctions, which it could not re-sell.  In addition to the ARS securities it already held, Citi was now going to have to repurchase $7.3 billion of its clients' ARS as part of a settlement.

16.     By mid-September 2008, the financial markets were reeling in the wake of the Lehman Brothers collapse.  Citi executives held morale-boosting sessions with employees and floated positive messages in the press, with CEO Vikram Pandit trumpeting the Company as a "pillar of strength in the markets."  But within a month, Citi's true condition – and Defendants' deception – was revealed.

17.     On Tuesday, October 14, 2008, Citi received its first infusion of bail-out funds from the federal government.  Two days later, on October 16, the Company released its third-quarter earnings.  Citi had not, in fact, turned a corner; the Company's losses *increased* by $600 million, or $0.11 per share.  Citi announced yet another $4.4 billion in write-downs and another

$3.9 billion increase in its loan loss reserves.  By Friday, October 17, 2008, Citi's stock had fallen from $18.62 to $14.88, nearly double the decline in the S&P 500 during that time.

18.     The situation deteriorated further in November 2008.  On November 17, Pandit held an employee Town Hall meeting.  While he again noted Citi's strong capital position, the market was skeptical.  Then, on November 19, Citi announced it would have to unwind its SIVs, taking a $17.4 billion hit in the process.  The damage to Citi's stock was dramatic.  After word surfaced of the Town Hall meeting, the price fell from $9.52 to $8.89.  Then, after the news on the SIVs, the stock fell 23% in a single day, to $6.40.  By Friday, November 21, 2008, the stock closed at $3.77, with trading volume shooting up to 1 billion.

19.     After an emergency weekend session with the government and Citi's board, the parties announced a $326 billion bail-out package on Sunday, November 23, 2008.  The government would provide $301 billion in loan guarantees, largely to guarantee the at-risk subprime mortgages and toxic assets Citi could not sell.  Analysts noted that Citi had been touting the Company's soundness while at the same time negotiating with the government for the bail-out.

20.     Without the federal government's bail-out package the Company may well have gone under.  But even that effort was not enough to stop the bleeding.  Starting on January 10, 2009, reports circulated about Citi's precarious condition and the prospect of it selling Smith Barney, its profitable brokerage arm, in order to generate cash.  This move signaled desperation to Citi's investors, and the stock fell from $6.75 to $5.60 on this news.

21.     Amid continued discussion of Citi's viability, on January 16, 2009, Citi released its earnings for the fourth quarter of 2008, which were worse than predicted – an $8.3 billion loss, or $ 1.72 per share.  Citi's stock price collapsed, closing at $3.50 on January 16.

22.     In less than two years, from October 15, 2007, through January 16, 2009, Citi's stock price fell almost 93%, from $47.72 to $3.50.  It performed worse than the Dow, the S&P Financial Index, and individual peers such as Bank of America, Goldman Sachs, and JPMorgan. What now remains of this former giant is Citicorp, the unit that retains its profitable business lines, and Citi Holdings, created largely to manage the toxic assets that were central to Citi's collapse.  In June 2009, Citi was removed from the Dow Jones Industrial Average.

23.     Plaintiffs now bring suit to recover the losses they incurred as a result of their purchases of Citi securities during an approximately four-year period running from January 1, 2004 to January 15, 2009 (the "Relevant Period").  Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.     JURISDICTION AND VENUE

24.     The claims herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated under the Exchange Act.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1332.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as Citigroup is headquartered in this District and most of the untrue statements and omissions were made in or issued from this District.  Many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

27.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.   Plaintiffs

28.     Plaintiff International Fund Management S.A. ("IFM") is an investment fund management company established under Luxembourg law and based in Luxembourg.  IFM is a subsidiary of DekaBank Deutsche Girozentrale ("DekaBank"), one of the largest German financial institutions and services providers, with assets under management in its subsidiaries of more than €160 billion, and group locations in Germany, Luxembourg and Switzerland.  IFM is a 100% subsidiary of DekaBank and a Luxembourg fund management company of mutual funds known as "fonds commun de placement" or "FCPs."  Under Luxembourg law, a manager of FCPs has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs.  During the Relevant Period, IFM purchased 4,906,200 common shares of Citigroup on behalf of the FCPs it managed, for a total of $147 million.  Because Defendants' public disclosures were materially false and misleading, the FCPs managed by IFM lost in excess of $85 million on these investments.  As IFM makes all investments in its own name, and also pursuant to applicable Luxembourg law, IFM has standing to pursue this action for the economic benefit of the FCPs in which the investments are allocated.

29.     Plaintiff Deka International S.A. Luxemburg ("DIL") is an investment fund management company established under the laws of Luxembourg and is a 100% subsidiary of DekaBank.  DIL is a Luxembourg fund management company of FCPs, and as such it has exclusive authority to make investment decisions for the FCPs it manages, and to bring suit to recover any losses incurred by those FCPs.  During the Relevant Period, DIL purchased more

than 1 million common shares of Citigroup common stock on behalf of funds it managed, for which it paid more than $38 million. Because Defendants' public disclosures were materially false and misleading, the funds managed by DIL lost in excess of $7 million on these investments. As DIL makes all investments in its own name, and also pursuant to applicable Luxembourg law, DIL has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

30.     Plaintiff Deka FundMaster Investmentgesellschaft mbH ("DFM") is an investment and fund management company established under the laws of Germany and is a subsidiary of DekaBank. DFM is known as a Kapitalanlagegegesellschaft ("KAG") in the form of a "Master KAG," which is a fund management platform for third party institutional assets under German investment company law. Under the German Investment Act, a KAG invests the assets of a third party in its own name and makes investments in such name for the benefit of a third party. A KAG's investment power and legal ownership of the funds carries with it the right to bring legal claims, in its own name, to recover losses incurred by any funds set up by the KAG. During the Relevant Period, DFM purchased 525,397 common shares of Citigroup on behalf of funds it managed, for which it paid more than $20 million. Because Defendants' public disclosures were materially false and misleading, the funds managed by DFM lost in excess of $9.5 million on these investments. As DFM makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

31.     Plaintiff Deka Investment GmbH ("DI") is a subsidiary of DekaBank. DI is an investment company (KAG) under the German Investment Act. During the Relevant Period, DI purchased more than 2.2 million shares of Citigroup common stock on behalf of funds it

managed, for which it paid more than $82 million.  Because Defendants' public disclosures were materially false and misleading, the funds managed by DI lost in excess of $18 million on these investments.  As DI makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

32.    Plaintiff BayernInvest Kapitalanlagegesellschaft mbH ("Bayern-Invest") is a wholly owned subsidiary of Bayerische Landesbank, the Bavarian state bank.  Bayern-Invest is a KAG and functions as a "Master KAG" under German investment company law.  During the Relevant Period, Bayern-Invest purchased 485,769 common shares of Citigroup on behalf of funds it managed, for which it paid more than $20 million.  Because Defendants' public disclosures were materially false and misleading, the funds managed by Bayern-Invest lost in excess of $11 million on these investments.  As Bayern-Invest makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

33.    Plaintiff HansaInvest Hanseatische Investment-GmbH ("Hansa") is one of the oldest investment firms in Germany, and manages assets of approximately €9 billion in over 90 public and 30 special funds.  Hansa is a KAG and functions as a "Master KAG" under German investment company law.  During the Relevant Period, Hansa purchased 454,800 common shares of Citigroup on behalf of funds it managed, for a total purchase price of more than $15 million.  Because Defendants' public disclosures were materially false and misleading, the funds managed by Hansa lost in excess of $5.8 million on these investments.  As Hansa makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

34.     Plaintiff Metzler Investment GmbH ("Metzler") is a Frankfurt-based German fund management company organized according to the German Investment Act.  Metzler is a KAG under German investment company law.  During the Relevant Period, Metzler purchased more than 2 million common shares of Citigroup on behalf of funds it managed, for a total purchase price of more than $75 million.  Because Defendants' public disclosures were materially false and misleading, the funds managed by Metzler lost in excess of $24 million on these investments.  As Metzler makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

35.     Plaintiff Nord/LB Kapitalanlagegesellschaft AG ("Nord/LB") is a German fund management company with over €8 billion under management.  Nord/LB is a KAG and functions as a "Master KAG" under German investment company law.  On behalf of funds it managed, Nord/LB purchased 260,110 common shares of Citigroup during the Relevant Period, for which it paid more than $11 million.  Because Defendants' public disclosures were materially false and misleading, the funds managed by Nord/LB lost in excess of $5.4 million on these investments.  As Nord/LB makes all investments in its own name, and also pursuant to applicable German law, it has standing to pursue this action for the economic benefit of the funds in which the investments are allocated.

36.     Plaintiff Swiss Life Investment Management Holding AG ("SLIM") is a subsidiary of Swiss Life Holding AG.  SLIM is the direct or indirect parent company of Swiss Life Asset Management AG, Swiss Life Funds AG, Swiss Life AG, and Anlagestiftung Swiss Life, which collectively purchased 595,343 common shares of Citigroup during the Relevant Period.  These securities were purchased for $29 million using Swiss Life insurance premiums

received and, as a result, SLIM was the owner of those securities at all relevant times and has standing to pursue this action.  Because Defendants' public disclosures were materially false and misleading, SLIM lost in excess of $4.9 million on these investments.

37.    Plaintiff City of Richmond is the capital of the Commonwealth of Virginia.  City of Richmond sues on behalf of the City of Richmond Retirement System ("RRS").  RRS, established in 1952, manages the pension assets for the public workers of the City of Richmond. RRS manages assets totaling approximately $550 million for its more than 9800 members. During the Relevant Period, RRS purchased 86,225 shares of Citigroup common stock, for which it paid more than $4 million.  Because Defendants' public disclosures were materially false and misleading, RRS lost approximately $1.5 million on these investments.  Plaintiff City of Richmond has standing to pursue this action on behalf of RRS.

38.    During the Relevant Period, in addition to their purchases of Citigroup common stock, Plaintiffs purchased various debt securities issued by Citigroup, including but not limited to securities with the following ISIN numbers: AU300CGRP031, AU300CGRP049, AU300CGRP056, AU300CGRP064, AU3CB0017028, AU3CB0017036, AU3FN0001749, CA172967DJ71, CA172967DX65, CA172967EB37, CA17310ZEQ06, CH0018140878, CH0022549015, CH0022549122, CH0024683192, CH0026791225, CH0027670329, CH0027670352, CH0029365100, CH0030911819, DK0030059092, JP584119A594, JP584119A768, JP584119A875, JP584119B360, JP584119B592, JP584119B766, JP584119C2C8, JP584119C368, JP584119C590, JP584119C764, JP584119D2C7, JP584119D366, JP584119D598, JP584119D762, JP584119E2C6, JP584119E364, JP584119E596, JP584119E760, JP584119F593, JP584119F767, NZCPRDT001C3, NZCPRDT002C1, TH093403L706, TH093403LC07, TH093403R406, US172967AL52,

US172967AM36,    US172967AQ40,    US172967AR23,    US172967AS06,    US172967AZ49,

US172967BC45,    US172967BJ97,    US172967BL44,    US172967BP57,    US172967BU43,

US172967BW09,    US172967BZ30,    US172967CC36,    US172967CE91,    US172967CK51,

US172967CQ22,    US172967CS87,    US172967CT60,    US172967CU34,    US172967CV17,

US172967CX72,    US172967CY55,    US172967DA60,    US172967DC27,    US172967DD00,

US172967DE82,    US172967DH14,    US172967DL26,    US172967DM09,    US172967DP30,

US172967DQ13,    US172967DR95,    US172967DS78,    US172967DU25,    US172967DW80,

US172967DY47,    US172967DZ12,    US172967EA51,    US172967EC18,    US172967EG22,

US172967EH05,    US172967EJ60,    US172967EK34,    US172967EL17,    US172967EM99,

US172967EN72,    US172967EP21,    US172967EQ04,    US172967ER86,    US172967ES69,

US172967ET43,    US172967EU16,    US172967EV98,    US172967EW71,    US172967EY38,

US173094AA18,    US17313UAA79,    US17313UAB52,    US17313UAC36,    US17313UAE91,

USU17406CE41,    XS0101328432,    XS0116066449,    XS0118237188,    XS0168658853,

XS0168860509,    XS0173603969,    XS0180008905,    XS0180032103,    XS0185490934,

XS0188201296,    XS0193765673,    XS0195612592,    XS0197646218,    XS0213026197,

XS0216282557,    XS0221793499,    XS0226062981,    XS0233760247,    XS0233761138,

XS0236075908,    XS0243636866,    XS0245936496,    XS0248814401,    XS0253421514,

XS0256739722,    XS0257598341,    XS0258939643,    XS0259257003,    XS0263792615,

XS0267537248,    XS0270148793,    XS0273390939,    XS0273437169,    XS0274259331,

XS0277974076,    XS0282530954,    XS0284710257,    XS0289239963,    XS0301080197,

XS0303074883,    XS0306605956,    XS0306606418,    XS0306606921,    XS0316522787,

XS0320479123,    XS0332831055,    XS0335121397,    XS0335160296,    XS0350626965,

XS0354858564,    XS0355738799,    XS0371091777,    XS0372391945,    XS0381986453,

XS0433943718, XS0443469316, and XS0449155455.  Plaintiffs sustained damages on these investments as a result of Citigroup's public statements being materially untrue and incomplete. Plaintiffs have standing to pursue claims to recover these damages for the same reasons they have standing to pursue claims to recover damages on their investments in Citigroup common stock.

      **B.**    **<u>Defendants</u>**

             **1.**    **<u>Citigroup</u>**

      39.    At all relevant times herein, defendant Citigroup Inc. ("Citigroup" or "Citi" or the "Company") has been a diversified global financial services holding company, incorporated under the laws of the State of Delaware, and headquartered at 399 Park Avenue, New York, New York.  Citi offers a broad range of financial services to consumer and corporate customers, with more than 200 million customer accounts and operations in more than 100 countries.  As of December 31, 2008, Citigroup reported total assets of approximately $1.9 trillion, and 2008 revenues of close to $53 billion, down from over $86 billion in 2006.  In terms of assets, as of June 30, 2008, Citigroup ranked as the eighth largest bank in the world, and the second largest bank in the United States, behind JPMorgan Chase.

             **2.**    **<u>Individual Defendants</u>**

      40.    Defendant Charles "Chuck" Prince ("Prince") served as Citi's Chief Executive Officer ("CEO") from October 2003 until November 4, 2007, when he resigned in the wake of revelations of large losses stemming from Citi's CDO exposure.  He also served as Citi's Chairman from April 18, 2006 through November 4, 2007.  Defendant Prince signed Citi's Form 10-K filings for the years 2003 through 2006, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K filings and Citi's Form 10-Q filings for each quarter through the third quarter of 2007 did not contain any untrue statement of

material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations.  Prince was also quoted in Citi's press releases, participated in conference calls with securities and market analysts.  As an executive officer of Citi, Defendant Prince was responsible for the day-to-day operations of the Company. Defendant Prince is responsible for Citi's untrue statements and omissions complained of herein that were made prior to November 4, 2007.

41.     Defendant Vikram Pandit ("Pandit") has served as Citi's CEO from December 11, 2007 through the present.  Defendant Pandit signed Citi's Form 10-K filings for 2007 and 2008, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K filings and Citi's Form 10-Q filings for the first three quarters of 2008 did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations. Pandit was also quoted in Citi's press releases, and participated in conference calls with securities and market analysts.  As an executive officer of Citi, Defendant Pandit is responsible for the day-to-day operations of the Company.  Defendant Pandit is responsible for Citi's untrue statements and omissions complained of herein that were made after December 11, 2007.

42.     Defendant Gary Crittenden ("Crittenden") served as Chief Financial Officer ("CFO") of Citi from March 12, 2007 until March 2009.  He subsequently served as Chairman of Citi Holdings until July 9, 2009, when he resigned to join a private equity firm.  Crittenden signed Citi's Form 10-K and 10-Q filings for 2007 and 2008, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K and 10-Q filings did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations.

Crittenden also participated in conference calls with securities and market analysts.  As a senior executive officer of Citi, Crittenden was responsible for the day-to-day operations of Citigroup and his behavior is central to Citigroup's misconduct.  Defendant Crittenden is responsible for Citi's untrue statements and omissions complained of herein that were made after March 12, 2007.

43.     Defendant John C. Gerspach ("Gerspach") served as Citi's Chief Accounting Officer and Controller from March 2005 through July 9, 2009, when he became the Company's CFO.  Defendant Gerspach signed Citi's Form 10-Q and 10-K filings for 2005 through 2008. Defendant Gerspach is responsible for Citi's untrue statements and omissions complained of herein that were made during his tenure at the Company.

44.     Defendant Steven Freiberg ("Freiberg") was the CEO of Citi's Global Card Division, formerly known as the Global Consumer Group.  This unit was responsible for consumer lending, including residential mortgages.  Defendant Freiberg made representations at investor conferences regarding Citi's mortgage lending practices and the strength of its mortgage portfolio, including a conference held on September 12, 2007.

45.     Defendant Robert Druskin ("Druskin") was Chief Operating Officer ("COO") of Citigroup and a member of the Office of the Chairman from December 11, 2006 until his retirement in December 2007.  During that period, he supervised all aspects of the business and was a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007. Prior to becoming COO of Citigroup, Druskin had been a senior executive in the Citigroup Corporate and Investment Banking Group ("CIB"), serving as its President and COO from August 2002 until December 2003 and as its CEO since December 2003.

46.     From 2004 until October 2007, Defendant Thomas G. Maheras ("Maheras") was the CEO of the Company's Global Capital Markets, a division of Citi Markets and Banking, which arranged the CDOs and other Variable Interest Entities.  From January 2007 through October 2007, Defendant Maheras was also Co-President of Citi Markets and Banking, and was Co-Chair of Citi Markets and Banking from May 2007 through October 2007.  Maheras was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements.  Defendant Maheras was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

47.     Defendant Michael Stuart Klein ("Klein") was Chairman of the Institutional Clients Group and Vice Chairman of Citigroup from March 2008 until July 21, 2008. Previously, Klein was Chairman and Co-CEO of Citi Markets and Banking, and had been CEO of Global Banking from 2004 until he became Co-CEO of Citi Markets and Banking on January 20, 2007 Klein was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements.  Defendant Klein was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

48.     The defendants identified in ¶¶ 40-47 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and Citigroup are collectively referred to herein as the "Citigroup Defendants."

49.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Citigroup, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants ascertained such information through Citigroup's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts,

and employees, attendance at management and/or Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Citigroup officers and/or directors.

50.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's various SEC filings, press releases and other public statements during their tenures at the Company.   Further, as officers and directors of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, risk, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

51.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the Company's public filings, press releases and public statements were products of the collective actions of those Individual Defendants who were members of the Company's board of directors and/or senior management when those statements were issued.

### 3.     KPMG LLP

52.     Defendant KPMG LLP ("KPMG") is an audit, tax and advisory company which has served as the Company's outside auditor since 1969.   KPMG issued unqualified audit opinions on the annual financial statements of Citigroup which were contained in the Company's 2004 Annual Report on Form 10-K, filed on February 28, 2005 ("2004 Form 10-K"); its 2005

Annual Report on Form 10-K, filed on February 24, 2006 ("2005 Form 10-K"); its 2006 Annual Report on Form 10-K, filed on February 23, 2007 ("2006 Form 10-K"), and in its 2007 Annual Report on Form 10-K, filed on February 22, 2008 ("2007 Form 10-K").

## IV.   BACKGROUND

### A.   Subprime Mortgages Become Attractive To Lenders

53.      For lenders, the historically-underserved "subprime borrower" became a very attractive source of potential profit during the early-to-mid 2000s.  In broad terms, a subprime borrower is generally one who has a high debt-to-income ratio (usually 50% or greater), an impaired or minimal credit history, or some other characteristic that is associated with a higher risk of default.

54.      Lenders typically rely on the Fair Isaac Credit Organization ("FICO") credit score to classify a borrower as "prime," "nonprime," or "subprime."  FICO defines the FICO score, which ranges from 300 to 850, as "the standard measure of U.S. consumer risk" and "the recognized industry standard in consumer credit risk assessment."  A borrower with a FICO score below 660 is generally labeled "subprime."

55.      Additionally, "subprime," when used to describe mortgages, may refer to loans sharing certain underwriting characteristics that increase the likelihood of default, often because the borrower cannot satisfy the underwriting criteria employed for conforming, prime loans.  The underwriting features associated with subprime mortgages include: (1) high loan-to-value ("LTV") ratios, often in excess of 80%; (2) minimal or no down payment; (3) low introductory, or "teaser" rates; (4) the option to pay less than the monthly principal and interest payment; and (5) minimal or no documentation or verification of borrower income or assets (otherwise known as "stated income," "no income/no asset verification," "NINA" or "no-doc" loans).  Depending

on the collateral and the lender's underwriting criteria, loans bearing some of these hallmarks may be classified as "Alt-A" or "nonprime," a category falling somewhere between prime and subprime.

56.     The LTV ratio is particularly important in assessing the risk associated with a subprime loan.  The LTV ratio compares the amount loaned to the total appraised value of the property.  For example, if a borrower obtains a mortgage for $70,000 to purchase a house worth $100,000, the LTV ratio is 70%.  Lower LTV ratios are indicative of less risk for two reasons. First, a borrower with a low loan balance relative to the value of the property is less likely to default, because he has too much equity at stake to risk losing the property if he defaults. Second, in the event of default, the built-in equity cushion protects the lender from loss, because even after the costs of foreclosure are factored in, the lender is still at a greater likelihood of recouping the original loan amount.

### B.     The Proliferation Of Financial Instruments Backed By U.S. Residential Mortgages

57.     Lenders were motivated to engage in riskier lending practices, such as subprime lending, because of the expansion in the market for securities backed by pools of mortgages. These mortgage-backed securities ("MBS") and CDOs enabled lenders to sell mortgages to third parties, thereby transferring the risk of delinquencies and defaults on the mortgages they originated.  Thus, lenders could generate profits by ramping up originations, regardless of loan quality.

58.     MBS and CDOs are types of asset-backed securities ("ABS").  ABS are not a new concept, as the Government National Mortgage Association ("Ginnie Mae") had been bundling and selling securitized mortgages as ABS for years.  However, the collateral underlying Ginnie Mae's ABS was subject to strict criteria that earned these securities "AAA" ratings from the

credit rating agencies.  As the real estate market exploded, the ABS were used as the platform to propagate new, more creative financial instruments that often bundled and re-bundled subprime mortgages or loans to borrowers with less-than-stellar credit.

59.     For instance, RMBS bundled subprime residential mortgages.  To create an RMBS, an originator or underwriter purchased a large number of individual residential mortgages (often numbering in the thousands) from banks and/or non-bank mortgage lenders (*e.g.*, Citigroup).  Generally, the mortgages underlying an RMBS possessed similar characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that they could be pooled together and rated accordingly.

60.     Once the originator or underwriter purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold them to a "special purpose vehicle" ("SPV").  An SPV is a separate, bankruptcy-remote legal entity created by the originator in order to transfer the risk of the mortgages off the originator's balance sheet.  The SPV takes title of the individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool. RMBS are issued in several unequal classes called tranches, ranging from "High Grade" (AAA and AA-rated bonds), to "Mezzanine" (BBB- to B-rated bonds), to an unrated equity tranche sometimes called the "residual."

61.     The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages through the prioritization of payments and the apportionment of losses among the different classes.  Typically, the AAA-rated tranche of the RMBS received first priority on cash flows from the borrowers on the underlying mortgages (otherwise known as "remittance payments") but received a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders received the highest return on their investment because

the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experiences defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

62.     In most instances, an RMBS originator or underwriter worked closely with one of the three rating agencies, Moody's Investors Service ("Moody's"), Standard & Poor's ("S&P") or Fitch Ratings ("Fitch"), to determine the right combination of mortgages to include as collateral for a given RMBS.  The goal for an originator or underwriter was to fill each mortgage pool with high-interest-paying but riskier collateral that would still allow for an AAA-rated class of RMBS.  Riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans to compensate the lender for taking on the additional risk.  By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV.  This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

63.     Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors.  The SPV transferred proceeds from the sale of the RMBS to the originator in consideration for the underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

64.     The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), illustrates the creation and structure of a typical RMBS issuance:



66.     While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective.  Citigroup, among others, was also involved in developing more complex structured finance products designed to profit from subprime RMBS, most notably CDOs.

67.     Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  It is created in very much the same way as RMBS, the key difference being that while RMBS are backed by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches.

68.     Just as with RMBS, CDO originators amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO.  Instead of warehousing residential mortgages, a CDO originator collected tranches of RMBS.  In the course

of this process, the CDO originator had to evaluate the quality of the RMBS tranches that would be used to collateralize the CDO.  In other words, the originator had to decide if it was creating a "Mezzanine CDO," which typically would be collateralized by lower BBB/BB-rated RMBS tranches, or a "High Grade CDO," which typically would be collateralized by AAA/AA-rated RMBS tranches.

69.     CDO originators earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors.

## C.     Citigroup's Involvement In Mortgage-Related Activities

70.     Citigroup was an active participant in both the mortgage origination and securitization industries during the Relevant Period, and its eventual losses were precipitated by its activities on both fronts.

### 1.     Subprime Lending Fuels Citi's Bottom Line

71.     Beginning in 2005, Citi aggressively expanded its subprime lending, both through direct originations and through purchases from third parties known as "correspondent" lenders. By 2006, Citi was the fourth-largest mortgage originator, with $132.9 billion in loan originations in the first nine months of that year.  Citi's first mortgage portfolio grew to $150 billion by the end of 2007.

72.     By expanding its loan originations, Citi generated a pool of mortgages it could then bundle into RMBS, which it could then bundle into CDOs, both of which were then often sold to Citi-sponsored SIVs.  Thus, the same loans became a source of revenue multiple times, and fueled Citi's growth in both its lending and banking businesses.

## 2. Citi's Mortgage Portfolio Included
## Large Volumes Of Subprime and Other Risky Loans

73.     Citi's expansion into subprime lending also expanded its exposure to risk of default.  By the end of 2007, Citi had direct exposure to roughly $24 billion in subprime first mortgages and roughly $63 billion of second mortgages.[1]  These second mortgages posed significant risk because, as a holder of a second lien, the lender is the last to be re-paid.  Thus, as housing prices declined and default rates increased, the risk and magnitude of losses on the second mortgages became more severe than on first liens.

74.     Additionally, Citi's portfolio was highly susceptible to losses from its high LTV (loan-to-value) loans.  By the end of 2007, Citi was exposed to over $50 billion in loans in the highest-risk category (*i.e.*, LTV of 90+%) and another $75 billion in the 80+% category, more than any of its peers.

## 3. Citigroup's CDOs

75.     Citigroup was heavily involved in the CDO market.  In 2006, Citi was the second-largest CDO underwriter, doing $34 billion in new issues.

76.     As discussed in more detail below, Citigroup's problematic CDO exposure stemmed from several sources.  First, Citi's CDOs were created based on an unrealistic model, in terms of assessing the probable losses and assigning the appropriate ratings to correspond to the different degrees of risk among the tranches.  Second, as Citi's CDOs became harder to sell, it simply recycled unsold tranches into new issues, creating increasingly inferior products, with increasingly higher risks, despite the fact that each CDO had ostensibly AAA-rated super senior tranches.

---

[1]  Second mortgages are substantially similar to home equity lines of credit, or "HELOCs," and the two terms are sometimes used interchangeably by the press and analysts.  Technically, however, a HELOC is a credit line and operates more like a credit card, where the balance and interest rates can fluctuate.

77.     Citi created its CDOs based on assumptions regarding three key factors: (1) the risk of default of the underlying asset (*i.e.*, each RMBS tranche being included in the CDO); (2) the severity of any likely loss; and (3) the degree of correlation between the underlying assets, *i.e.*, the degree to which the risk of default among the RMBS was related and not independent.

78.     Citi's assumptions regarding these three factors were problematic for several reasons.  Citi's assumptions regarding the risk of default and likely losses were completely unreasonable.  In fact, Citi's model assumed that housing prices would continue to rise by 6% each year in perpetuity.  When prices started to decline, the foundation of Citi's model crumbled, as both the risk of default and severity of default were bound to increase.

79.     Additionally, Citi's assumptions regarding the degree of correlation were unrealistic in any housing market.  Each CDO collected a basket of RMBS, which themselves collected thousands of mortgages.  Thus, each CDO appeared to have massive diversification.  However, the CDOs did not provide the degree of non-correlation necessary to make diversification effective.  Because each RMBS tranche was comprised of subprime mortgages, which grew more similar and more risky between 2004 and 2006, each tranche was actually a basket of *highly correlated* assets.  A BBB-rated RMBS tranche contained mortgages that were somewhat likely to default; a BBB-rated CDO tranche contained tens of thousands of mortgages that shared the *same* likelihood of default.  Further, the diversification provided within each RMBS was actually reversed in the CDO, as explained in a Citigroup quantitative credit strategy and analysis group report for investors.[2]  Thus, losses were likely to spread widely across the CDO and the degree of correlation actually increased with each tranche.  Accordingly, the correlation was higher for the super senior tranches, rendering these super senior tranches quite

---

[2]  *See CDO of ABS sub-prime exposure assessed*, Structured Credit Investor, Mar. 28, 2007.

vulnerable to losses from more junior tranches.  In this sense, these super senior tranches were far riskier than their name and AAA-rating would suggest.

### D.    Citigroup's SIVs

80.    Citigroup also created highly risky off-balance sheet special purpose entities called SIVs.  SIVs, which were invented by Citigroup in 1988, are essentially investment companies set up as special purpose entities ("SPEs"), which generate investment returns by borrowing money at low interest rates in the short and medium term commercial paper market, and investing that money in long-term fixed income instruments, such as mortgage backed securities and credit card debt, which pay higher interest rates.  In other words, SIVs are set up to capture the spread between lower short-term interest rates and higher long-term interest rates, a process that has been described as "yield curve arbitrage."  These SIVs also invest in CDOs and other mortgage-related securities.  All of these instruments rely on the underlying soundness of the long-term securities upon which their value is ultimately based.  Citigroup received significant fees in exchange for managing these SIVs.

81.    Citi was affiliated with seven SIVs, for which it provided management and other services.  Additionally, for reputational reasons, Citi was at all material times committed to providing a liquidity back-stop to its affiliated SIVs in the event they failed.  Because of Citigroup's explicit and implicit commitments to its affiliated SIVs, Citigroup was a "primary beneficiary" of the SIVs and was required to consolidate these entities' financial results on its financial statements and to disclose the carrying amount and classification of the consolidated assets that were collateral for the SIVs' obligations.  In violation of applicable accounting rules, Citigroup did not comply with this requirement.

82.    By failing to consolidate the SIVs on its balance sheet, Citigroup understated the risk to which Citigroup was exposed – valued at $100 billion in the second quarter of 2007 – as a

consequence of its ties to the SIVs.  The true extent of that risk did not become apparent to investors until November 19, 2008, when Citigroup disclosed that the SIVs were so impaired that it could not find a buyer.  Citi paid $17.4 billion to wind down the SIVs and bring the assets onto its balance sheet.  Simultaneously, the assets were written down by another $1.1 billion.

         **E.**      **Citigroup's ARS**

83.      Auction rate securities ("ARS") are long-term debt instruments with an interest rate set through what is referred to as an auction process.  ARS are issued by municipalities, student loan entities, corporations or closed-end mutual funds.  These instruments are essentially bonds with interest rates that reset through frequent auctions, typically every seven, fourteen, twenty-eight or thirty-five days, and their maturity is usually 30 years.

84.      The ARS issuer selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  At auction, the broker-dealer managing the process takes orders from its customers and customers of non-participating broker-dealers.  Customers bid the lowest interest rate (or dividend) they are willing to accept and the auction clears at the lowest rate of those bid that is sufficient to cover all the securities for sale.  That rate then applies to all the securities in that auction until the next auction.  If there are not enough bids to cover the ARS for sale, the auction fails and the issuer pays a maximum rate, which is either a pre-determined flat rate or a rate set by a pre-determined formula.  In such a case, a customer seeking to re-sell her ARS is left holding them.

85.      While this process might frequently leave customers holding illiquid ARS, the firms managing the auctions – including Citi - did not allow this to happen.  Instead, they would smooth out the process by buying excess ARS with their own capital.  Thus, real auctions did not occur.  As a result, the clients who purchased ARS, particularly individual investors, did not see

that the market had the potential to freeze.  This lack of transparency became problematic for Citi when the market froze in 2008.

>        **F.        Indicators That Mortgage Markets Were Deteriorating By 2005**

86.        By late 2005, three key indicators used by industry experts to assess the state of the mortgage market pointed in the direction of a slowdown in mortgage markets.  First, as illustrated by the chart below, the Housing Price Index, which measures changes in home prices, peaked in mid-2005 and declined precipitously from late 2005 through 2007:





87.        Second, as housing prices declined, interest rates began to rise from their historically-low levels:



88.    This combination was devastating for borrowers who had over-extended themselves by purchasing homes based on their ability to pay initial lower monthly payments marketed by lenders as part of "payment-option" loan products or other adjustable rate mortgages ("ARMs").  The original theory behind these mortgages was that as long as home values continued to rise, the borrower could use the increased equity to "catch-up" on their payments and refinance the mortgage when the low introductory or adjustable rate was about to expire.

89.    Unfortunately, with rising interest rates, declining home prices and expiring introductory rates, many borrowers began to experience "payment shock" as monthly payments skyrocketed to account for recasting of interest rates and resetting of payments to fully-amortizing levels.  As a result, beginning in mid-2005, mortgage default rates, the third indicator of the state of the mortgage market, rose drastically for subprime loans with variable rates, as illustrated in the chart below:



Mortgage delinquency rates, 2001–07

NOTE: The data are monthly. Prime-mortgage data extend through April 2007, and subprime-mortgage data extend through May 2007. Delinquency rate is the percent of loans ninety days or more past due or in foreclosure. Prime mortgages include near-prime mortgages.
SOURCE: First American LoanPerformance.

90.     Citi, which repeatedly touted its conservative approach, its sophisticated risk modeling tools, and its active and diligent risk management, was aware of the spike in loan delinquencies beginning in mid-2005 and witnessed a similar spike in delinquencies in its own mortgage loan portfolio.  Based on these sharp increases in mortgage delinquency rates, Citi and the Individual Defendants recognized the likelihood that many subprime and other ARM borrowers would not be able to repay loans.

**G.     Indicators That Secondary Markets For
MBS And CDOs Were Deteriorating By February 2007**

91.     The spike in mortgage delinquencies also affected the value of RMBS and CDOs, which Citigroup had amassed in its loan portfolio and which were tied to the revenue streams that the underlying subprime mortgages were supposed to generate.  This rise in delinquencies, in conjunction with declining home values and rising interest rates, made it more difficult for subprime borrowers to refinance their way out of resetting mortgages they could not afford. This, in turn, exacerbated already-deteriorating market conditions.

92.     By February 2007, it was widely recognized that this convergence of factors would materially impair even the highest rated RMBS and most senior tranches of CDOs.  This decline in value was reflected in a specialized index, the ABX.HE ("ABX Index"), which was designed in January 2006 by a consortium of banks, including Citigroup, to track the value of subprime RMBS tranches.  Specifically, the ABX Index measures the cost of purchasing protection for a subprime RMBS.  Thus, if the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value.  The American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgages.

93.     The consortium created different ABX indices to correspond to different types of underlying RMBS.  Thus, the ABX.AAA was designed to correspond to the performance of AAA-rated RMBS, whereas the ABX.BBB corresponded to the performance of BBB-rated RMBS.  Additionally, in February 2007, the consortium of banks created an index called the TABX, to track the value of different tranches of Mezzanine CDOs.

94.     As set forth in the chart below, during the first half of 2007 the value of the ABX.BBB Index plummeted, evidence that the cost of insuring subprime RMBS had increased dramatically.  This corresponds to the rise in payment delinquencies reported at the same time.

**Figure 5: ABX.BBB 06-2**



Source: Markit

95.     By February and March 2007, the ABX Index for BBB and BBB- RMBS tranches had suffered substantial declines.   The ABX.BBB 06-2 index, shown above, was down to roughly 80% of par and some BBB- tranches had dropped to approximately 60% of par. Likewise, CDO prices plummeted at every Mezzanine CDO level, including the "super senior" levels that had been retained by Citigroup during its securitization process.

96.     Thus, the escalating risks associated with RMBS and CDOs were well documented and understood early in 2007.  What was unknown to investors – but well known to Citigroup and the Individual Defendants – was that Citigroup had built up billions of dollars of these securities in its portfolios because it had retained a sizeable share of the CDO tranches that it created.

## V.     DEFENDANTS' FRAUDULENT SCHEME

### A.     Defendants Concealed Citi's Risky Lending Practices

97.     Until 2008, Citi was an industry leader in extending subprime mortgages and refinancings.  However, Citi's subprime loans were extended based on shoddy underwriting and, often, abusive and predatory terms, thereby heightening the risk that a significant number of the borrowers would ultimately default.  Citi's loan portfolio also ballooned by an increased reliance on purchases of loans from correspondent lenders who specialized in loans to high-risk borrowers on terms likely to lead to default.

98.     As the subprime mortgage market deteriorated, Citi failed to set aside adequate reserves and misstated the amount of such reserves, thereby overstating the Company's income by billions of dollars (since the reserves should have been charged against the income).  In contravention of SEC guidance and rules, Defendants failed to disclose to investors known risks regarding Citi's subprime portfolios and products and concealed the fact that, as the subprime crisis unfolded, Citi stood to lose billions of dollars.

99.     Citi's financial statements assured investors that it had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means.  For example, the Company's Form 10-K filing for the year ended December 31, 2006 ("2006 Form 10-K") issued on February 23, 2007, stated:

> The Company provides a wide range of mortgage and other loan products to its customers. **In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust**. [emphasis added]

The 2006 Form 10-K also stated that Citi mitigated risk in its mortgage portfolio by selling most of the loans it originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. **To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.** [emphasis added]

100.    In reality, however, Citigroup remained exposed to substantial subprime-related risk by virtue of its interests in CDOs and RMBS, and thus had not mitigated or transferred those risks, as it led investors to believe.

101.    Until the end of 2007, even in the face of the widespread problems with subprime loans, Citi continued its practice of denying any problems.  For example, on September 12, 2007, Defendant Freiberg, chief executive of Citi's North American consumer operations, claimed that Citi's subprime mortgage business "actually looks pretty good."  According to Freiberg, "Where you think there would be a fire – in our subprime portfolio – it  actually looks pretty good."

102.    Defendants' assurances that Citi was unaffected by the subprime mortgage crash were later proven to be blatantly false.  Only a few weeks after Mr. Freiberg's rosy public statements, on October 1, 2007, Citi admitted that it would have to increase its loan loss reserves by $1.9 billion and faced increased credit costs of $2.6 billion, mostly due to its consumer lending portfolio.  In the fourth quarter of 2007, Citi announced still another increase in its reserve build of $3.8 billion, $2.4 billion of which was in the U.S. consumer lending business. Additional losses attributable to Citi's mortgage lending were announced throughout 2008.

103.    In total, from the first quarter of 2007 through the fourth quarter of 2008, Citi increased its loan loss reserves by $15.5 billion, much of which was necessitated by its risky mortgage lending practices.  The extent of Citi's mortgage-related losses was also apparent when the Company revealed the breakdown of the federal government's loan guarantees provided in

November 2008.  Of the $301 billion in guarantees, over half – $176.5 billion – was to support Citi's mortgages.

           **B.**        **Defendants Concealed The Nature And Extent Of Citi's CDO Exposure**

104.      Defendants also failed to disclose Citi's direct exposure to CDOs backed by subprime mortgages.

105.      Citi issued billions of dollars worth of CDOs from 2004 through 2007.  In 2006, Citi was the second-largest underwriter of CDOs, doing $34 billion in new deals.  And although the subprime storm had already started to gather by the beginning of 2007, CEO Charles Prince admitted to the Financial Times in July 2007 that Citi was still engaged in its dangerous subprime dance.  In a now infamous interview, he said, "When the music stops, in terms of liquidity, things will get complicated.  But as long as the music is playing, you've got to get up and dance.  We're still dancing."  On November 3, 2007, the UK's Telegraph opined that "those words are now being carved on his corporate gravestone."

106.      On July 20, 2007, during Citigroup's second quarter 2007 earnings conference call, Defendant Crittenden reassured investors that the Company was reducing its subprime exposures, stating:[3]

> Now let me spend a minute talking about two topics, the subprime secured lending market and our leveraged lending activities.  Our subprime exposure in Markets and Banking can be divided into two categories …  The first is secured lending and the second is trading.  With regards to secured lending, we have been actively managing down our exposure for some time.  We had $24 billion in assets at the end of 2006.  It was $20 billion at the end of the first quarter and $13 billion at the end of the second quarter …

107.      On October 15, 2007, during Citigroup's third quarter 2007 earnings conference call, Crittenden again assured investors that Citigroup's sub-prime exposure was limited:[4]

---

[3] Bloomberg, Citigroup Earnings Conf. Call, July 20, 2007, at 7.

> The impact of the severe market dislocations resulted in a revenue decline of 24% and a net income decline of 74%. … $1.6 billion [came] from writedowns in mortgage-backed securities which were warehoused for future CDO or CLO securitizations as well as on CDO positions. Our subprime exposure related to these positions was $24 billion at the beginning of the year, $13 billion at the end of the second quarter, and declined slightly during the third quarter.

108.   The above statements were false. Citigroup in actual fact retained a much larger volume of subprime securitized assets, primarily CDOs, on its balance sheet. It was not until November 4, 2007 that Citi revealed an additional $43 billion in exposures, and yet another $10.5 billion came to light in January 2008. By making partial disclosures in July and October 2007 which seemed complete, Citi gave its investors false comfort that they knew the limits of the exposure.

109.   Among the nearly $54 billion in CDO exposures that were concealed from investors prior to November 2007 was $25 billion in exposures relating to Commercial Paper CDOs. Citigroup had issued these CDOs with a "liquidity put" that bound the Company to provide liquidity if a CDO's value declined and the CDO could not refinance its maturing debt. Unbeknownst to Citi's investors, during the summer of 2007, Citi had actually repurchased $25 billion in these Commercial Paper CDOs – which were backed by subprime collateral – and added that $25 billion in exposure on its books.

110.   After the extent of Citigroup's holding of subprime-related securities was later revealed in the fall of 2007, the Citigroup Defendants repeatedly issued quarterly and annual reports that materially overstated the value of those holdings. Indices tracking the market prices of CDOs indicated that, with respect to certain of Citi's holdings, the value had completely evaporated. Yet, Citi, itself a large participant in the securitization market, turned a blind eye to

---

[4] Bloomberg, Citigroup Earnings Conf. Call, October 15, 2007, at 7.

this reality and instead implemented a strategy in which it took incremental, but insufficient and untimely, write-downs in an effort to conceal the truth about its exposures and the financial impact of carrying billions of dollars of worthless assets on its balance sheet.  As of that time, the market had completely dried up and Defendants knew that taking incremental write-downs was nothing more than a postponement of the inevitable, which allowed Citi to delay acknowledging the damage done to its balance sheet from these toxic assets.

111.    Citi's 2006 Form 10-K described its strategy for valuing the assets on its balance sheet as follows:

> Substantially all of these assets and liabilities are reflected at fair value on the Company's balance sheet. Fair values are considered verified if they meet one of the following criteria:
>
> • Externally substantiated via comparison to quoted market prices or third party broker quotations;
>
> • By using models that are validated by qualified personnel independent of the area that created the model and inputs that are verified by comparison to third-party broker quotations or other third-party sources where available; or
>
> • By using alternative procedures such as comparison to comparable securities and/or subsequent liquidation prices

112.    What Citi did not disclose was that the financial models it used to determine the value of its CDOs and mortgage backed securities were highly inaccurate and entirely subjective, and that Citi knew these models were unreliable.

113.    Moreover, rather than these models being "verified" by "third party broker quotations or other third party sources," Citi worked with rating agencies to manipulate the debt ratings of its assets and then Citi used these ratings to value the assets on its balance sheet.  A 2007 report, cited in an article by professor John Coffee, Jr. of Columbia University, indicates that the conflicts of interest between investment banks such as Citigroup and the ratings agencies

led to massive and improper inflation in the ratings provided to CDOs.[5]  The article reports that corporate bonds rated Baa by Moody's, which is the lowest investment grade rating, had a default rate of 2.2% from 1983 to 2005.  On the other hand, CDOs given the same Baa rating by Moody's had a default rate of 24% over the same period – more than 10 times higher than the bond default rate.  According to Professor Coffee, the only possible explanation for this rate differential is that the ratings agencies, because of their conflict of interest, significantly inflated the ratings provided to CDOs at the behest of giant investment banks such as Citi.  Citi, because of its central involvement in the ratings process, knew that many of its CDOs were not investment grade, but it continued to carry them on its books as if they were – with no disclosure of the increased risks to investors.  On the contrary, as described above, it sought to downplay those risks.

114.     In the end, the losses on the CDOs were so severe that they were a prime cause of Citi's near insolvency, which was prevented only through the government bail-out.

### C.     Citi Creates Off-Balance-Sheet Entities To Conceal Additional Subprime Risk

115.     Citigroup also inflated its results by creating and then maintaining SIVs, highly risky investment vehicles from which Citigroup derived extremely lucrative fees in return for providing management and other services.

116.     The extent of Citigroup's relationship and commitment to its affiliated SIVs was material to investors because of the enormous risks to which SIVs are exposed, as explained below.  Yet, despite its knowledge of the precise risks of default and poor quality of underwriting of its subprime business, Citi concealed these risks from the financial markets and its investors.

---

[5]  John Coffee, Jr., *Grade Inflation*, National Law Journal, Sept. 10, 2007, at 12.

### 1.    Citi Establishes SIVs To Generate Off-Balance Sheet Cash

117.    As of June 30, 2008, Citi was affiliated with seven SIVs: (1) Beta Finance Corp.;

(2) Centauri Corp.; (3) Dorada Corp.; (4) Five Finance Corp.; (5) Sedna Finance Corp.; (6) Vetra

Finance Corp and (7) Zela Finance Corp.  At that time, these SIVs ranged in size from about

$300 million for Vetra Finance Corp. to $10.7 billion for the largest, Beta Finance Corp.  At their

peak, Citi's seven SIVs collectively owned $100 billion in assets, representing an astonishing

25% of the total assets held by all SIVs globally.[6]  By the end of 2008, these same seven SIVs

held only $17.4 billion of assets.

118.    Citi maintained significant connections with the seven SIVs.  All seven were

managed by a Citi unit called Citibank International PLC.  A 2005 Moody's Investors Service

report on Centauri stated that Citibank International PLC handled tasks such as evaluating

investment opportunities, conducting valuation of the SIV's portfolio, and arranging funding and

hedging on behalf of the SIV, all of which generated enormous and highly profitable fees for

Citi.  Citi also provided a liquidity back-stop for the SIVs, which many commentators have

described as amounting to a guarantee.  Apart from providing these myriad services to the SIVs,

Citi was at all material times committed to back-stopping its affiliated SIVs for reputational

reasons.  As a managing director of Moody's Corp.'s SIV-ratings team explained:

> [I]t is clear that a bank sponsor, particularly a large commercial
> bank, can provide options to the SIV manager that another type of
> entity cannot.  Banks have reputations to protect, in business and
> political interests far removed from the world of SIVs, and the
> blow to a bank's reputation that may be occasioned by a failure of
> a SIV may be more than the bank can tolerate. … Even where the
> bank does not invest in the capital [of the SIV], the relationship
> with capital note investors may be such that it behooves the bank

---

[6]  David Reilly, Carrick Mollenkamp & Robin Sidel, *Conduit Risks Are Hovering Over Citigroup*, Wall Street Journal, Sept. 5, 2007, at C1.

to avoid losses to capital note investors to protect that relationship.[7]

119.    These reputational concerns were real.  If investors in Citi's SIVs incurred losses, Citi itself would have experienced difficulty obtaining funding in the short-term market as investors would have identified the problems of the SIVs as the problems of Citi.

120.    Because of all of its extensive financial and reputational interests in the SIVs, Citi was at all material times committed to back-stopping the SIVs in the event they failed, but it concealed this fact from investors in order to avoid consolidating the SIVs on its balance sheet.

## 2.    Risks Associated With Citi's SIVs

121.    SIVs are subject to a number of risks, including the risk associated with their underlying investments.  Citi's SIVs were heavily invested in various mortgage-related securities – including non-U.S. and U.S. RMBS, CDOs, and CMBS (commercial mortgage-backed securities), which together comprised between 22% and 28% of those SIVs' assets.  Thus, Citi's SIVs were subject to the risks that accompanied these securities.

122.    Citi's SIVs were also highly leveraged, creating another risk.  For example, according to detailed filings with the London Stock Exchange on September 6, 2007, Beta Finance was leveraged 14.24 times.

123.    Furthermore, because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is a classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to significant "liquidity risk."  In other words, because SIVs constantly re-borrow in the short-term commercial paper market, the SIVs always face the risk that they will not be able to re-borrow if lenders in the commercial

---

[7] *Update on Moody's Perspective on the Ongoing Liquidity Crisis and the Ratings of Debt Programmes in the SIV Sector*, Moody's Special Report, Sept. 5, 2007, at 7.

paper market withdraw.  In that event, the SIVs would no longer be able to hold their long-term assets and would be required to sell them.  If there were no demand for those assets, the SIVs could be forced to sell those assets at depressed prices.

124.    The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in rating SIVs.  On March 13, 2002, Standard & Poor's published "Structured Investment Vehicle Criteria," which outlined all the criteria considered by Standard & Poor's in rating an SIV.  Among the criteria, Standard & Poor's cited the SIV's liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs issue a mixture of CP [commercial paper] and MTNs [medium term notes], their weighted-average liability maturity is usually about four to six months, whereas the assets in the vehicle will have considerably longer average maturities. Secondly, some of the SIV's assets will require due diligence by potential purchasers, thereby increasing the sale period for such assets.

### 3.    Accounting Treatment For SIVs

125.    In the wake of the Enron scandal – which involved Enron's use of off-balance sheet entities to eliminate debt from its balance sheet  – the nation's accounting rule-makers, the Financial Accounting Standards Board ("FASB"), revised the rules for accounting for off-balance sheet special purpose entities and the disclosures necessary for such entities.

126.    Prior to January 2003, under GAAP, a company had to consolidate the financial results of any entity  in which it had a "controlling interest" – a term defined as ownership of more than 50% of the entity's voting interests.  In January 2003, FASB issued FIN 46, revised in December 2003 to FIN 46(R),[8] to address the use of off-balance sheet entities in which the

---

[8]   Interpretation No. 46, *Consolidation of Variable Interest Entities* (as revised December 2003), interpreting Accounting Research Bulletin 51, Consolidated Financial Statements.

reporting company owned less than 50% of the voting interests in the entity but nonetheless bore the majority of the risks and rewards of the entity.

127.    FIN 46(R) recognizes that reporting companies may have "variable interests" in off-balance sheet entities, the combination of which may result in the reporting company bearing the majority of such an entity's risks and rewards.  "Variable interests" refer to the economic and contractual arrangements that give an enterprise the associated "rights" to gains and losses of an entity's operations.  Accordingly, FIN 46(R) requires that a reporting company consolidate the "Variable Interest Entity" or "VIE" if the company's variable interests in that VIE entity result in the company absorbing more than half of the VIE's expected losses and/or receiving more than half of the VIE's expected residual returns.  Under these circumstances, the company is deemed the "primary beneficiary" of the VIE.

128.    As explained by FASB Chairman Robert Hertz in a 2007 Bloomberg interview, "FIN 46(R) requires a company and the auditors to understand all the arrangements in the structures, both explicit and implicit, and also understand the design and intent behind those structures.…  And if there's a party at risk for a majority of the expected losses, then that party has to consolidate."[9]

129.    FASB member Tom Linsmeier has further explained that companies also must periodically reconsider if a VIE's "primary beneficiary" has changed.  Thus, implicit guarantees "must be taken into consideration both at the inception of the VIE and at specific reconsideration events – like the rollover of commercial paper in an SIV."[10]  Specifically, Linsmeier explained that "[i]f a bank sponsor in deteriorating credit markets feels it is necessary in order to protect its

---

[9]  Jonathan Weil, *Citigroup SIV Accounting Looks Tough To Defend*, Bloomberg, Oct. 24, 2007.

[10]  *Id.*

reputation to provide an implicit guarantee of additional support to a VIE, and that additional support would make it the party that is expected to absorb the majority of losses, then the bank sponsor should be consolidating the VIE."[11]

130.    Depending on whether an entity is considered the "primary beneficiary" of a VIE, FIN 46(R) provides for various disclosures.  Once a company is deemed to be the "primary beneficiary" of a VIE and is required to consolidate the VIE, the company or individual is required by FIN 46(R) to disclose, among other things, "the nature, purpose, size, and activities of the variable interest" and the "carrying amount and classification of consolidated assets that are collateral for the variable entity's obligations."  Even where the company is not considered the "primary beneficiary," FIN 46(R) provides that an enterprise that holds a "significant variable interest" in a VIE must disclose the "nature of its involvement with the variable interest entity and when that involvement began"; the "nature, purpose, size, and activities of the variable interest entity"; and the "enterprise's maximum exposure to loss as a result of its involvement with the variable interest entity's obligations."  Citi failed to comply with FIN 46(R) in all of these respects.

### 4.    Defendants Concealed Material Information Regarding Citi's Commitment To Its Affiliated SIVs

131.    The extent of Citigroup's relationship and commitment to its affiliated SIVs, as described above, was material to investors because of the enormous risks to which SIVs are exposed – including risks relating to the quality of their underlying assets, their high degree of leverage, and liquidity risk.

132.    Citi adopted FIN 46(R) as of January 1, 2004.  For many years prior to that date, and at all material times since the creation of Citi's affiliated SIVs, Citi knew of the risks to

---

[11]  *Id.*

which SIVs were exposed and, more importantly, that it would be required to back-stop the SIVs if the SIVs failed, regardless of the fact that the SIVs were maintained off-balance sheet.  For the various reasons described above, Citi was committed to ensuring that the SIVs did not fail. Indeed, by early 2007, as Citi's affiliated SIVs started to decline due to the deteriorating conditions in the credit market, and particularly the subprime market, Citi became aware that the possibility that it would have to back-stop the SIVs was being realized.

133.    Because of Citigroup's explicit and implicit commitments to its affiliated SIVs, Citigroup was a "primary beneficiary" of the SIVs and was required to consolidate these entities on its financial statements beginning in 2004, and to disclose the carrying amount and classification of the consolidated assets that were collateral for the SIVs' obligations.  Even if Citigroup was not the "primary beneficiary" of the SIVs, Citigroup held a "significant variable interest" in the SIVs and was therefore required to disclose the nature of its involvement with the SIVs; when that involvement began; the nature, purpose, size, and activities of the SIVs; and Citigroup's maximum exposure to loss as a result of its involvement with the SIVs.

134.    In each of Citigroup's financial statements for 2004 through 2007, Citigroup fraudulently failed to comply with any of these rules under FIN 46(R).  First, Citigroup failed to consolidate the financial results and liabilities of its seven affiliated SIVs as required by FIN 46(R).  Thus, for example, Citigroup's 2006 Form 10-K represented that the total assets of its consolidated VIEs was only $54.7 billion as of December 31, 2006, which excluded the assets of Citigroup's affiliated SIVs.

135.    Second, even if it were not required to consolidate the SIVs, Citigroup was required to disclose the specific items of information required by FIN 46(R) concerning those SIVs because of Citigroup's "significant variable interest" in the SIVs.  However, again,

Citigroup failed to include any such information.   KPMG, for its part, recklessly issued unqualified audit opinions on Citi's annual financial statements for the years 2004 through 2007, despite Citi's non-compliance with FIN 46(R).

136.     By keeping the SIVs off its balance sheet, the Defendants misrepresented to investors the actual risk to which Citigroup was exposed – valued at $100 billion in the second quarter of 2007 – as a consequence of its ties to the SIVs.   However, in the face of significant credit downgrades of the SIVs, Citi ultimately had to reveal that its SIVs suffered significant losses and faced the prospect of even greater losses as a result of having to sell their assets at fire sale prices in order to pay back the money they borrowed.   On December 13, 2007, Citi transferred nearly $50 billion onto its books, thereby admitting that it was exposed to the liabilities of the SIVs all along.   Still, Citigroup continued to understate the magnitude of its exposure via the SIVs.   Eventually, when the losses could not be hidden any longer, Citi admitted on November 19, 2008, that the SIVs were so impaired that it could not find a buyer. Citi paid $17.4 billion to wind down the SIVs and bring the assets onto its balance sheet. Simultaneously, the assets were written down by another $1.1 billion.

### D.     Defendants Failed To Disclose And Accurately Account For Auction Rate Securities

137.     The Citigroup Defendants' deception was not limited to Citi's subprime lending-related activities.   They also concealed from investors that Citi had accumulated over $11 billion dollars of risky, illiquid ARS, which it then had to write down significantly.   When the extent of Citi's exposure was revealed and Citi was forced to repurchase $7.3 billion of ARS from its customers, the Company's stock price declined further, causing additional damage to investors.

1.    **Citi's ARS Involvement**

138.    Citi was involved in the ARS market in several ways.  Through Citigroup Global Markets, Citi provided underwriting services for ARS issuers and managed the auction process through which the interest rates were reset and the ARS were resold.  Citi received underwriting fees from the issuers as well as fees for remarketing the ARS.  For ARS that Citi placed with its customers or held in inventory, Citi received higher fees than for other short-term instruments.

139.    Citi also marketed these ARS assets to its private brokerage clients, including retirement plans and other institutional investors.  Citi billed the ARS as highly liquid cash equivalents with "[c]ompetitive short-term interest rates compared with other money market instruments,"[12] which could be liquidated on demand at the next auction date.  Given that the ARS were billed as comparable to money market funds, Citi's customers invested funds in these instruments that might be needed for near-term expenses such as down payments on real estate, college tuition, medical expenses, or taxes.  Citi did not explain to these customers that the funds invested in ARS could become illiquid, and could remain so for long periods of time.

140.    In order to ensure that the auctions did not fail, thereby providing its clients the promised liquidity, Citi had a practice of submitting cover or support bids for the auctions in which it was the lead broker.  In other words, by buying the securities itself when there were not enough buyers at the auctions, Citi guaranteed the liquidity it had promised.

141.    If Citi's cover bid was "hit," Citi would purchase the amount of ARS necessary to prevent a failed auction and hold the ARS in its inventory until it could sell those ARS in the secondary market between auctions.  Citi would submit sell orders for any ARS it still held by the time of the next auction.

---

[12]   *Securities and Exchange Commission v. Citigroup Global Markets, Inc.*, 08-Civ-10753 (S.D.N.Y.), Complaint ("SEC Compl."), ¶ 13.

142.     Although Citi explained to its clients that Citigroup "may submit a bid in an auction to keep it from failing," Citi did not disclose that it had a practice of doing so regularly and therefore was holding unsold ARS in its inventory.  Its investors were therefore in the dark as to the possibility that the Company could be left holding illiquid assets worth billions of dollars.  Moreover, Citi's investors were unaware that Citi was deceiving its clients regarding the degree of liquidity provided by the ARS, which in turn made the Company vulnerable to claims from these clients when they later could not sell the ARS they had purchased from Citi.  Thus, the ARS made Citi vulnerable on two fronts.

### 2.     The ARS Market Is Hit By The Credit Crisis, And Citi Is Increasingly Challenged In Efforts To Support The ARS Auctions

143.     Historically, Citi's support of its ARS auctions had not been a problem for the Company.  It set a limit for capital available to purchase the ARS necessary to prevent failed auctions and its average ARS inventory, ranging from approximately $1 to $2 billion, stayed within that limit.

144.     However, beginning in the summer of 2007, the ARS market began to deteriorate.  Demand for ARS fell sharply, and failed auctions became more frequent.  Exacerbating the impact of the overall credit crunch, a FASB decision as to how to book cash equivalents was impacting the ARS market.  Whereas corporations previously had booked their ARS as cash equivalents, pursuant to the recent FASB decision, these assets would be reclassified as short-term instruments.  This decision prompted an exodus from the ARS market by corporate holders, putting additional pressure on Citi to support the auctions itself in order to replace the shrinking corporate demand.

145.     In August 2007, auctions failed for $6 billion in ARS backed by complex investments, such as MBS.  Increasingly, Citi had to purchase the ARS to prevent failed

auctions, which stressed Citi's balance sheet.  By August 2007, the dollar amount of Citi's ARS inventory had reached the internal limit it had set.  Thus, Citi had to either raise the limit or stop supporting the auctions.

146.     According to a complaint filed by the SEC against Citi in December 2008, an email dated August 16, 2007, shows that senior management were concerned about the "current state of the auction rate market, [their] commitment to the auctions, its impact on [their] balance sheet and effect of [their] actions on [their] clients" and acknowledged that their "actions will have broad-reaching implications to all of [Citi's] constituents, the market, and [its] franchise."[13]   In particular, as acknowledged in an email dated August 19, 2007, the ramifications of allowing widespread failed auctions included the risk of lawsuits by Citi customers who had been sold ARS as alternatives to money market funds.[14]

147.     Given these risks, Defendants ultimately decided to increase the balance sheet limit and continued to support the auctions.  They increased this limit additional times throughout the fall of 2007 and the beginning of 2008, in order to accommodate Citi's growing ARS inventory. By February 2008, the inventory (and balance sheet limit) had increased from approximately $2 billion to over $10 billion[15].

148.     Rather than curtail its marketing of ARS securities in light of these problems, Citi continued to market and acquire new ARS, eager to earn the fees associated with underwriting and marketing new securities.  Citi even explored opportunities to take over ARS from other broker-dealers who were struggling, even though doing so hindered its ability to continue supporting the auctions.

---

[13]  SEC Compl. ¶ 34.

[14]  SEC Compl. ¶ 35.

[15] SEC Compl. ¶ 36.

149.    Defendants were aware as the fall of 2007 progressed that the ARS market as a whole was subject to growing illiquidity.  By November, the problems had spread beyond the ARS backed by complex securities, particularly into ARS issued by municipalities, which were impacted by doubts regarding the solvency of bond insurers such as Ambac Financial Group and MBIA Inc.

150.    By early December 2007, Citi management was discussing how they would handle a widespread failure and the risk management personnel were analyzing the impact of failed auctions.  A December 7, 2007 email indicates that Citi had already determined it would let some ARS go if the market got worse, even if the damage would spread to other asset types.  Internal emails from mid-December show that Citi was prepared to let the auctions fail for student loan ARS and fully expected broader market failures.  Citi even planned its public relations strategy for the "unavoidable eventuality" of a failed auction that loomed ahead.[16]

151.    Defendants were also aware that auction failures had a potentially snowballing effect.  Failures of ARS marketed by other broker-dealers or for different types of ARS would impact the market as a whole.  As one internal Citi document from December 2007 noted: "[I]f one segment of the ARS market experiences fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market"[17] although in some cases investors can be convinced that the damage is limited to one type of ARS only.

152.    Similarly, Defendants recognized that if customers learned of the growing illiquidity of the ARS assets, their fears would fuel a sell-off, further increasing the over-supply and the pressure on Citi to support the auctions.  Thus, Citi consciously monitored the awareness

---

[16]  SEC Compl. ¶ 64.

[17]  SEC Compl. ¶ 56.

of retail customers and financial advisors about the ARS market developments, essentially to ensure that their customers did not realize they were holding assets that were rapidly losing liquidity.

153.    Despite the fact that Citi's ARS holdings had nearly tripled in the second half of 2007 while the growing illiquidity put Citi at risk of being sued by its clients, Citi did not disclose any of this risk in its Form 10-Q for the third quarter of 2007 or its 2007 Form 10-K.

### 3.    Citi Allows Auctions To Fail

154.    In late January, 2008, several auctions for municipal ARS failed for the first time in years.  By early February, the ARS market was in disarray.  On February 7, 2008, a Citi ARS trader noted:  "Panic is now clearly evident with both retail and institutional customers.  Pricing is very erratic as dealers attempt to find a new buying base for ARS."[18]

155.    Goldman Sachs let auctions fail on February 7 and 9, 2008, for securities backed by student loans.  With other major dealers such as Lehman and JPMorgan also allowing auctions to fail, it was clear by February 9, 2008, that the market was imploding.

156.    Given that Citi had already overextended itself by accumulating over $11 billion in ARS by that time, Citi recognized that it could not sustain the pattern indefinitely.  On February 11, 2008, Citi stopped supporting its student loan ARS, and those auctions failed.  On February 12, Citi stopped supporting ARS with formulaic maximum re-set rates from a variety of issuers, and those auctions all failed[19].  In total, more than 100 auctions failed, for a total of approximately $6 billion.  Thereafter, Citi allowed the rest of its managed auctions to fail.

---

[18]  SEC Compl. ¶ 69.

[19]  SEC Compl. ¶ 36.

157.     The entire ARS market, estimated at $325 billion to $360 billion, was impacted. By February 14, 2008, 87% of the auctions conducted that day failed, and by the end of the month, the market in general had seized, leaving investors with illiquid assets and issuers paying high re-set interest rates.  Well into the spring, the ARS market as a whole remained frozen.

### 4.     Defendants Continue To Conceal The Full Impact Of The ARS Market Failure

158.     In the immediate aftermath of the ARS market failures, analysts and investors focused on its impact on the issuers and on the investors who held ARS.  Various issuers, such as municipalities, hospitals, and other public entities, were suddenly faced with ballooning interest payments.  And by the end of the February 2008, purchasers left holding illiquid ARS filed the first case against another broker-dealer, UBS.  Industry experts surmised that state and/or federal regulators were looking at the issue as well, especially since the SEC had previously investigated ARS broker-dealers in 2004-2006 (including Citi) and had noted its concerns that purchasers were not adequately informed of the risks of illiquidity.  Thus, by the end of February 2008, it was clear that Citi could expect scrutiny on behalf of its clients, whether in a private suit or by government regulators.

159.     In mid-March 2008, reports surfaced that the SEC was looking at market failures in the municipal bond auction market.  By the end of March, the first class actions were filed against Citi and the Massachusetts securities regulator was investigating Citi's peers.  In mid-April, the Financial Industry Regulatory Authority ("FINRA") indicated it was investigating the ARS market, along with the SEC.

160.     In the meantime, Citi was dealing with its own retained inventory of ARS.  As an initial matter, Citi tried to sell the ARS it had accumulated.  With the market illiquid, however, it

could only sell a small portion of its holdings.  By mid-April, it had managed to sell off only $3 billion of its ARS holdings.

161.    Additionally, Citi had to determine whether to write down the remaining ARS assets, and by how much.  As early as January 2008, Bristol-Myers Squibb's decision to take a $275 million impairment charge on its ARS drew attention in the financial press, since that company had previously categorized those assets as short-term marketable securities.  By mid-February, other corporate ARS holders such as 3M and US Airways had already disclosed significant write-downs on their ARS holdings.

162.    Further, several of Citi's peers had publicly stated that they were writing down the ARS held by their clients.  In early April, UBS and Goldman Sachs indicated they would write down their clients' ARS holdings, using internal models to estimate a price in the absence of an actual market.  UBS also indicated it had marked down its own $11 billion in ARS holdings by $800 million.  Merrill Lynch marked down the values of the ARS in its own account, although it did not mark down its clients' holdings.[20]  In contrast, Citi took no position publicly on whether it was retaining its clients' holdings at face value.  Concealing its position regarding its clients' holdings also conveniently enabled Citi to conceal the necessity of writing down its own ARS holdings.

163.    Citi did not disclose the extent of its ARS holdings and the associated write-downs until April 18, 2008, when it issued its first quarter earnings report.  For the first time Citi announced that it had an ARS inventory of $8 billion, and that it had held $11 billion of illiquid ARS as of mid-February, of which $1.5 billion were already written down.

---

[20]   *See* Susanne Craig, et al., *The Auction-Rate Lockout – Values Tossed Around As Individual Investors Can't Get at Their Cash*, Wall Street Journal, Apr. 3, 2008, at C1.

164.     Even after this disclosure, Citi continued to understate its exposure in relation to the ARS issues and the impact of its own ARS holdings on its capital adequacy.  It was not until August 2008 that Citi investors learned the extent of damage stemming from Citi's obligations to the clients left holding illiquid ARS.  Pursuant to a settlement with the SEC and New York State Attorney General, Citi agreed to repurchase $7.3 billion of ARS from its disgruntled clients. Later that year, in December, when the SEC filed its complaint against the Company (in wrapping up the proceedings related to the $7.3 billion settlement), the market learned that Citi management knew as early as August 2007 that the ARS market was weakening and that it would not be able to continue to support the auctions.  Thus, as early as August 2007, the Citigroup Defendants knew that both the Company and its clients were at risk of being stuck with potentially illiquid securities, yet they failed to disclose that critical information to investors.

### E.     Defendants' False And Misleading Statements Concerning Citi's Losses Are Used To Prop Up Financial Results And Falsely Assure Investors Of Its Financial Health

165.     Capital adequacy is the level of capital a bank must hold to cover its exposure to the risk of its activities on and off balance sheet, and it is one of the primary metrics investors consider when evaluating the financial strength of institutions such as Citigroup.

166.     Each quarterly and annual report that Citigroup filed with the SEC between January 2004 and January 2009 contained a discussion of Citigroup's "Tier 1 capital ratio" and stated that Citigroup's balance sheet was "strong" and "well capitalized" under regulatory guidelines.  In fact, by no later than the end of the first quarter of 2006, Citigroup's balance sheet was neither strong nor well capitalized.

167.     Throughout 2006, Citi sustained the illusion of being a well capitalized bank by failing to make the requisite increases in its loan loss reserves.  For example, the Company was

only able to report a tier 1 capital ratio of 8.59% in its 2006 Form 10-K because its loan loss reserves had been depleted throughout the year and were understated by billions of dollars by the end of December.

168.    And in 2007, the deception continued.  Even with Citi's failure to disclose its mounting subprime-relates losses and its obligation to supports its SIVs, the Company's tier 1 capital ratio fell from 8.2% at the end of the first quarter down to 7.1% by the end of the year. Had Citi not misrepresented the extent of its exposure and the necessity to increase its loan loss reserves by at least $8 billion, investors would have seen that the Company's position was even more precarious than it appeared.

169.    Even as Citigroup's capital adequacy was in serious jeopardy in 2008 due to the impairment of billions of dollars in subprime-related assets, Citigroup continued to mislead the investing public with pronouncements of its improving financial health.  For example, in its July 18, 2008 earnings release, Citi touted its Tier 1 capital ratio and emphasized that its write-downs in its securities and banking business had decreased by 42%.  In September 2008, Pandit told the New York Times that the Company was a "pillar of strength in the markets."  Yet on October 14, 2008, this "pillar of strength" accepted $25 billion from the federal government's TARP fund.

170.    The misrepresentations still continued.  On November 17, 2008, at a "Town Hall" meeting, Citi attempted to reassure its employees that it could weather future challenges.  At the same time, it disclosed that it was reclassifying $80 billion in various unspecified assets – essentially writing them off without the associated impact on its balance sheet.  As Citi was desperately trying to stave off insolvency by finding a willing buyer and negotiating with the government about a further rescue, it offered false assurances that it had a "very strong capital and liquidity position."  But no bank was willing to take on toxic assets that could not be

properly valued.  Thus, the government was forced to prop up the Company with a $326 billion bail-out package, announced on November 23, 2008.  An article appearing in the Wall Street Journal the next day noted that the Company's claims of capital adequacy, made as recently as November 20, 2008, were made at a time when the Company's executives and directors knew the Company was in dire straits.

171.    It was not until January 16, 2009, in its earnings release for the fourth quarter of 2008, that Citi finally disclosed the assets covered by the government's $301 billion guarantee, revealing that the Company's mortgage portfolio and SIVs were likely included in the $80 billion of reclassified assets announced in November, and that Citi's exposure via these toxic assets had long been understated.

## VI.    THE TRUTH BEGINS TO EMERGE

### A.    October 2007:  Citigroup Makes Partial But Incomplete Disclosures Concerning Its Growing Losses And Subprime Exposure

#### 1.    October 1:  Citi Issues Pre-Earnings Release

##### (a)    Overall Financial Picture

172.    In the fall of 2007, the drastic consequences of Citi's reckless risk-taking started coming to the surface.  On October 1, 2007, almost three weeks before its scheduled quarterly earnings release, Citi announced that it expected a decline in net income of roughly 60% from the third quarter of 2006, an estimate subject to finalization of third quarter figures.  This announcement came as a surprise to investors, because less than three months earlier, on July 20, 2007, Citi had announced record second quarter net income of $6.23 billion, or $1.24 per share, up 18% from the second quarter of 2006.  Thus, Citigroup had initially appeared to be stronger than its peers who were faltering as the subprime crisis hit.

173.     Citi attributed its poor third quarter 2007 results to "dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment."[21]  In particular, the drop was attributed to weak performance in fixed-income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs.  Despite this news, Defendant Prince stated that the Company expected to return to a "normal earnings environment" in the fourth quarter.[22]  As discussed below, however, the worst was yet to come, as Prince already knew.  The third quarter of 2007 would turn out to be Citi's last profitable quarter until the first quarter of 2009.

**(b)     Subprime Lending**

174.     In its global consumer lending unit, Citi reported an increase in credit costs of approximately $2.6 billion compared to the prior year third quarter, caused by continued deterioration in the credit environment, portfolio growth, and acquisitions.  Roughly one-fourth of the increase (approximately $650 million) was due to higher net credit losses, and the other three-fourths were attributed to a $1.95 billion increase in loan loss reserves – more than four times the $465 million increase in reserves taken in the prior quarter.

175.     In a pre-recorded message Citi posted on its website on October 1, 2007, Defendant Crittenden explained the factors necessitating the increases in loss reserves, all of which were related to the housing market downturn and broader credit crunch, and which Citi knew about well before the third quarter of 2007 but had fraudulently failed to incorporate into its loss reserve calculations.  For example, Crittenden noted that the reserve build was partially necessitated by losses inherent in the portfolio, but not yet visible, such as borrowers making

---

[21] *Citi Expects Substantial Decline in Third Quarter Net Income*, Citigroup Press Release, Oct. 1, 2007.

[22] *Id.*

payments slightly later than usual or even into the grace period, which signals the possibility of future delinquencies. Crittenden also noted macro-economic variables such as declining residential sales as another reason for increasing the reserves, as well as higher delinquency rates in the Company's overall mortgage portfolio.

176.     While Citi conveyed the impression that the conditions requiring the increased reserves had only recently developed, the Company's loss reserves had actually been inadequate far longer. Whereas Citi had generally maintained a ratio of losses to total loans at or above 2%, the ratio had fallen below that level for the entire year 2006 and for the first three quarters of 2007. The ratio reached a low of 1.39% (and 0.99% looking at only the U.S.) in the second quarter of 2007 and was still only 1.64% by the end of the third quarter.

177.     Moreover, as Citi was increasing its volume of loans, it was decreasing the dollar amount of its reserves, causing the reserve ratio to fall based on both a lower numerator (i.e., amount of reserves) and a higher denominator (amount of loans). The reserves reached a low of $8.94 billion in the fourth quarter of 2006 and only increased marginally – to $9.51 billion – by the end of the first quarter of 2007, well after the downturn in the housing market (and associated increase in defaults) had become apparent.

178.     As the graph below demonstrates, looking at only the Company's North American consumer lending business, while the loan loss reserve ratio had stayed in the 2.0% range from the first quarter of 2003 through the third quarter of 2004, it dropped below that level in the fourth quarter of 2004, and continued to decline until it hit bottom at 0.98% in the fourth quarter of 2006. In fact, for five consecutive quarters – from the third quarter of 2006 through the third quarter of 2007 (inclusive) – the net credit loss ratio was higher than the reserve ratio. In other words, the actual losses were higher than the reserves.

# *Consumer* [(1)] *Credit Trends*



179.    However, given that housing prices started to decline in mid-2005 and interest rates began to rise at roughly the same time, by no later than mid-2006, the Citigroup Defendants knew or were reckless in not knowing that Citi's low reserves were inadequate, particularly in light of the large volume of adjustable-rate mortgages that were set to adjust in 2006 and 2007, triggering an increase in the default rate.  As the default rates increased, Citi was required to *increase* the reserve ratio above the historic averages.  Thus, even at 2%, the reserves were inadequate, but it was not until early 2008 that Citi began to increase the reserves substantially.

(c)    CDOs

180.    In its October 1, 2007 earnings release, Citi also announced write-downs of approximately $1 billion associated with subprime MBS warehoused for future CDOs and its own CDO positions.  On the recorded conference call, Crittenden explained that in January of 2007, Citi began to lower its exposure to subprime CDOs, reducing that exposure from $24 billion at the beginning of the year to $13 billion at the end of June.  But Crittenden's disclosure were false.  As was later revealed beginning just a few weeks later, *see infra* at ¶¶ 217-18, Citi actually held roughly $66 billion of CDOs.

181.    Additionally, Crittenden falsely claimed that Citi "typically ha[d] sold the lowest rated tranches of the CDOs and held onto most of the highest rated tranches, where historically

values ha[d] been stable" and only declined during the summer when rating agencies changed their methodology and instituted certain downgrades.[23]   In reality, the Citigroup Defendants knew that Citi frequently retained the riskiest tranches, which it then repeatedly attempted to repackage in yet another CDO issue, to avoid being stuck with these undesirable assets.

### 2.   October 15, 2007:  Citi Announces Third Quarter Results

182.   On October 15, 2007, Citi formally released its third quarter results, reporting net income of $2.2 billion, or $0.44 per share, a drop of 60% from the prior year third quarter – as predicted in the October 1, 2007 press release.  However, in the two-week span between the earnings preview and the actual report, total write-downs increased from roughly $2.6 billion to roughly $2.9 billion.  Citi attributed this $300 million difference to a "refinement of [its] calculations" as it went through the quarter-ending closing process.[24]  Additionally, the charge to build loan loss reserves increased by $290 million from $1.95 billion to $2.24 billion, reflecting accelerating delinquencies in the Company's U.S. mortgage portfolio during the month of September.  Thus, Citi's fortunes had declined by approximately $600 million in that two-week period.

183.   In the conference call with analysts held later that day, Prince acknowledged that although the general market dislocation had caused some of the Company's problems, "some of [the Company's] losses in Structured Credit and Credit Trading were greater than would have been expected from that market dislocation and simply reflect poor performance."[25]  Crittenden

---

[23]  Oct. 1, 2007 Recorded Call Transcript at 3, attached as Exhibit 99.2 to Citigroup Form 8-K, filed Oct. 1, 2007.

[24]  Fair Disclosure Wire, Citigroup Earnings Conf. Call, Oct. 15, 2007, at 3.

[25]  *Id.* at 2.

echoed Prince, noting that "there is no question that [Citi] underperformed certain competitors even considering turbulent market conditions."[26]

> **B.  Early Fall 2007:  Citi Makes Partial But
> Incomplete Disclosures Regarding Its SIV Exposure**

184.   In August 2007, as the credit markets tightened based on fears of sub-prime mortgages and securities backed by such mortgages, SIVs globally were confronted with a one-two punch.  On the one hand, the short-term commercial paper market dried up, restricting the ability of the SIVs to re-borrow to finance their operations.  On the other hand, the SIVs were unable to divest their assets because of investor fears as to the quality of these assets given the problems with sub-prime mortgages.  Citi's SIVs did not escape these problems.

185.   On September 5, 2007, despite Citi's denials, investors began to learn of Citi's substantial exposure to its affiliated SIVs.  On that day, the Wall Street Journal published an article which stated that, although few investors realized it, banks such as Citi could find themselves burdened by affiliated investment vehicles that had issued tens of billions of dollars in short-term commercial paper:[27]

> Citigroup, for example, owns about 25% of the market for SIVs, representing nearly $100 billion of assets under management. The largest Citigroup SIV is Centauri Corp., which had $21 billion in outstanding debt as of February 2007, according to a Citigroup research report.  There is no mention of Centauri in its 2006 annual filing with the Securities and Exchange Commission.
>
> Yet some investors worry that if vehicles such as Centauri stumble, either failing to sell commercial paper or suffering severe losses in the assets it holds, Citibank could wind up having to help by lending funds to keep the vehicle operating or even taking on some losses.

---

[26] *Id.* at 7.

[27] Reilly, Mollenkamp and Sidel, *Conduit Risks Are Hovering Over Citigroup: If the Vehicles Go Sour, Rescues Could Be Costly; 'Bank Has No Concerns'*, Wall Street Journal, Sept. 5, 2007.

> Citigroup has told investors in its SIVs (which stands for
> Structured Investment Vehicles) that they are sound and pose no
> problems.
>
> "Quite simply, portfolio quality is extremely high and we have no
> credit concerns about any of the constituent assets," said a recent
> letter from Paul Stephens and Richard Burrows, directors in
> Citigroup's London-based group that oversees the bank's SIVs.
> "Citi's SIVs remain robust and their asset portfolios are
> performing well."
>
> A Citigroup spokesman declined to comment on the bank's SIV
> disclosures or potential exposure that it might face from them.

186.   Over the weekend of October 13 and 14, 2007, press reports circulated that

several major banks, including Citi, Bank of America and JPMorgan Chase, had been meeting

for at least three weeks to create a rescue fund of up to $100 billion (to be called the "Master

Liquidity Enhancement Conduit") to bail out the SIVs.  According to the Wall Street Journal[28]:

> The new fund is designed to stave off what Citigroup and others
> see as a threat to the financial markets world-wide: the danger that
> dozens of huge bank-affiliated funds will be forced to unload
> billions of dollars in mortgage-backed securities and other assets,
> driving down their prices in a fire sale. That could force big write-
> offs by banks, brokerages and hedge funds that own similar
> investments and would have to mark them down to the new, lower
> market prices.
>
> ****
>
> In recent weeks, investors have grown concerned about the size of
> bank-affiliated funds that have invested huge sums in securities
> tied to shaky U.S. subprime mortgages and other assets.  Citigroup,
> the world's biggest bank by market value, has drawn special
> scrutiny because it is the largest player in this market.

In essence, the rescue fund would have been used to purchase the assets held by SIVs, including

Citi's seven SIVs, and allow those SIVs to be unwound.  According to the Wall Street Journal

report:

---

[28]   Mollenkamp, McDonald and Solomon, *Big Banks Push $100 Billion Plan to Avert Crunch*, Wall Street Journal,
Oct. 13, 2007, at A1.

> The plan is encountering resistance from some big banks. They
> argue that Citigroup is asking others to help bail out its affiliates
> and an industry-wide bailout isn't needed. …
>
> The new fund represents a way for Citigroup and other banks to
> 'outlast the current market conditions that are so dry right now,'
> says Jaime Peters, an analyst at Morningstar Inc.

187.     By sponsoring a $100 billion rescue plan to buy the assets from the SIVs and

thereby allowing the SIVs to be wound down, ***Citi effectively admitted that it was liable for the***

***losses of the SIVs all along***.  By agreeing to take first line losses on the assets purchased by the

rescue fund, Citi made explicit its commitment to back-stop the SIVs.  Unlike JPMorgan Chase

and Bank of America, who had little or no exposure to SIVs and sponsored the fund in order to

earn fees, Citi sponsored the fund purely to protect its exposure to its seven affiliated SIVs.

188.     According to an October 15, 2007 Reuters article, entitled "Banks set up fund to

bail out investment vehicles," since hitting an all-time high of $1.183 trillion in early August, the

U.S. asset-backed commercial paper market had shrunk by nearly 25 percent during an

unprecedented nine consecutive weeks of contraction.  In short, the liquidity risk to which SIVs

were peculiarly subject was now materializing and SIVs globally were starting to fail.

189.     On Monday, October 15, 2007, the details of the ill-fated rescue plan were

announced before the market opened.  Under the plan, the rescue fund would have purchased

highly rated assets from the SIVs and sold short term debt such as commercial paper to help

finance the purchases.  However, the sponsoring banks would have been the first to take losses if

the new fund suffered losses on its assets.[29]

190.     During the Company's third quarter 2007 earnings conference call later on

October 15, 2007, Citi implicitly confirmed its financial commitment to its affiliated SIVs.

---

[29]  *See Banks set up fund to bail out investment vehicles*, Reuters, Oct. 15, 2007.

During the conference call, Citi revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons that Citi's balance sheet had deteriorated, including a decline in Citi's Tier 1 capital ratio from 7.9% to 7.4% during the course of the third quarter, falling below Citi's target of 7.5%.[30]  As Citi's CFO, Gary Crittenden, stated on the call[31]:

> Both the Tier 1 capital ratio and the [Total Common Equity] to risk weighted managed assets ratio reflect the impact of acquisitions and **additional assets such as certain leveraged loans and commercial paper which came onto our balance sheet during the quarter.** [emphasis added].

191.    Yet, during that same call, Crittenden once again asserted that Citi would only consolidate those SIVs to which it had "some kind of contractual commitment."  Crittenden did not reveal that Citi could (and would) choose to support the SIVs, even without a contractual commitment.

192.    As reported by the Wall Street Journal on October 18, 2007, under the superconduit rescue plan, the fund's sponsors will "have to pay a fee to take part, *accept a discounted price for their assets* and *help insure investors against losses.*" [32]

193.    On October 19, 2007, the New York Times published an article that revealed why Citi's non-performing "corporate loan" total had doubled to $1.2 billion in just three months, the bulk of which was a loan to shore-up an SIV.  Citi had provided a back-up line of credit to an SIV that would be called if the SIV could not borrow and a German bank could not meet its promise to make the loan.  Yet, the very facts that triggered Citi's obligation to extend the loan had occurred at the time the agreement was made and the so-called "corporate loan" was simply

---

[30]   See also David Wighton, *Citigroup still failing to stop the SIV skeptics*, FT.com, Oct. 22, 2007 (available at http://us.ft.com/ftgateway/superpage.ft?news_id=fto102220071806549804).

[31]   Bloomberg, Citigroup Earnings Conf. Call, Oct. 15, 2007, at 5-6.

[32]   Mollenkamp, Solomon, Sidel and Bauerlein, *How London Created a Snarl in Global Markets*, Wall Street Journal, Oct. 18, 2007 (emphasis added).

Citi disguising its commitments to shore-up the SIVs it managed in the event of a potential default.  As summed up by the article: "That's a neat trick.  You don't make the loan until you know it will be a bad loan."[33]

### C.   November 2007:  Citi Makes Partial But Incomplete Disclosures Regarding Additional CDO Exposure And Massive Write-Downs, And Shakes Up Its Management Team

#### 1.   November 4, 2007 Press Releases

##### (a)   Citi's Overall Picture; Prince "Resigns"

194.    On October 31, 2007 and November 1, 2007, Citi announced that it was convening an emergency board meeting over the weekend beginning November 2, to discuss its problems.   On Sunday, November 4, 2007, Citi issued a press release announcing that its Chairman and CEO, Charles Prince, was resigning and that Robert Rubin would become Chairman of the Board.  Citi also designated Sir Win Bischoff, who had been Chairman of Citi Europe, to act as CEO.

##### (b)   CDOs

195.    In another press release on November 4, 2007, Citi disclosed that its subprime-related direct exposure as of September 30, 2007 was approximately $55 billion, and not the $11.4 billion that it had previously disclosed to investors.  Citigroup's $55 billion exposure "consisted of (a) approximately $11.7 billion of subprime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs)."  Of this $55 billion exposure, Citigroup estimated that it would have to write down between $8 billion and $11 billion.

---

[33]  Floyd Norris, *No Way to Make a Loan*, New York Times, Oct. 19, 2007, at C1.

196.    The $11.7 billion of subprime exposure in the lending and structuring business represented a reduction from the $13 million that reportedly existed as of June 30, 2007. However, the $43 billion of super senior exposure had never before been disclosed at all.  In fact, $25 billion of this new exposure was added to Citi's books during the summer, when it repurchased the Commercial Paper secured by CDOs pursuant to the liquidity put that accompanied this particular securitization.  Crittenden conceded that the remainder of the $43 billion exposure had accumulated over time.  Yet this subprime exposure was concealed in the third quarter earnings release issued on October 15, 2007, as well as the pre-earnings release issued on October 1, 2007, and all other Company disclosures that preceded it..

197.    This announcement of Citi's substantial subprime exposure, coming so soon after the Company's recent reassurances, took investors and Wall Street analysts by complete surprise. Deutsche Bank reported that "Citi [] disclosed (we think for the first time) an additional $55B of mortgage-related structured product exposure, mostly of super senior tranches of CDOs ($43B) …"  JPMorgan reported that "[t]he majority of the exposure against which Citi is taking a charge has never been disclosed before, not even in its 3Q earnings call even to indicate its existence, which is very surprising."   According to BusinessWeek, Citi reaped lucrative fees of approximately $40 million a year for agreeing to cover nearly 90% of the finance backing for the CDOs if the commercial paper market seized up, a possibility that became reality.  A Wall Street Journal article went further, and questioned whether Citigroup should in fact have consolidated a further $41 billion in CDO assets on Citigroup's books – for a combined CDO exposure of $84 billion.  On Monday, November 5, Citi's share price fell almost 5% to $35.90, and fell further by the end of the week, down to $33.10.

198.    Citi justified the write-downs of Citi's subprime-related assets as necessary in the wake of a series of rating agency downgrades of subprime mortgage-related assets, which had occurred after the end of the third quarter of 2007.  With respect to the super senior tranches of CDOs, Citi asserted that these tranches were not subject to valuation based on observable market transactions, and that Citi had therefore determined their fair value based on estimates of, among other things, future housing prices, as well as discount rates updated to reflect the rating agencies downgrades of sub-prime mortgage-related assets.

199.    Citi also stated that if sales of the super senior tranches of ABS CDOs were to occur in the future, the sales might represent observable market transactions that could be used to determine the value of Citi's super senior tranches.  But the fact that the these assets were not selling was itself an indicator that they were priced too high.  Moreover, even if some portion of these CDOs were AAA-rated, they were backed by subprime assets, which themselves were rapidly deteriorating.  In sum, even if the super senior tranches of CDOs sat at the top of the pile, the pile was nonetheless a pile of toxic assets, none of which were truly high grade.  At best, the super senior tranches were perhaps less toxic than the more junior tranches.

200.    Moreover, when Citi provided more detail on the breakdown of its CDO exposure when it released its fourth quarter earnings for 2007 and first quarter earnings for 2008, it became clear that Citi's "super senior" exposure included assets of dubious quality.

201.    *First*, Citi indicated that it was holding approximately $8 billion in mezzanine CDOs, which, by definition, were *not* high grade.  As revealed when Citi released its results for the fourth quarter of 2007, 52% of Citi's mezzanine CDOs, with a face value of $9.0 billion, were from 2006 or later – the worst years for subprime CDOs (as Crittenden had admitted during

the November 4, 2007 earnings call). And, according to the breakdown provided with the first quarter earnings for 2008, 94% of the mezzanine holdings were rated BBB *or lower*.

202. **Second**, 80% of the supposed "high grade" CDOs were from the particularly toxic 2006 and 2007 vintages, and 41% were rated BBB or lower. Even the best assets among the lot – the Commercial Paper CDOs – included a substantial quantity of subprime collateral. Ten percent of the underlying RMBS were rated BBB (or lower) and 12% were rated A. None of these assets were maintaining their value. By July 2007, the ABX.BBB index had dropped to 40% of par value, and it was down to 30% by the end of September. Similarly, the ABX.A index was down to 50% by the end of September, and even the ABX.AA index had fallen to 80% of par by the end of September. Given how poorly *all* the underlying RMBS CDOs were performing, it was clear that no CDOs could escape significant losses. Thus, Citi was required to take much larger write-downs on the $43 billion to reflect these market conditions, as subsequent write-downs would illustrate.

203. Additionally, Citi's statements directly contradict the opinions of its own experts. As early as March 2007, Matt King, of Citi's European quantitative credit strategy and analysis group, explained that the super senior tranches were in fact at more risk than the junior tranches. His report specifically "recommend[ed] that existing investors in high quality tranches switch out in favour of smaller allocations to, say, triple-B tranches instead. . ."[34]

204. **Third**, the ABX indices, in particular the TABX, provided an observable input that Citi was required to use in determining the timing and extent of its write-downs. The TABX had already fallen under 70% of par by the end of June 2007, and by the end of September 2007, the TABX had collapsed to 34.24% of par. Yet Citi took virtually no write-downs on these

---

[34] *CDO of ABS sub-prime exposure assessed*, Structured Credit Investor, Mar. 28, 2007.

CDOs until mid-October, and even then, its estimated write-downs of $8 billion to $11 billion represented only a 25% write-down at most (*i.e.*, equivalent to valuing the portfolio at roughly 75% of par).

205.     Ironically, while Citi ignored the *relevant* index, Citi justified its delay in taking write-downs by citing the recent decline in the *irrelevant* ABX-AAA index, with Crittenden comparing the super senior CDOs to the RMBS captured in that index.   However, the ABX indices measure the value of the underlying RMBS, not the CDOs, which are one layer removed. As explained above, the CDOs were collateralized by the lower-rated RMBS tranches.   Thus, the appropriate index for comparison was the TABX or the ABX-BBB index, which had declined long before October 2007.[35]

206.     **Fourth,** rather than using this observable input, Citi relied entirely on its own flawed modeling.   As Citi insiders would later tell the New York Times, the first problem with this model was in placing "blind faith" in the passing grades the rating agencies bestowed upon these complex instruments.   As late as the summer of June 2007, Citi was relying on the judgment of the rating agencies that Citi's CDO holdings faced an "extremely low probability of default (less than .01%)," despite the enormous losses that had already occurred throughout the MBS market earlier in the year, and despite the Citigroup Defendants' knowledge that Citi's CDO holdings represented, in many cases, the worst of the worst in terms of likelihood of default.[36]   Moreover, although the CDOs had not been downgraded, hundreds of tranches of BBB-rated RMBS were downgraded in July 2007.   Further, a December 13, 2006 Fitch report issued a negative ratings watch for mezzanine CDOs, and in March 2007, Moody's warned that

---

[35] *See* Bloomberg, Citigroup Earnings Conf. Call, Nov. 5, 2007, at 6, 8.

[36] *See* Eric Dash & Julie Creswell, *Citigroup Saw No Red Flags Even As It Made Bolder Bets*, New York Times, Nov. 23, 2008.

defaults and downgrades of RMBS would have magnified consequences for CDOs invested in these RMBS. Moody's warned that the resulting downgrade in CDOs could be as much as ten notches, *e.g.*, from AAA down to BB+ (junk status).

207.    Citi's own analysis questioned the validity of the ratings, as indicated in a CDO prospectus dated March 28, 2007, stated[37]:

> Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality. Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value, therefore, ***they may not fully reflect the true risks of an investment. Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates. Consequently, credit ratings of the Collateral Debt Securities will be used only as a preliminary indicator of investment quality.***

208.    Thus, Citi's continued reliance on the ratings was reckless, at best.

209.    Citi also modeled its valuation on the discount rates for collateralized loan obligations ("CLOs"), which are securitized packages of corporate loans. In other words, Citi compared AAA CDOs to AAA CLOs. However, the flaw with this method is obvious: defaults on subprime mortgages (and RMBS) were skyrocketing, which was not the case for comparably-rated corporate bonds.[38] Citi itself recognized the flaw in making such a comparison, specifically noting that "it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds, even if both transactions are performing admirably."[39] Nevertheless, Citi used the AAA CLO discount rates in order to avoid larger write-downs.

---

[37]  Armitage CDO Prospectus, Mar. 28, 2007, at ¶ 18 (emphasis added).

[38]  *See* Carrick Mollenkamp & David Reilly, *Why Citi Struggles to Tally Losses – Swelling Write-Downs Show Just How Fallible Pricing Models Can Be*, Wall Street Journal, Nov. 5, 2007, at C1.

[39]  *A General Review of CDO Valuation Methods*, Citigroup, Feb. 15, 2006, at 7.

210.     Additionally, Citi's model did not account for the possibility – which the Citigroup Defendants knew had become a reality by 2007 – of a national housing downturn or the prospect that millions of borrowers would default on their mortgages.

### 2.     Citi Discloses Support Of SIVs In Form 10-Q For Third Quarter 2007

211.     Citi filed its Form 10-Q for the third quarter of 2007 on November 5, 2007, before the market opened.  In this filing, Citi disclosed that it had provided $10 billion of financing to its SIVs in previous weeks to shore up those funds, and that the SIVs had drawn $7.6 billion of credit as of October 31.  But despite this action, Citi inexplicably still insisted that it would "not take actions that would require the Company to consolidate the SIVs."[40]

212.     Citi's representations regarding its obligation to consolidate the SIVs were false, as was proven the next month.

### D.     December 2007:  Citi Admits Obligation To Consolidate SIVs

213.     During November 2007, Citi started to hint that its SIVs were worth closer to $66 billion than the $83 billion previously reported.  In light of these developments, ratings agencies finally caved in and started to downgrade Citi's SIVs.  One SIV, Dorada, was downgraded to Caa3, while SIVs with Aaa ratings were placed on review.  The reason for the downgrades was not just the deterioration of the market values of the SIVs, but also "the sector's inability to refinance maturing liabilities," according to Moody's.

214.     Citi named Defendant Pandit as CEO on December 11, 2007.  Two days later, on December 13, 2007, Citi issued a press release stating that it was "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investment Vehicles."  In other words, it belatedly consolidated the

---

[40]  November 5, 2007 Form 10-Q, at 7.

SIVs onto its balance sheet.  In addition, in the December 13 press release, Citi admitted that the combined assets of the SIVs actually totaled only $49 billion, not the $66 billion reported just one month earlier, which itself was a reduction from the $83 billion reported a few months before that.

## E.  January 2008:  Citi Discloses Additional Write-Downs

### 1.  Citi Reports Record Losses

215.    When the carnage was finally tallied and announced on January 15, 2008, Citi's fourth quarter write-downs for the subprime assets totaled $18.1 billion, and it reported a net loss for the quarter of $9.83 billion, or $1.99 per share – the worst performance in the Company's history.  Citi's losses were attributed to the significant increase in credit costs, comprised mostly of $6.1 billion in net credit losses and a $6 billion loan loss reserve build, necessitated by the rising delinquencies that had brought the Company's loan loss reserve ratio to dangerously low levels, particularly in light of the escalating losses Citi was seeing in its consumer lending portfolio.

216.    Citi announced the layoffs of more than 20,000 employees as a result of the deterioration of its business and cost-cutting due to the size of its losses.  In addition, Citi had to raise $12.5 billion in capital and cut its dividend by 41%.  Citi also announced that its Tier 1 capital ratio had fallen to 7.12%, down from 8.2% in the first quarter of 2007.  As a result of this news, the stock price fell from $29.06 to $26.94, more than 7%, and by January 22, the price had fallen further to $24.40.

### 2.  CDOs

217.    In the January 15, 2008, earnings release, Citigroup disclosed an additional $17.4 billion in write-downs in its sub-prime related exposure related to CDOs, with the current value estimated at $37.3 billion.  Additionally, Citi disclosed the existence of an additional $10.5

billion in CDO exposure, now bringing the total to approximately $66 billion.  These CDOs were supposedly hedged under financial guarantee contracts with monoline insurers Ambac Financial and MBIA.  However when those counterparties suffered their own credit downgrades in late 2007, Citi could no longer conceal the exposure via these CDOs.  Citi was forced to reveal their existence, and to make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.

218.    Citi's disclosure came as a particular surprise to investors given that during the November 5, 2007 earnings call, Crittenden had downplayed the risk associated with the monoline insurers.  He stated that Citi had not quantified the risk but conceded that they are "important counterparties . . . and there is obviously potentially secondary and tertiary exposures that potentially could exists [sic] for the company . . ."   When analyst Guy Moszkowski pressed for an amount of potential disclosure, Crittenden simply answered that the Company had not disclosed that information.[41]

219.    The Company explained in the January 15, 2008 earnings release that its super senior CDO exposures (high grade and mezzanine) were not subject to valuation based on observable transactions and that it therefore determined fair value based on estimates.  Citi noted that it had refined its valuation methodology "to reflect ongoing unfavorable market developments.  The methodology takes into account both macroeconomic factors, including estimated housing price adjustments over the next four years . . . and microeconomic factors, including loan attributes, such as age, credit scores, documentation status, loan-to-value (LTV) ratio, and debt-to-income (DTI) ratio."[42]   However, since these assets were supported by

---

[41]   Bloomberg Transcript, Citigroup Earnings Call, Nov. 5, 2007 at 6.

[42]   Citigroup Earnings Release, Jan. 15, 2008, at 12 n.4 (Schedule B).

subprime mortgages with rapidly increasing delinquency rates, the assets were essentially illiquid. Moreover, the market indices for similar securities had lost virtually all their value by early 2008, and Citi was required to write down its CDOs accordingly.

220.    During the January 15, 2008, earnings conference call, analyst Meredith Whitney of Oppenheimer questioned Crittenden regarding Citi's valuation approach. Whitney questioned why Citi was valuing the mezzanine portion of its CDO holdings at $0.43 on the dollar, when the Company had admitted it did not expect a rebound in that market. She noted that Citi's price seemed to be "above where the strike prices are or if there is a strike price, where the market has indicated."[43]  Crittenden's response was simply that the Company took the reductions it thought were appropriate and that their values seemed to be in the range with other investors or institutions who were valuing their portfolios.[44]

221.    While Citi continued to assert that there were no observable factors to use in valuing the CDOs, Crittenden explained during the January 15, 2008, earnings conference call that Citi had in fact begun to use the ABX indices as a reference point, as a "crosscheck against [its] cash flow model . . . to uncover any inconsistencies."[45]  Further, as discussed above, other market participants considered the various indices, particularly the TABX index, as a barometer of the CDOs' value.

### 3.    Consumer Lending, Including Mortgages

222.    The other significant source of Citi's losses was the $12.7 billion in credit costs, including $6.1 billion in net credit losses and a $6 billion loan loss reserve build. The $2.6 billion increase in net credit losses was largely attributable to the increased losses in U.S.

---

[43]  Fair Disclosure Wire, Citigroup Earnings Conf. Call, Jan. 15, 2008, at 15.

[44]  *Id.* at 16.

[45]  *Id.* at 12.

consumer credit costs, stemming from increased delinquencies on first and second mortgages, unsecured personal loans, credit cards and auto loans.  The consumer banking costs included a net charge of $2.3 billion to increase loan loss reserves.

223.    The necessity for a sharp increase in reserves was clear.  In the fourth quarter of 2006, the loan loss reserve ratio for U.S. consumer credit had dropped to 0.96% (compared to an average of 2%) and was still only at 0.99% in the second quarter of 2007.  Even after the large increase in the third quarter, the ratio had only increased to 1.29%, and it was only after the $3.3 billion infusion in the fourth quarter that the U.S. ratio once again surpassed 2.0%.[46]  However, even this increase was conservative, given that delinquency rates (defined as more than 90 days past due) for first mortgages had jumped from 1.38% in the third quarter of 2006 to 2.56% by the end of 2007.  For loans with a FICO score of less than 620, which represented 10% of the Company's U.S. consumer mortgage portfolio, the delinquency rate had reached 7.83% by the fourth quarter of 2007.[47]  As Crittenden pointed out in the January 15, 2008 earnings conference call, the delinquency rate for loans with FICO scores less than 620 was triple that of the overall first mortgage portfolio.[48]

224.    In an implicit acknowledgement that its credit standards had been too lax, Citi announced that its loan originations had declined 16%, reflecting modified loan approval criteria and curtailment of activity with third-party loan originators.  As Crittenden explained during the January 15, 2008 earnings conference call, moderating Citi's loan growth was part of the Company's risk mitigation strategy.  "The shift in origination mix, along with tightening

---

[46]  Citigroup Earnings Review Presentation, Jan. 15, 2008, at 9.

[47]  *Id.* at 10.

[48]  Fair Disclosure Wire, Citigroup Earnings Conf. Call, Jan. 15, 2008, at 6.

underwriting criteria, have resulted in an improved quality of originations. . ."[49]  Crittenden also indicated that Citi had eliminated certain product offerings, undermining the Company's previous claims that its portfolio mix was appropriate.  In sum, as Defendant Pandit stated on the January 15, 2008 conference call, Citi needed to reshape its risk philosophy, explaining that the Company was "enhancing [its] risk culture and involving new talents."[50]

      **F.**      **April 2008:  Citi Reveals New Sources Of Problems**

              **1.**      **First Quarter Results Show Improvement, But Continued Problems**

225.      On April 18, 2008, Citi issued a press release announcing its results for the first quarter of 2008.  The Company posted a net loss of $5.1 billion, or $1.02 per share, compared to a profit of $1.01 per share generated in the first quarter of 2007.  The Company reported write-downs of approximately $12 billion, down from roughly $16 billion in the fourth quarter of 2007, beating many analysts' projections.  Citi also announced credit costs of $6 billion, consisting of $3.8 billion in net credit losses and a $1.9 billion net charge to increase loan loss reserves.

226.      Citi's CFO Gary Crittenden stated that there would be no additional dividend cuts or further equity raising.  Despite the extent of the loss, these results represented an improvement over the last quarter of 2007, leading analysts and investors to conclude that the worst was over.  As a result, and in conjunction with the pledge of no future equity raises or dividend cuts, the Company's stock price increased after the earnings were reported.

              **2.**      **Additional Write-Downs In Markets & Banking**

227.      Citi had been steadily reducing its CDO exposure, which now stood at $29.1 billion, down from $37.3 at the end of 2007.  However, this process entailed write-downs of an

---

[49] *Id.* at 6.

additional $6 billion, which were still inadequate.  Although the relevant indices had lost nearly all their value by early 2008, Citi had still only written down its CDO portfolio by just under half.  Moreover, the Company's decision later in the year to stop valuing $80 billion in assets, including some portion of its CDOs, indicated that these assets were basically worthless.

### 3. First Mention of Significant Exposure Of Alt-A Loans

228.    In the April 18 release, Citi disclosed for the first time a significant exposure to Alt-A loans, necessitating write-downs of $1.0 billion, leaving the Company with $18.3 billion in exposure.  However, as recently as January 15, 2008, Citi had denied that its Alt-A losses posed a substantial risk.[51]  The Company once again had misled investors as to the extent of its nonprime exposure.  Analyst Susan Roth Katzke of CreditSuisse commented that this new exposure was "[w]orthy of note."[52]

### 4. Partial But Incomplete Disclosures Regarding ARS

229.    In the April 18, 2008 press release, Citi also announced for the first time that it had been holding illiquid ARS as a result of failed auctions and deterioration in the credit markets.  In February it had held $11 billion of ARS, but it had managed to reduce its inventory to $8 billion by mid-April.  The Company also took $1.5 billion in write-downs on its ARS inventory.

230.    Analysts specifically noted that this ARS exposure had never before been disclosed, despite the significant write-downs now announced.  As with the Alt-A exposure, Susan Roth Katzke of CreditSuisse saw the new category of exposure as noteworthy.

---

[50]  *Id.* at 1.

[51]  *See* Fair Disclosure Wire, Citigroup Earnings Conf. Call, Jan. 15, 2008, at 16-17.

[52]  Susan Roth Katzke, *Citigroup*, CreditSuisse Equity Research, Apr. 18, 2008, at 2.

  
231.     Although Citi disclosed its own ARS exposure, it downplayed the impact on its capital adequacy.  While Crittenden explained that the Company was taking steps to provide liquidity for its customers, the Company did not address the potential liability associated with the various regulatory investigations underway, or the private suit already filed by Citi's clients who were left holding billions of illiquid ARS.

### G.     July 2008:  Citi Takes More Write-Downs

232.     Citi released its second quarter earnings for 2008 on July 18, 2008, reporting a net loss of $2.2 billion, or $0.49 per share.  The Company disclosed an additional $7.2 billion in write-downs in securities and banking, including $3.4 billion in CDOs, bringing the total exposure to $22.5 billion.  Citi also reported write-downs of $585 million on highly leveraged finance commitments, $545 million on commercial real estate positions, and $325 million on Alt-A mortgages.  Yet, these write-downs were still inadequate.  *See supra* at ¶ 227.

233.     While Citi noted that its negative revenues were partially offset by a $197 million **gain** on its ARS inventory, it omitted any mention of the potential ARS-related liability it faced in light of the pending government investigations or private lawsuits its clients had commenced. Investors would only learn of this exposure when the SEC and New York Attorney General announced their settlement with Citi.

### H.     August 2008:  SEC Announces ARS Settlement; Citi Is Forced To Disclose ARS Exposure Stemming From Client Losses

234.     The next blow came on August 7, 2008, with the announcement of a settlement with the SEC, the New York Attorney General, and other state regulators regarding their investigations into the ARS market.  Citi announced its commitment to repurchase $7.3 billion of its clients' ARS.  Citi estimated that the pre-tax difference in value between the purchase price and market value for the ARS then eligible for repurchase was $500 million and that the impact

on its balance sheet would be "de minimus."   However, this assertion was based on the assumption that Citi would eventually resell the ARS at or near face value, an assumption that was wholly unfounded.  Citi eventually took an additional $612 million in write-downs on its ARS holdings.

235.    Citi also reported that it would work with its clients to provide interim liquidity. For individuals, small institutions, and charities, the Company would provide non-recourse loans, up to the par amount of their ARS.  For its institutional investor clients, Citi would use its best efforts to facilitate issuer redemptions or to use other means to address liquidity concerns. Citi also disclosed that it was paying $100 million in fines, with $50 million paid to the State of New York and the other $50 million to other state regulatory agencies.

236.    Citi still did not disclose, however, that it had anticipated a dislocation of the ARS market as much as a year earlier, but had done nothing to protect its own holdings or its clients.

I.      **September 2008:  Citi Attempts To Reassure Market Of Its Viability, Despite Financial Sector Turmoil**

237.    In early September, 2008, Lehman Brothers was on the verge of collapse and needed a strategic buyer or government intervention in order to survive.  However, Lehman found no takers and the government chose to let the company fail.

238.    To calm market and employee fears, Pandit issued a letter to Citi employees, which the Wall Street Journal published on September 15.  In the letter, Pandit claimed that the Company had managed its critical priorities well over the past year, and that Citi had "tremendous capacity to make commitments to [its] clients."  Pandit also encouraged employees to remind their clients (and shareholders) that Citi had established a very strong capital base and had a strong cash position.

239.    In an interview for a September 21, 2008 article, Pandit told the New York Times that the Company had been a "pillar of strength in the markets" during the recent turmoil.  Pandit also stated that there was no reason to break up the Company into smaller units.  Pandit proclaimed:  "If there's anything I'm right about 100 percent it's the strategy we're on and what we're doing."[53]  Crittenden was quoted in the same article, trying to put a positive spin on the remaining $22 billion of subprime and mortgage-related securities on Citi's balance sheet, noting that most of the securities predated 2006, "when mortgage lending practices really went off the rails."

240.    Before long, both Pandit's and Crittenden's positive spin would be proven false, as Citi announced two phases of a government bail-out, as well as additional write-downs and losses.  In fact, Citi had not turned a corner in September, contrary to the impression the Company sought to convey.

    **J.**      **<u>October 2008</u>**

        **1.**     **<u>First TARP Installment</u>**

241.    On October 3, 2008, President Bush signed the Emergency Economic Stabilization Act of 2008 (H.R. 1424), commonly known as "the bail-out bill," which gave the Secretary of the Treasury up to $750 billion to purchase "distressed" (*i.e.*, subprime) bank assets in order to restore liquidity and stabilization to the U.S. economy.  The bill created the federal government's Troubled Asset Relief Program ("TARP"), and funds loaned to banks became known as TARP funds.

242.    On October 14, 2008, Citigroup – the supposed "pillar of strength" – received a $25 billion infusion in TARP funds.

---

[53]  Julie Creswell and Eric Dash, *Citigroup:  Above the Fray?*, New York Times, Sept. 21, 2008.

## 2. Third Quarter Results Show Still More Write-Downs, With SIVs And Alt-A Securities As Primary Sources

243.    On October 16, 2008, Citi released its third quarter 2008 earnings.  The Company announced that quarterly losses had increased from $2.2 billion to $2.8 billion, with loss per share increasing from $0.49 to $0.60.  With these results, it was apparent that Citi had not sustained the slight improvement seen in the second quarter earnings report released in July.

244.    Yet again, Citi's poor performance was the result of write-downs in the securities and banking operations (totaling $4.4 billion), as well $4.9 billion in net credit losses, $1.1 billion of which was due to residential real estate losses in North America, and a $3.9 billion charge to increase loan loss reserves.

245.    While Crittenden had emphasized in his interview for the September 21, 2008 New York Times article that "most" of Citi's remaining subprime exposure was in assets predating 2006, substantial exposure to toxic assets issued in or after 2006 remained. Additionally, although Citi had managed to trim its exposure to subprime CDOs, the losses from its Alt-A holdings had grown, with a $1.153 billion write-down, its largest yet for these assets and more than triple the amount taken in the second quarter.  Citi disclosed that on holdings of Alt-A assets with a $20.7 billion face value, Citi had already taken write-downs of approximately 35%, leaving it with $13.6 billion in exposure.  Of this remaining exposure, nearly $10 billion was from the troubled period of 2006 and later, and therefore likely to face additional substantial write-downs.   Additionally, Citi was now classifying $10.2 billion of the $13.6 billion as "available for sale," meaning that Citi was no longer applying mark-to-market rules for these assets, as a way to avoid recognizing some of the associated losses the Company had incurred.

246.    Citi also disclosed a $2 billion write-down on its SIV holdings, leaving the Company with $27.5 billion in exposure.

247.    Further, by this time, the losses stemming from Citi's ARS exposure had grown. Citi's revenues were reduced due to a $612 million write-down related to the Company's ARS settlement, and the third-quarter earnings reflected the previously-announced $100 million fine.

**K.    November 2008**

**1.    Citi Discloses Reclassification Of $80 Billion In Assets**

248.    On November 17, 2008, Citigroup held a "Town Hall" meeting, in an attempt to reassure its employees that it could weather future challenges.  At that meeting, Pandit explained that the Company had reduced its risky assets while putting the Company "in a very strong capital position."  He also stated that the Company was "very well positioned from a capital standpoint to weather future potential challenges."

249.    On the same date, Citigroup disclosed that it was reclassifying $80 billion in various unspecified assets by designating these assets as "held to maturity," "held for sale," or "held for investment," which meant the Company could avoid taking the necessary write-downs by keeping these assets on its books at cost.  Citi did not disclose what assets were included in this $80 billion.

250.    As Citi was desperately trying to stave off insolvency by finding a willing buyer and negotiating with the government about a further rescue, it offered false assurances that it had a "very strong capital and liquidity position."  But no bank was willing to take on the toxic assets that could not be properly valued.

**2.    Citi Announces Plan to Dismantle SIVs and Purchase Remaining $17.4 Billion, Yet Reasserts Strength**

251.    On November 19, 2008, Citi announced plans to dismantle its SIVs and repurchase the SIVs' remaining $17.4 billion in assets, in what was billed as a "nearly cashless" transaction.  The Company disclosed that the assets of the SIVs had been valued at $21.5 billion

as of September 30, 2008, and that the decline reflected sales and maturities of $3.0 billion and a decline in market value of $1.1 billion – in just that six-week period.

252.    Citi's decision to repurchase these assets was part of the Company's program of providing support to the SIVs.  The Company indicated that the fair value of its support was $6.5 billion but that it expected to be repaid upon completion of the transaction.  Citi also indicated that it would record these assets as available for sale.  In other words, Citi was again avoiding the mark-to-market rules that would have entailed additional write-offs on the SIV assets.

253.    The market reacted harshly to this news, with Citi's stock price tumbling 23% by the close of trading on November 19.

254.    In the wake of this news, Pandit remained steadfastly upbeat.  In a statement released on November 19, he asserted that the Company was "entering 2009 in an even stronger position than [it] entered 2008," noting its stronger capital base and liquidity and the reduction in expenses and exposure to risky assets.  Pandit emphasized its long-term operating earnings power.[54]

### 3.    Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion

255.    Despite Pandit's attempts to reassure the market (and Citi employees) that the Company remained solvent, he could not restore confidence.  The Board called an emergency meeting on Friday, November 21, and the Board spent the weekend negotiating a bail-out plan with various federal agencies.[55]

256.    Ultimately, the weekend negotiations led to an announcement of a *$326 billion* bail-out package, announced on the evening of Sunday, November 23, 2008.  Pursuant to the

---

[54]    *See* David Enrich, *Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market*, Wall Street Journal, Nov. 20, 2008, at C1.

agreement reached with the U.S. Treasury, the Federal Reserve Board, and the FDIC, the Treasury would invest $20 billion in TARP funds in Citi preferred stock.  In exchange for an additional $7 billion in preferred stock issued to the U.S. Treasury and the FDIC, the federal government would guarantee $306 billion of securities, loans, and commitments.  The hundreds of billions of dollars of assets requiring the government's guarantee included assets backed by residential and commercial real estate, including subprime-related assets, which Citi had repeatedly tried to conceal and minimize.

257.    An article appearing in the Wall Street Journal the next day noted that the Company's claims of capital adequacy, made as recently as November 20, were made at a time when the Company's executives and directors *knew* the Company was in dire straits and had been negotiating with the government over the terms of a potential bail-out.[56]  Yet the Citigroup Defendants had continued their deception, even as Citi bargained for a life-line from the government.

> **L.    December 2008:  SEC Files Complaint Regarding ARS, Revealing Citi's Knowledge Of ARS Exposure As Early as Mid-2007**

258.    On December 11, 2008, the SEC filed a complaint against Citi related to the ARS market problems that had developed earlier in the year.  While no new exposure was revealed, the allegations detailed in the Complaint made it clear to the market that Citi and its senior management had been aware as early as August of 2007 that Citi could not continue supporting the auctions, and that either the Company or its clients (or both) were likely to be stuck holding the illiquid assets.

---

[55]  *See* Bradley Keoun, *Citigroup Gets U.S. Rescue from Toxic Losses, Capital Infusion*, Bloomberg, Nov. 24, 2008.

[56]  *See* David Enrich et al., *U.S. Agrees to Rescue Struggling Citigroup*, Wall Street Journal, Nov. 24, 2008.

**M.      January 2009:  Details of Bail-Out Reveal True Weaknesses of Mortgage-Related Assets and Contents of $80 Billion Recategorized in November**

259.      On January 9, 2009, Citi announced that it was pursuing a plan to sell its Smith Barney brokerage unit.  Among the plans under discussion was a plan to create a joint venture with Morgan Stanley, despite Pandit's previous commitment to keeping the Company whole.

260.      In light of the government pressure on Citi to raise additional capital and analyst predictions of another loss for the first quarter of 2009, observers saw a deal with Morgan Stanley as likely.  By January 11, 2009, the terms of a proposed deal had been made public.  The plan called for Morgan Stanley to pay $2 billion to $3 billion (or possibly more) for a controlling stake in Smith Barney.  By January 12, a deal had apparently been reached, pursuant to which Morgan Stanley would pay $2.5 billion for a 51% stake in Smith Barney.

261.      That same day, a Wall Street Journal article reported on the continuing woes facing the Company.  Fourth quarter losses were expected to be billions of dollars greater than previously anticipated.  Citi was expected to post an operating loss of at least $10 billion when it announced its fourth-quarter earnings on January 22, 2009, marking the Company's fifth consecutive quarter in the red.  Such losses would bring the Company's total 2008 losses to over $20 billion and would put it on track to post its worst year since its predecessor, City Bank of New York, was founded in 1812.

262.      On January 15, 2009, Citi filed a Form 8-K, detailing the terms of the $326 billion federal bail-out.  For the first time, Citi itemized the $301 billion[57] in assets that the government would guarantee.  These assets included $191.6 billion in consumer loans, including $154.1 billion in first and second mortgages.  The $301 billion also included $11.4 billion in Alt-A

---

[57]  In the Form 8-K, Citigroup indicated that the original $306 billion commitment had been reduced to $301 billion, based on adjustments in valuations of certain assets.  *See* Citigroup Form 8-K, Jan. 15, 2009, at Ex. 99.1.

RMBS, as well as another $22.4 billion in unfunded second mortgage commitments. The guarantee also covered $6.4 billion in protection for the SIV assets that Citi had purchased.

263.     In sum, while the Citigroup Defendants had repeatedly concealed the extent of Citi's exposure to the subprime-related assets and its SIVs, in the end, Citi's exposure was so substantial that it could not bear the burden of carrying these assets without government assistance. With respect to the SIVs in particular, Citi's final disclosure was yet another piece of evidence showing that the Company could not, in fact, abandon these entities, and that it therefore was required to consolidate them well before it finally did, and to take appropriate write-downs.

264.     On January 16, 2009, after days of news coverage regarding the impending deal with Morgan Stanley and the possible creation of a new entity to house the toxic assets, Citi announced its fourth quarter results for 2008, with an $8.29 billion net loss, putting the Company's total losses for the year at a staggering $18.72 billion. This quarterly loss was twice the analyst consensus, indicating Citi had not lost its capacity to shock the market.

265.     Citi also announced that it would reorganize into two business lines focused on banking and other financial services. As part of its reorganization plans, Citi announced its intention to sell its CitiFinancial consumer-lending business and Primerica Financial Services life-insurance unit.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

266.     Based on the foregoing, the Defendants made numerous false and misleading statements and omissions of material fact during the Relevant Period concerning the risk concealed in its loan portfolio and in its holdings of subprime-related securities. Because the Defendants concealed Citi's actual exposure to subprime-related assets, they also failed to take

write-downs in a timely manner that reflected the deteriorating value of those assets. Thus, throughout the Relevant Period, Citi's earnings and capital position were continually overstated and false and misleading because they did not take into account the degree of loss Citi would incur as market conditions deteriorated.

### A.   Citigroup's Financial Statements During The Relevant Period Were Materially False And Misleading And Violated GAAP

267.   Citigroup, in reporting its financial results during the Relevant Period, made false statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading. As set forth in detail below, Citigroup published financial statements and information that violated generally accepted accounting principles ("GAAP") and SEC regulations prohibiting false and misleading public disclosures. These financial statements include the audited year-end financial statements included in Citigroup's 2004 Form 10-K, 2005 Form 10-K, 2006 Form 10-K and 2007 Form 10-K, and the financial information included in the Company's quarterly reports filed with the SEC on Form 10-Q for each of the interim quarterly periods during the years 2004 through 2008 (collectively, the "SEC Filings").

268.   GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices. GAAP are the official standards authorized by the SEC and promulgated in part by the Financial Accounting Standards Board ("FASB") and the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority includes the FASB Statements of Financial Accounting Standards ("FAS"), followed by, among other pronouncements, FASB Interpretations ("FIN") and FASB Staff Positions ("FSP").

269.     Pursuant to SEC Regulation S-X, financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures (17 C.F.R. § 210.4-01(a)(1)).   Regulation S-X also requires quarterly financial statements to comply with GAAP, with the exception that quarterly financial statements do not need to include disclosures that would be duplicative of disclosures accompanying annual financial statements (17 C.F.R. § 210.10-01(a)).

270.     Citigroup's financial statements in the SEC Filings violated GAAP in material respects by, among other things:

     a.     Understating loan loss reserves;

     b.     Failing to disclose a concentration of credit risk from CDOs with direct subprime exposure;

     c.     Failing to consolidate Citi's Commercial Paper CDOs on its balance sheet;

     d.     Failing to consolidate Citi's SIVs on its balance sheet;

     e.     Overstating the fair value of Citi's CDOs with direct subprime exposure;

     f.     Overstating the fair value of Citi's total assets; and

     g.     Overstating the adequacy of Citi's capital.

271.     KPMG issued unqualified audit opinions on the financial statements in Citigroup's Form 10-K filings for the years 2004 through 2008, falsely stating that those financial statements complied with GAAP in all material respects.

### 1.     Citigroup Reported Materially Understated Loss Reserves In Violation Of GAAP

272.     A bank sets aside loan loss reserves to provide a current reserve against credit losses.   Under GAAP, Citi is required to establish loan loss reserves at a level sufficient to cover

probable losses from its lending activities, including its mortgage portfolio.  The level of reserves is an important data point for investors.

273.    Under SFAS 5, *Contingencies*, Citigroup is required to set a reserve when (a) "it is *probable* that an asset had been impaired . . . at the date of the financial statements," and (b) "the amount of the loss can be reasonably estimated."  (emphasis added).  Even if losses on mortgage exposures are only "reasonably possible," SFAS 5 requires detailed disclosures, including estimates of losses.  Thus, GAAP required the Company to establish loss reserves that reflected the amount of loans that already had defaulted and been charged off, as well as the additional amount of loans that were likely to default but had not yet done so.

274.    Although SFAS 5 indicates that losses should be recognized once the events causing the losses are probable and can be reasonably estimated, the American Institute of Certified Public Accountants' (AICPA) Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AICPA Guide"), notes that there is an important caveat to that rule: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

275.    Additionally, SFAS 114, *Accounting By Creditors for Impairment of a Loan*, defines "impairment" for individual loans as "impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."  This principle is also instructive in determining, in accordance with GAAP, when a group of pooled loans is impaired.

276.    These GAAP provisions support the "Expanded Guidance for Subprime Lending Programs" issued by federal bank regulators (the Office of the Comptroller of the Currency, the

Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation,

the Office of Thrift Supervision, and the National Credit Union Administration) in 2001:

> The [allowance] required for subprime loans should be sufficient
> to absorb at least all estimated credit losses on outstanding
> balances over the current operating cycle, typically 12 months.
> The board of directors and management are expected to ensure that
> the institution's process for determining an adequate level for the
> [allowance] is based on a comprehensive and adequately
> documented analysis of all significant factors.  The consideration
> of factors should include historical loss experience, ratio analysis,
> peer group analysis, and other quantitative analysis, as a basis for
> the reasonableness of the [allowance].  To the extent that the
> historical net charge-off rate is used to estimate expected credit
> losses, ***it should be adjusted for changes in trends, conditions,
> and other relevant factors***, including business volume,
> underwriting, risk selection, account management practices, and
> current economic or business conditions that may alter such
> experience.  The allowance should represent a prudent,
> conservative estimate of losses that allows a reasonable margin for
> imprecision.  (emphasis added).

277.    The SEC also provides direct guidance on the proper accounting for loan losses.

SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and

Documentation Issues*, ("SAB 102"), issued in July 2001, states: "It is critical that loan loss

allowance methodologies incorporate management's current judgments about the credit quality

of the loan portfolio through a disciplined and consistently applied process."  Thus, pursuant to

SAB 102, a loan loss allowance methodology should "[c]onsider all known relevant internal and

external factors that may affect loan collectability . . . [and] be based on current and reliable

data[.]"

278.    In sum, the relevant provisions required Citigroup to consider the specific

composition of its mortgage portfolio and the developing trends among borrowers with similar

profiles and/or loans with similar characteristics when determining the proper level of loan loss

reserves.

279.     In light of the Company's massive increase in high-risk loans, coupled with the downturn of the housing market in mid-2005, Citigroup was required to increase its reserves substantially throughout 2006 and 2007.   Yet, in violation of GAAP, Citigroup reduced its reserves as a percentage of its total loan balances through 2006 and 2007, as reflected in the chart below.  At the end of 2006, the Company maintained a reserve of only 1.32% of its total net loan balance – just half of the 2.64% it maintained in 2003, when the Company's loans were much less risky, and before the housing market began its freefall.  Further, throughout 2006, Citi was reducing the *dollar amount* of its reserves as it increased the volume of loans, thus pushing the reserve ratio down even further.

**Citigroup Loss Reserves and Loans: 2002-2008[58]**

| Period Ending | Reserve (millions) | Reserve Increase (Decrease) | Total Loans (millions) | Reserves as % of Total Loans |
|---|---|---|---|---|
| 12-31-2002 | $11,101 | -- | $447,805 | 2.48% |
| 12-31-2003 | $12,643 | $1,542 | $478,006 | 2.64% |
| 12-31-2004 | $11,269 | ($1,374) | $548,829 | 2.05% |
| 12-31-2005 | $ 9,782 | ($1,487) | $583,503 | 1.68% |
| 3-31-2006 | $ 9,505 | ($  277) | $605,307 | 1.57% |
| 6-30-2006 | $ 9,144 | ($  361) | $637,085 | 1.44% |
| 9-30-2006 | $ 8,979 | ($  165) | $655,832 | 1.37% |
| 12-31-2006 | $ 8,940 | ($   39) | $679,192 | 1.32% |
| 3-31-2007 | $ 9,510 | $ 570 | $693,344 | 1.37% |
| 6-30-2007 | $10,381 | $ 871 | $742,924 | 1.40% |
| 9-30-2007 | $12,728 | $2,347 | $773,969 | 1.64% |
| 12-31-2007 | $16,117 | $3,389 | $777,993 | 2.07% |
| 3-31-2008 | $18,257 | $2,140 | $789,843 | 2.31% |
| 6-30-2008 | $20,777 | $2,520 | $746,790 | 2.78% |
| 9-30-2008 | $24,005 | $3,228 | $716,955 | 3.35% |
| 12-31-2008 | $29,616 | $5,611 | $694,216 | 4.27% |

---

[58]  Figures from Citigroup Form 10-Ks for 2002, 2003, 2004, 2005, 2006, 2007, and 2008; Form 10-Qs for quarters ending Mar. 31, 2006, June 30, 2006; Sept. 30, 2006; Mar. 31, 2007; June 30, 2007; Sept. 30, 2007; Mar. 31, 2008; June 30, 2008; and Sept. 30, 2008.

280. At a minimum, Citi was required to keep its reserve ratio above the 2% level, which had been the norm before the Company significantly increased its portfolio of nonprime loans in 2005 and afterwards. However, the reserve ratio should have been set much higher than 2% as the conditions in the market worsened. Thus, while Citi belatedly boosted its reserves in the third and fourth quarters of 2007, these increases were still insufficient under GAAP.

281. Citigroup's loan loss reserves remained substantially understated in the fourth quarter of 2007 and in most of 2008. By the end of 2007, the housing market had collapsed. Yet Citi's reserves barely exceeded the 2% level, ending the year at 2.07%, and increasing only slightly to 2.31% as of the end of the first quarter of 2008. Even at the end of the second quarter of 2008, the Company's reserves still stood at only 2.78%, only slightly higher than the rate of 2.64% in 2003, in a superior credit environment. This ratio would increase to 4.27% by the end of 2008, when Citi finally acknowledged the extent of its exposure.

282. Citi repeatedly materially understated its loss reserves, including in its Form 10-Q filings for the periods ending March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008, and in its 2006 Form 10K and 2007 Form 10-K, in violation of SFAS 5 and SEC Regulations.

283. Additionally, because Citi understated its loan loss reserves, the Company also materially overstated the value of its assets. Had the Company taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risks in its loan portfolio in the relevant periods, as required by GAAP, its earnings would have declined, leading to lower revenue for the reporting periods in 2006 and the first three quarters of 2007, and even greater net losses for the fourth quarter of 2007 and all of 2008.

284.    KPMG, as the Company's auditor, should have recognized that the housing market downturn placed Citigroup at heightened risk of losses and should have carefully evaluated the adequacy of the Company's loan loss reserves under GAAP. Its failure to do so was, at a minimum, reckless.

### 2. Citigroup Failed To Disclose A Concentration Of Credit Risk From Subprime-Related Exposure In Violation of GAAP

285.    Citigroup failed to disclose that it had a concentration of credit risk from CDOs, warehoused loans, and financing transactions with direct subprime exposure in its annual and quarterly financial statements for 2004, 2005, and 2006, and in its quarterly financial statements for the periods ending March 31, 2007 and June 30, 2007, in violation of GAAP.

286.    FAS 107, *Disclosures about Fair Value of Financial Instruments*, ¶ 15A required Citigroup to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Thus, Citigroup was required to disclose all significant concentrations of credit risk from CDOs, loans, and financing transactions with direct subprime exposure.

287.    FAS 107, ¶ 15A states that, "Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions." FAS 107, ¶ 15A further requires that the following be disclosed about each significant concentration:

    a.    Information about the (shared) activity, region, or economic characteristic that identifies the concentration;

    b.    The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments

that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity;

        c.    The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments; and

        d.    The entity's policy of entering into master netting arrangements for which the entity is a party, and a brief description of the terms of those arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

288.    FSP SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk*, ¶ 7 states that, "The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a concentration of credit risk as that term is used in FAS 107, either as an individual product type or as a group of products with similar features."  FSP SOP 94-6-1, ¶¶ 2-6 gives examples of loan terms that may increase credit risk such as negative amortization, high loan-to-value ratio, option ARMs, interest-only loans, and other loan terms that fall under the general category of subprime.  Similarly, FSP SOP 94-6-1, ¶ 7 provides the following examples of shared characteristics which may give rise to significant concentrations of credit risk:  borrowers subject to significant payment increases, loans with terms that permit negative amortization, and loans with high LTV ratios.

289.    Citigroup's CDOs with direct subprime exposure had been issued as far back as 2003.  The majority remained undisclosed, with some kept off-balance-sheet, until November 4, 2007.

290.    On November 4, 2007, Citigroup shocked the market by disclosing that it had approximately $55 billion of direct subprime exposures, consisting of $43 billion of CDO super senior exposures that were being disclosed for the first time, and $11.7 billion in lending and structuring exposure.[59]  The $11.7 billion in lending and structuring exposure had grown from the $11.4 billion disclosed on October 15.  The $43 billion of CDO super senior exposures disclosed on November 4, 2007, included $25 billion of Commercial Paper CDOs that Citigroup failed to consolidate on its balance sheet (*see infra* at ¶¶ 294-302), $10 billion of High Grade CDOs, $8 billion of Mezzanine CDOs, and $0.2 billion of CDOs-squared, which are CDOs collateralized by other CDOs.

291.    Prior to November 4, 2007, Citigroup failed to disclose that its CDOs, loans, and financing transactions with direct subprime exposure gave rise to a concentration of credit risk that required disclosure by GAAP.  Citigroup was required by FAS 107 and FSP SOP 94-6-1 to disclose this concentration of credit risk because these financial instruments were primarily backed by subprime RMBS collateral.  The underlying loans had terms such as negative amortization, high LTV ratio, option ARMs, and interest-only, which increased Citigroup's exposure to credit risk.  The counterparties to these loans (*i.e.*, the subprime borrowers) had similar economic characteristics, such as being subject to significant payment increases, negative

---

[59]  Citigroup later provided detail in its 2007 Form 10-K.  Citigroup's total gross exposure to CDOs was $65.1 billion.  The super senior exposure consisted of $24.9 billion in commercial paper CDOs, $9.5 billion in high grade CDOs, $8.3 billion in mezzanine CDOs, and $0.2 billion in CDO-squared, totaling $42.9 billion, which previously had been rounded off to $43 billion.  In addition to the $42.9 of super senior exposure and the $11.7 billion of lending and structuring exposure, for the first time Citi disclosed an additional $10.5 billion of exposure via hedged CDOs.

amortization and high LTV ratios.  In light of these similar economic characteristics, the changes in economic conditions would similarly impact these borrowers' ability to meet the terms of these loans.

292.    Citigroup's failure to disclose completely the above concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure in its Form 10-Q and Form 10-K filings for 2004, 2005, and 2006, and its Form 10-Q filings for the periods ending March 31, 2007 and June 30, 2007, as required by FAS 107 and FSP SOP 94-6-1, violated GAAP.

293.    KPMG should have, but failed to, examine Citigroup's risk concentrations and ensured that they were disclosed as required by GAAP.

### 3.    Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP

294.    Citigroup failed to consolidate its Commercial Paper CDOs on its annual and quarterly financial statements for 2004, 2005, and 2006, and on its quarterly financial statements for the periods ending March 31, 2007 and June 30, 2007, in violation of GAAP.

295.    Citigroup's Commercial Paper CDOs are Variable Interest Entities (VIEs) subject to the consolidation rules set forth in FIN 46(R), *Consolidation of Variable Interest Entities,* as Citi eventually acknowledged.[60]  A Variable Interest Entity is defined by the FASB in FIN46(R) to include entities that have previously been referred to as special-purpose entities (SPEs) that are to be evaluated for consolidation under GAAP.

296.    FIN 46(R), ¶ 2(a) states that a "variable interest entity refers to an entity subject to consolidation according to the provisions of this Interpretation."  FIN 46(R), ¶ 14 states that "an

---

[60]  Citigroup 2007 Form 10-K, at 91.

enterprise shall consolidate a variable interest entity if that enterprise has a variable interest . . . that will absorb a majority of the entity's expected losses . . ."

297.    On November 5, 2007, during the analyst conference call discussing the revised results for the third quarter of 2007, Citigroup disclosed for the first time that in conjunction with structuring a particular issue of Commercial Paper CDOs, Citigroup wrote put options or "liquidity puts" protecting the holders of the put options from any losses the Commercial Paper CDOs would incur.  Citigroup's CFO, Gary Crittenden, stated[61]:

> [T]his was essentially a funding mechanism that was used as we structured CDOs up until I believe the end of 2005.  So we would sell a structured CDO to a customer.  We would provide a liquidity put essentially to that customer . . . and this was all backed by sub-prime collateral . . . [W]e decided actually to buy the commercial paper associated with that during the course of the summer and as a result, that came back on our books . . . And so that's what the $25 billion [a portion of the just disclosed $43 billion in CDOs] is made up of.

298.    Citigroup disclosed in its 2007 Form 10-K that[62]:

> [i]n certain CDO transactions underwritten by the Company during 2003-2006, the senior funding of the CDOs was in the form of short-term commercial paper.  In order to facilitate the issuance of commercial paper by the CDO, the Company wrote a put option ("liquidity puts") to the CDO to benefit the commercial paper investors, which was accounted for as a derivative.  The total notional amount of these written liquidity puts was approximately $25 billion.

299.    FIN 46(R), ¶ B10 states that "written put options … are variable interests if they protect holders of other interests from suffering losses."  And, "to the extent the … written put options  . . . will be called on to perform in the event expected losses occur, those arrangements are variable interests . . . "

---

[61]  Bloomberg, Citigroup Business Update Call, Nov. 5, 2007 at 5.

[62]  Citigroup 2007 Form 10-K, at 91.

300.     Beginning in the fourth quarter of 2007 and continuing through the fourth quarter of 2008, Citigroup took $13.3 billion of total write-downs of its $25 billion in Commercial Paper CDOs, representing a 57% reduction in face value.  These write-downs demonstrate that the Company had been at risk for a majority of the Commercial Paper CDOs' expected losses when it issued the liquidity puts.

301.     Citigroup failed to disclose that the liquidity puts placed it at risk for the majority of the expected losses of the Commercial Paper CDOs, thereby requiring consolidation pursuant to FIN 46(R).  Citigroup's omission was a violation of GAAP and SEC Regulations, as was its failure to consolidate the Commercial Paper CDOs' financial results on Citigroup's financial statements, including Citigroup's Form 10-Q and Form 10-K filings for 2004, 2005, and 2006 and its Form 10-Q filings for the periods ending March 31, 2007, and June 30, 2007.

302.     KPMG, if it had conducted its audits in a non-reckless manner, would have acknowledged the existence of these liquidity puts in Commercial Paper CDOs dating back to 2003, and would have ensured that these CDOs were consolidated on Citi's financial statements.

### 4.     Citigroup Overstated The Fair Value Of Its CDOs With Direct Subprime Exposure In Violation Of GAAP

303.     Citigroup overstated the fair value of its CDOs with direct subprime exposures in its quarterly financial statements for March 31, 2007, June 30, 2007, September 30, 2007, in its annual financial statements in its 2007 Form 10-K, and potentially in later periods as well.

304.     FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶13 states that "unrealized holding gains and losses for trading securities shall be included in earnings."  Thus, Citigroup was required by GAAP to write down the fair value of its CDOs with direct subprime exposure and include the write-downs in its reported earnings.  Citigroup's 2007 Form 10-K overstated the fair value of its CDOs with direct subprime exposures.

305.     Citigroup adopted FAS 157, *Fair Value Measurements*, effective January 1, 2007. FAS 157, ¶ 5 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  FAS 157, ¶ 22 "prioritizes the inputs to valuation techniques used to measure fair value into three broad levels.  The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3)."  FAS 157, ¶ 28 also defines an intermediate type of observable inputs, Level 2, to include "a) Quoted prices for similar assets or liabilities in active markets; b) Quoted prices for identical or similar assets or liabilities in markets that are not active…; c) Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates); and d) Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)."

306.     FAS 157, ¶ 21 makes clear that "[v]aluation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs."  FAS 157, ¶ 21 explains that:

> inputs refer broadly to the assumptions that market participants would use in pricing the asset or liability, including assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique. Inputs may be observable or unobservable:
>
> a.      Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity.

> b. Unobservable inputs are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

307. Citigroup's 2007 Form 10-K stated that "the Company accounts for its CDO super senior subprime direct exposure and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings."[63] Citigroup stated in its 2007 Form 10-K that its CDOs with subprime exposure were not subject to valuation based on observable transactions; were Level 3 assets subject to valuation based on significant unobservable inputs; and were classified in Level 3 of the fair-value hierarchy throughout 2007. Similarly, Citigroup's Form 10-Q for the third quarter of 2007, filed November 5, 2007 (the "November 5, 2007 Form 10-Q") stated that the super senior tranches of subprime-related CDOs were not subject to valuation based on observable market transactions. The November 5, 2007 Form 10-Q stated that the fair value of these senior exposures was "based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value."[64] Citi's valuation method violated GAAP.

308. *First*, much of Citi's CDO inventory was comprised of CDOs Citi could not sell. Thus, these assets were unattractive to buyers at face value. It was clear to Citi throughout 2007 that carrying these CDOs at face value did not reflect the "price that would be received" in a transaction between market participants, as required by FAS 157.

309. *Second*, Citigroup violated GAAP by failing to use an observable Level 2 input, *i.e.*, the TABX index, for Mezzanine CDOs. This index was a readily available observable input of the fair market value of Citigroup's CDOs with subprime exposure, particularly Citigroup's

---

[63] 2007 Form 10-K, at 169.

[64] November 5, 2007 Form 10-Q, at 102.

Mezzanine CDOs.  Pursuant to FAS 157, Citigroup was required to value its Mezzanine CDOs using the Level 2 observable TABX index instead of the unobservable Level 3 inputs it did use. Citigroup's failure to compare its Mezzanine CDOs to the TABX, which would have led the Company to write down these assets (and reflect these write-downs in its pre-tax income pursuant to FAS 115 ¶13), was a violation of GAAP.

310.    Citigroup held $8.3 billion of undisclosed Mezzanine CDOs on its books at par value as of March 31, 2007, June 30, 2007, and September 30, 2007.  However, during 2007, the TABX index for Mezzanine CDOs suffered substantial declines to approximately:

        a.    85% of par as of March 31, 2007, or a 15% drop in value;

        b.    69% of par as of June 30, 2007, or a 31% drop in value; and

        c.    33% of par as of September 30, 2007, or a 67% drop in value.

311.    Accordingly, Citigroup was required by FAS 157 to write down the fair value of its $8.3 billion of Mezzanine CDOs by approximately:

        a.    15%, or $1.2 billion as of March 31, 2007;

        b.    31%, or $2.6 billion as of June 30, 2007; and

        c.    67%, or $5.6 billion as of September 30, 2007.

312.    Thus, as of September 30, 2007, the $8.3 billion in Mezzanine CDOs should have been valued at $2.7 billion, yet still Citi valued them at face value.

313.    In the fourth quarter of 2007, Citigroup belatedly wrote-down the $8.3 billion face value of its Mezzanine CDOs by 63%, or $5.2 billion, still *less than* the amount that was appropriate based on the TABX declines during the first three quarters of 2007.  Thus, by December 31, 2007, the Company had still not taken sufficient write-downs, and its GAAP violations continued.

314.     Accordingly, Citigroup's failure to write-down the fair value of its Mezzanine CDOs as of March 31, 2007, June 30, 2007, September 30, 2007, and December 31, 2007, as required by FAS 157, and to include the write-downs in pre-tax income, as required by FAS 115, violated GAAP.

315.     Furthermore, the TABX was also relevant for Citigroup's Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and the warehoused and unsold CDOs from its lending and structuring operations.   Thus, the TABX decline required write-downs of these assets as well.   Citigroup's failure to take any write-downs on these super senior CDOs, disregarding the decline in the TABX index, an observable higher Level 2 input that had declined substantially in value, as required by FAS 157, and to include the write-downs in pre-tax income, as required by FAS 115, violated GAAP.

316.     Citi's failure to minimize the use of the unobservable Level 3 inputs also violated GAAP.

317.     **Third**, Citi's internal modeling was fatally flawed.   The Company stated that its valuation processes[65]:

> include a number of key controls that are designed to ensure that fair value is calculated appropriately.   Such controls include a model validation policy requiring that models that provide values used in financial statements be validated by qualified personnel independent from those who created the models and escalation procedures to ensure that valuations using unverifiable inputs are identified and monitored on a regular basis by senior management.

This statement was untrue.  Citigroup did not ensure that fair value for its subprime-related assets was calculated appropriately.

---

[65] Citigroup September 30, 2007 Form 10-Q, at 79.

318.     Citigroup's CDOs were largely collateralized by subprime RMBS.  At a time when the residential real estate market was already in freefall, with the related RMBS market also suffering, Citi's CDOs were not properly valued at par.  As detailed above, all of Citi's supposedly High Grade CDOs included BBB-rated RMBS and RMBS from the particularly toxic 2006 and 2007 vintages.  In essence, Citi's CDOs sat at the top of a heap of toxic assets and were perhaps less lethal, but were toxic nonetheless.

319.     In particular, Citi's model suffered from the following problems[66]:

a.     Citi disregarded the views of  its own credit analysts who stated that super senior CDO tranches were at high risk of suffering losses and who had recommended investors sell these assets;

b.     Citi was overly reliant on the ratings of these CDOs, despite (a) its own caution that rating agencies do not always make timely changes and that the ratings should only be used as a "primary indicator" of the investment quality; (b) widespread market discussion of the fact that the ratings were not keeping pace; and (c) the rating agencies' own statements about possible downgrades;

c.     Citi used the discount rate for CLOs, despite its own warning that comparing the two classes of assets would "not be fair";

d.     Citi improperly used the ABX-AAA index as an input, which measured underlying RMBS, not CDOs, which had a more diverse – and higher risk – asset base; and

e.     Citi stated that one of the "primary drivers" impacting its super senior valuations was housing prices, yet Citi did not properly incorporate the fact that housing prices had been falling since mid-2006.

---

[66] *See* Citigroup 2007 Form 10-K, at 169.

320.     Additionally, Citi stated in its Form 10-Q for the third quarter of 2007 that it made adjustments to account for counterparty credit risk.[67]   In January 2008, Citi disclosed an additional $10.5 billion in CDOs, which had been hedged through guarantee contracts with the monoline insurers.  Given that these insurers were already distressed in late 2007, Citi was required to take write-downs sooner, and to take a more significant write-down than the $900 million write-down taken in December 2007.  Its failure to properly account for the counterparty credit risk was also a violation of GAAP.

321.     As a result of Citi's failure to properly value its CDOs, the Company overstated the value of these assets and, accordingly, inflated its earnings, in its Form 10-Q filings for the periods ending March 31, 2007, June 30, 2007, and September 30, 2007, in its 2007 Form 10-K, and potentially in later filings as well, in violation of GAAP.

322.     KPMG recklessly failed to conduct its audits in accordance with generally accepted auditing standards ("GAAS").  As a result, Citi's valuation of its CDOs was seriously flawed and not in compliance with GAAP.

### 5.     Citigroup Failed To Consolidate Its SIVs On Its Balance Sheet In Violation Of GAAP

323.     Citigroup failed to consolidate its sponsored SIVs on its annual and quarterly financial statements for 2004, 2005, and 2006, and on its quarterly financial statements for March 31, 2007, June 30, 2007 and September 30, 2007, although the Company was required by GAAP to do so.

324.     Citigroup's SIVs are Variable Interest Entities (VIEs) subject to the consolidation rules set forth in FIN 46(R).

---

[67] *See* Citigroup September 30, 2007 Form 10-Q, at 78.

325.    FIN 46(R)-5, *Implicit Variable Interest under FASB Interpretation No. 46* (revised December 2003), ¶ 3 states that one example of an implicit variable interest is "an implicit agreement to replace impaired assets held by a variable interest entity that protects holders of other interests in the entity from suffering losses."  FIN 46(R)-5 also states that the determination as to whether a Company is effectively guaranteeing all or a portion of an investment or would be expected to make funds available and, therefore, an implicit variable interest exists, should take into consideration all the relevant facts and circumstances.  Those facts and circumstances include whether there is an economic incentive for the Company to act as a guarantor or to make funds available.

326.    Citigroup, whether or not legally required, had an implicit guarantee to provide support to its sponsored SIVs as defined in FIN 46(R)-5.  On December 13, 2007, the Company reported that "it has committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investments Vehicles ('SIVs')."  Citigroup's 2007 Form 10-K stated that "on December 13, 2007, Citigroup announced its decision to commit, not legally required, to provide a support facility that would resolve uncertainties regarding senior debt repayment facing the Citi-advised Structured Investment Vehicles (SIVs).  As a result of the Company's commitment, Citigroup included the SIVs' assets and liabilities in its Consolidated Balance Sheet as of December 31, 2007."

327.    Although Citigroup claimed not to be legally required to provide support to its SIVs, it acted as if it was, by buying commercial paper from one of its SIVs in October 2007, by providing $10 billion in financing to its SIVs at the same time, and by finally consolidating the SIVs on its balance sheet in the fourth quarter of 2007.  This implicit guarantee to its SIVs placed Citigroup at risk for a majority of the losses of the SIVs.  Citigroup provided an implicit

guarantee to its SIVs because it had an economic incentive, *i.e.*, loss of business reputation, to act as guarantor and make funds available to support the SIVs.

328.     This implicit guarantee placed Citigroup at risk for the majority of the losses of its SIVs, thereby requiring consolidation of the SIVs on Citigroup's balance sheet by GAAP.

329.     Citigroup's failure to consolidate its SIVs on its balance sheet in its Form 10-Q and Form 10-K filings for 2004, 2005, and 2006 and Form 10-Q filings for the periods ending March 31, 2007, June 30, 2007, and September 30, 2007, as required by FIN 46(R) and FIN 46(R)-5, violated GAAP.

330.     KPMG recklessly failed to make appropriate inquiry during its audits regarding the nature and scope of Citi's commitment to its SIVs, and thus failed to require the Company to consolidate those SIVs on its balance sheet, while falsely certifying that the Company's financial statements complied with GAAP.

### 6.     Citigroup Overstated the Fair Value Of Its Total Assets In Violation Of GAAP

331.     Citigroup overstated the fair value of its total assets on its annual financial statements for 2007 and on its quarterly financial statements for March 31, 2008, June 30, 2008 and September 30, 2008.

332.     Pursuant to FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶ 13 "unrealized holding gains and losses for trading securities shall be included in earnings." Thus, GAAP required Citigroup to write down the fair value of its total assets, as measured in compliance with FAS 157, and to include the write-downs in its earnings.

333.     On November 4, 2007, Citigroup disclosed for the first time that it had approximately $55 billion of direct subprime exposures in its Securities and Banking division and that it anticipated taking write-downs in the range of $8 billion to $11 billion.

334.     Over the next four quarters, Citigroup took a total of $40.8 billion of write-downs in its Securities and Banking division as follows:

      a.     $17.2 billion for the fourth quarter of 2007;

      b.     $12.1 billion for the first quarter of 2008;

      c.     $7.1 billion for the second quarter of 2008; and

      d.     $4.4 billion for the third quarter of 2008.

335.     The write-downs were on a variety of Citigroup's assets, including subprime related direct exposures, monoline credit value adjustments, highly leveraged finance commitments, Alt-A mortgages, ARS, commercial real estate, and SIVs.

336.     Citigroup's total assets as reported on its balance sheet were:

      a.     $2.19 trillion as of December 31, 2007;

      b.     $2.20 trillion as of March 31, 2008;

      c.     $2.10 trillion as of June 30, 2008; and

      d.     $2.05 trillion as of September 30, 2008.

337.     Despite the massive write-downs Citigroup had already taken, the fair value of its total assets remained overstated and, therefore, GAAP required further write-downs (with the write-downs included in earnings).  Citigroup was required by FAS 157 and FAS 115 to write down the fair value of its total assets because the Company failed to maximize observable higher Level 2 inputs over the unobservable lower Level 3 inputs that it was using to value its total assets, and failed to implement proper controls to ensure the valuation models used with Level 3 inputs were accurate.

338.     In sum, Citigroup's failure to take adequate write-downs on the fair value of its total assets on its 2007 Form 10-K and on its Form 10-Q filings for the periods ending March 31,

2008, June 30, 2008 and September 30, 2008, as required by FAS 157 and FAS 115, violated GAAP and resulted in material overstatements of the Company's assets for those periods.  The overstatement of its assets also caused Citigroup's earnings and capital to be overstated.

339.    KPMG, if it had conducted its audits in a non-reckless fashion and in accordance with GAAS, would have detected and/or prevented the Company's GAAP violations with regard to its failure to take necessary write-downs.

### 7.    Citigroup Overstated Its Capital Adequacy

340.    A bank's Tier 1 capital ratio measures its ability to withstand substantial losses, and therefore provides investors and regulators with important information regarding the Company's overall financial strength.  A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."  Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

341.    In the 2007 Form 10-K, Citigroup stated that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 7.12% at December 31, 2007."  Citigroup similarly stated in its Form 10-K filings for 2004 through 2006 that the Company was "well-capitalized" based on its Tier 1 capital ratio.

342.    If appropriate write-downs had been taken on the Company's subprime-related assets, and if the Company's loan loss reserves had been increased as required by GAAP, its reported Tier 1 capital ratio would have been less than 7.12% in 2007, and less than 8.59% at the end of 2006, and investors would have realized that the Company's capital adequacy was in serious jeopardy.  By failing to take appropriate write-downs, the Company overstated its Tier 1 capital ratio and the overall adequacy of its capital.

B.     **Defendants Prince, Pandit And Crittenden Signed False Sarbanes-Oxley Certifications**

343.    The SEC filings included certifications under the Sarbanes-Oxley Act (the "Sarbanes-Oxley Certifications") signed by Defendants Prince, Pandit and/or Crittenden, certifying that the signatory had reviewed the relevant SEC Filing and that such filing did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." These certifications were untrue because the Company's SEC filings contained the untrue statements and material omissions described herein.

C.     **KPMG's Audit Reports Were Materially False And Misleading**

344.    For each of the years from 2004 through 2007, KPMG issued unqualified audit opinions on the Company's financial statements. These audit opinions, which were included in the Company's Form 10-K filings for those years, stated that KPMG had conducted its audits in accordance with GAAS and that the Company's annual financial statements fairly presented, in all material respects, the Company's financial position as of each year-end, in conformity with GAAP. These statements were untrue, because KPMG's audits did not comply with GAAS, and because the Company's financial statements not only failed to comply with GAAP, but were materially misstated and misleading to investors.

345.    In particular, KPMG acted recklessly in that its audit of Citigroup's financial statements violated, among others, the following basic principles of GAAS:

a.     KPMG failed to exercise due professional care in the performance of its audit and the preparation of its reports;

b.     KPMG failed to adequately plan and supervise its audit;

      c.     KPGM incorrectly stated that the Company's financial statements were presented in conformity with GAAP; and

      d.     KPMG had an insufficient basis for expressing its unqualified opinion, for its audits had not been conducted in accordance with GAAS.

### D.    Additional False And Misleading Statements And Omissions During The Relevant Period

346.    In addition to the false and misleading statements and omissions in the Company's financial statements, the Citigroup Defendants made a number of false and misleading statements and omissions in the textual portions of the SEC Filings, and in press releases, analyst conference calls, interviews, and other public statements.

347.    Citigroup filed its Form 10-Q for the first quarter of 2004 (ending March 31, 2004) on May 5, 2004.   In this 10-Q, the Company made the following disclosure[68]:

> Variable Interest Entities
>
> * * *
>
> In addition to the VIEs that are consolidated in accordance with FIN 46-R, **the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary.** These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.
>
> * * *
>
> [T]he total assets of unconsolidated VIEs where the Company has significant involvement is $119.8 billion and $116.6 billion at March 31, 2004 and December 31, 2003, respectively, including **$8.2 billion and $7.9 billion in investment-related transactions,** $3.2 billion and $6.0 billion in mortgage-related-transactions, $10.0 billion and $8.5 billion in CDO-type transactions, $6.3 billion and $0.2 billion in trust preferred securities, and $92.1 billion and $94.0 billion in structured finance and other transactions.

---

[68]  Form 10-Q for the period ending Mar. 31, 2004, at 76-77.

348.    The above-quoted disclosures in Citigroup's Form 10-Q for Q1 2004 were repeated in each of the Company's Form 10-Q and Form 10-K filings through the second quarter of 2007, although beginning in the 2005 Form 10-K, the figures showing assets of unconsolidated VIEs were presented in table format.[69]  All of these disclosures were materially false and misleading because Citigroup was required to consolidate the unconsolidated SIVs from 2004 forward, in light of the Company's implicit obligation to support these entities.  Even if consolidation was not required in each of the referenced reporting periods, Citi's disclosures were nonetheless misleading in omitting to disclose the necessary level of detail regarding the Company's exposure and involvement with the SIVs to allow an independent assessment of the risks posed by the Company's involvement, as required by FIN 46(R).  Indeed, the term "SIV" does not appear at all until the Company's Form 10-Q for the third quarter of 2007, filed on November 5, 2007.

349.    In a July 31, 2006 article appearing in American Banker magazine, Bill Beckmann, President and Chief Operating Officer of the Company's CitiMortgage residential mortgage unit, explained that the Company was going to offer subprime loans only to high-quality borrowers who had the ability to repay the loans, and that the Company's various mortgage lending arms would screen for risk:[70]

> Mr. Beckmann called the rollout of interest-only nonprime ARMs 'entirely consistent' with the past statements [that Citi would refrain from offering alternative products such as interest-only and

---

[69]  The disclosures in the subsequent filings contained the same text, with figures adjusted accordingly.  *See* Form 10-Q for the period ending June 30, 2004, at 79-80; Form 10-Q for the period ending Sept. 30, 2004, at 84-85; 2004 Form 10-K, at 129-30; Form 10-Q for the period ending Mar. 31, 2005, at 79-80; Form 10-Q for the period ending June 30, 2005, at 83-84; Form 10-Q for the period ending Sept. 30, 2005, at 89-90; 2005 Form 10-K at 145-46; Form 10-Q for the period ending Mar. 31, 2006, at 90; Form 10-Q for the period ending June 30, 2006, at 107-08; Form 10-Q for the period ending Sept. 30, 2006, at 112-13; 2006 Form 10-K, at 147; Form 10-Q for the period ending Mar. 31, 2007, at 101; and Form 10-Q for the period ending June 30, 2007, at 66-67.

[70]  Jody Shenn, *New CitiMortgage Primed for Nonprime*, American Banker, Jul. 31, 2006.

no documentation loans, to subprime borrowers]. He said Citi would not offer interest-only loans 'deep into the nonprime space' – only down to 620 FICO scores. And, he stressed, 'we're not going to make a loan on an affordability basis. We're going to make a loan because we believe it's right for a customer because we think they can pay it back.'

350. The above statements, which are attributable to Citigroup by virtue of Beckmann's high-level position at the Company, were materially false and misleading when made, in the following respects:

a. Although Beckmann discussed Citi's intent to limit lending to situations where the borrower could re-pay the loan, he did not disclose that the Company was decreasing loan originations through its own staff and instead was increasing its reliance on correspondent channels for new loans. As discussed above, loans originated by these correspondent channels regularly involved borrowers with questionable abilities to pay back their mortgages, thereby bringing Citi well into the "deep" subprime space of borrowers with FICO scores below 620. In fact, 16% of Citi's mortgage portfolio was comprised of loans in this category by the end of 2007.

b. Citigroup knew that it was already accumulating mortgages that borrowers were having trouble repaying. At least as early as mid-2006, Citigroup was encountering mounting defaults among its correspondent channel loans, which eventually led Citi to demand repurchases from these lenders. Also, by mid-2006 Citigroup's warehouse lending division, First Collateral Services, a subsidiary of CitiMortgage, saw an increase in the volume of defective, stale loans it had acquired via warehouse credit lines extended to mortgage brokers, and which were often re-sold to CitiMortgage.

351.    In a December 2006 Mortgage Banking article, Mr. Beckmann made the following statements:[71]

> We are growing at double-digit rates in an industry that is contracting a bit. And the thing I'm probably the most proud of [is], we're not giving away the shop to grow. To the contrary: By the public data we can see, we're outperforming the industry in terms of profits per loan.

352.    This statement was materially false and misleading when made for at least three reasons:

a.      Beckmann omitted to disclose that Citi's growth was largely due to its increasing willingness to make or purchase risky loans that other lenders were avoiding. For example, Citigroup increasingly relied on correspondent channels for loan production, which regularly involving borrowers with questionable abilities to pay back their mortgages.

b.      At least as early as mid-2006, Citigroup was increasingly saddled with defective correspondent channel loans in early payment default, as was its warehouse lending division.

c.      Citigroup was only able to display impressive growth and increasing revenues by failing to timely recognize known and probable impairments to its mortgage portfolio, as demonstrated by the Company's deliberate delay in pursuing litigation arising from defective loans and its failure to take adequate charges to increase its loan loss reserves.

353.    With respect to bulk loan purchases, the December 2006 Mortgage Banking article further stated:

> 'There are loans that maybe we wouldn't feel comfortable with [putting] in our portfolio, but the Street is happy with. So, we'll have one bid for a customer and we'll parse the loans, some to

---

[71]  Robert Stowe England, *Citi Mortgage On the Move*, Mortgage Banking, Dec. 2006 (alteration in original, emphasis added).

[our] portfolio and some to CGM, which will package it and sell to the Street,' says Beckmann.

* * *

In the past, 'a correspondent might show us a pool of $100 million and we'd say, [w]e'll take $70 million,' Beckmann says. Then, however, 'Someone else might be willing to take $90 million,' leaving Citigroup at a potential disadvantage in acquiring the bulk purchase.

'Now, Citi can bid more robustly and not get stuck with the kicks – the loans we didn't want to take, but that someone else might feel happy with,' says Beckmann. 'So, now we have a combined strength of what we're happy to put in our portfolio at CitiMortgage and what Capital Markets Group is willing to purchase,' he says.

354.     These statements were false and misleading because they gave investors the impression that Citigroup was able to pass off bad mortgages through securitizations. However, as Citigroup would later reveal, it was building up an increasing inventory of stale loans, and was finding itself unable to resell ever-greater numbers of deficient mortgages bought from its correspondent channels.

355.     On January 19, 2007, Citigroup filed a Form 8-K, attaching a press release of the same date that announced earnings for the fourth quarter of 2006 (ending December 31, 2006) and also included limited financial information for the full year 2006 (the "January 2007 Form 8-K"). The January 2007 Form 8-K was signed by Defendant Gerspach, and quoted CEO Prince as stating that the Company's 2007 priorities included "remaining highly disciplined in credit management." This statement is misleading, because "remaining disciplined" was not possible when the Company had not been disciplined in its credit management to begin with. As discussed in detail above, Citigroup had engaged in reckless subprime lending in order to fuel the growth of its consumer lending portfolio and to generate mortgages that could be packaged into RMBS. Indeed, that growth in subprime lending was one reason Citi was able to increase its

global consumer assets under management in the fourth quarter by 17%, as reported in the January 2007 Form 8-K.

356.    The January 2007 Form 8-K also reported that the Company faced a "generally stable" consumer credit environment, and the financial data supplement filed as Exhibit 2 to the January 2007 Form 8-K reported a $2.1 billion charge for provision of loan losses for the fourth quarter of 2006, resulting in a total allowance for credit losses of $8.94 billion.  The Company also reported income of $5.13 billion for the fourth quarter of 2006, and income of $21.25 billion for the full year 2006.  Citi also reported total assets of $1.883 trillion, which incorporated the $8.940 billion allowance for loan losses, and total liabilities of $1.76 trillion.  These figures are misleading for many of the same reasons as the 2006 Form 10-K, discussed below.  In particular, the credit environment was deteriorating throughout 2006, and Citigroup was required to increase its loan loss reserves by a greater amount to accommodate the changing circumstances. Citi's credit reserves actually decreased during the fourth quarter of 2006, while net credit losses rose, resulting in a lower loan loss reserve percentage at the end of that quarter.  Thus, Citi's loan loss reserves were understated and its assets were overstated.  Additionally, because Citi was required to take a greater charge to achieve the appropriate reserve level, Citi's income was overstated.  The figures for total assets and total liabilities were also misleading because the balance sheet failed to include the Commercial Paper CDOs and the assets and liabilities of the SIVs that Citi was required to consolidate.

357.    In the 2006 Form 10-K, which was filed on February 23, 2007, Citigroup stated the following with respect to its "Allowance for Loan Losses"[72]:

> For consumer loans . . . each portfolio of smaller-balance,
> homogeneous loans – including consumer mortgage, installment,

---

[72] Citigroup 2006 Form 10-K, at 111.

revolving credit, and most other consumer loans – is collectively evaluated for impairment. **The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions**. (emphasis added)

358.     These statements – which were repeated in Citigroup's 2007 Form 10-K[73] – were false and misleading because the Company's impairment analysis ignored recent trends such as downturns in the housing market, and did not legitimately evaluate "probable losses inherent in the portfolio."

359.     Citigroup materially misrepresented its CDO-related exposure throughout the Relevant Period.   For example, the 2006 Form 10-K included information regarding the Company's CDO-related exposure.  The "Off Balance Sheet Arrangements" section stated[74]:

OFF-BALANCE SHEET ARRANGEMENTS

* * *

Mortgages and Other Assets

The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, **securitizing these assets also reduces the Company's credit exposure to the borrowers**….

* * *

Creation of Other Investment and Financing Products

The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which

---

[73]  Citigroup 2007 Form 10-K, at 114.

[74]  Citigroup 2006 Form 10-K, at 92-93.

match the clients' investment needs and preferences. Typically these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.

\* \* \*

See Note 22 to the Consolidated Financial Statements on page 143 for additional information about off-balance sheet arrangements. (emphasis added)

360.   Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the 2006 Form 10-K (the "Note 22" referred to in the immediately preceding quote) stated[75]:

Securitizations and Variable Interest Entities

The Company primarily securitizes credit card receivables and mortgages. Other types of assets securitized include corporate debt securities, auto loans, and student loans.

\* \* \*

... The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust.

\* \* \*

Variable Interest Entities

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under existing guidance and VIEs that the Company became involved with after July 1, 2003:

---

[75] *Id.* at 143-147.

| In billions of dollars | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Cash | $ 0.5 | $ 0.4 |
| Trading Account Assets | 31.6 | 29.7 |
| Investments | 10.1 | 6.1 |
| Loans | 6.8 | 9.5 |
| Other Assets | 5.7 | 4.7 |
| Total assets of consolidated VIEs | $54.7 | $50.4 |

* * * *

In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds….

* * * * *

The Company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. **Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.** The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated debt CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

119

In addition to the conduits discussed above, the following table represents the total assets of unconsolidated VIEs where the Company has significant involvement:

| In billions of dollars | December 31, 2006 | December 31, 2005[1] |
|---|---|---|
| **CDO-type transactions** | **$ 52.1** | **$ 40.7** |
| Investment-related transactions | 122.1 | 78.0 |
| Trust preferred securities | 9.8 | 6.5 |
| **Mortgage-related transactions** | **2.7** | **3.1** |
| Structured finance and other | 41.1 | 63.1 |
| Total assets of significant unconsolidated VIEs | $227.8 | $191.4 |

(1) Reclassified to conform to the current period's presentation.

* * * * *

As mentioned above, the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs. Although actual losses are not expected to be material, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $109 billion and $91 billion at December 31, 2006 and 2005, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs…. (emphasis added)

361.     The above-quoted disclosures in Citigroup's 2006 Form 10-K were the same as those included in the Company's Form 10-Q filings in 2004, 2005, 2006, and 2007 and in its

Form 10-K filings for 2004 and 2005.[76]  These disclosures were false and misleading for several reasons.

(a)     First, they made it appear as though Citigroup's CDOs were distinct from its mortgage-related transactions and mortgage securitizations, when in fact Citigroup's CDOs were collateralized primarily by subprime and Alt-A mortgages.

(b)     Second, they indicated that the effect of Citigroup's mortgage securitization activities was to ***reduce*** Citigroup's exposure to mortgage borrowers' credit risk. This was materially misleading because, while the mortgage securitizations themselves may have transferred credit risk from Citigroup to the purchasers of the RMBS, what Citigroup did not disclose was that its own CDOs were among the largest purchasers of those RMBS.  Moreover, Citigroup was the largest purchaser of the subprime-backed CDOs that it underwrote.  Thus, through its substantial retained interest in those CDOs, Citigroup therefore effectively remained subject to the very risks that it claimed it had transferred away from itself.

(c)     Third, the 2006 Form 10-K portrayed the CDOs as being structured to "diversify investors' risk to a pool of assets as compared with investments in an individual asset."  In truth, however, Citigroup's CDOs were not diversified, but rather were based on concentrations of RMBS bearing similar subprime risk profiles.  Moreover, the degree of correlation – *i.e.*, the lack of diversification – actually increased for the more senior tranches of

---

[76]  The disclosures in the previous and subsequent filings contained the same text, with figures adjusted accordingly. *See* Form 10-Q for the period ending Mar. 31, 2004, at 53-55, 71-75; Form 10-Q for the period ending June 30, 2004, at 59-60, 76-80; Form 10-Q for the period ending Sept. 30, 2004, at 62-63; 81-86; 2004 Form 10-K, at 98-99; 127-30; Form 10-Q for the period ending Mar. 31, 2005, at 61-62, 79-80; Form 10-Q for the period ending June 30, 2005, at 61-62, 80-84; Form 10-Q for the period ending Sept. 30, 2005, at 65-66, 86-90; 2005 Form 10-K at 106-07, 145-46; Form 10-Q for the period ending Mar. 31, 2006, at 73, 87-90; Form 10-Q for the period ending June 30, 2006, at 79, 102-08; Form 10-Q for the period ending Sept. 30, 2006, at 82, 109-13; 2006 Form 10-K, at 147; Form 10-Q for the period ending Mar. 31, 2007, at 42, 98-101; Form 10-Q for the period ending June 30, 2007, at 42, 63-67.

the CDOs.  As the primary purchaser of those CDOs, including the super senior tranches, Citigroup was subjected to those concentrated risks.

(d)     Fourth, they did not disclose that the Company was engaged in a practice of repackaging unsellable tranches into new CDOs, in an effort – largely unsuccessful – to offload the growing risks that they carried.  Nor did they disclose that Citigroup was amassing an ever-growing supply of unsellable, increasingly high-risk CDOs.

(e)     Fifth, while the 2006 Form 10-K contained a chart listing the total assets of the various VIEs (including CDOs) that were not consolidated on the Company's financial statements, there was no disclosure of the extent of Citigroup's interest – which was substantial – in those VIEs or in their underlying assets.  Given Citigroup's financial and other commitments to many of these VIEs, Citigroup was required to consolidate them on its financial statements under GAAP or, at a minimum, to provide the information required by FIN 46(R).

(f)     Sixth, Citigroup's statement that it "may … provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs" was misleading because it omitted to disclose that, in fact, the Company had written a liquidity put when it structured the Commercial Paper CDOs that would require it to repurchase those CDOs in the event of a liquidity issue.  Indeed, Citigroup disclosed that it had repurchased $25 billion in Commercial Paper CDOs pursuant to these liquidity puts during the summer of 2007.  In light of these liquidity puts, the Company was required to retain these CDOs on its balance sheet when they were issued, and to take write-downs in relation to those CDOs no later than the quarter ended June 30, 2007, given the status of the RMBS and CDO markets at that time.

362.    In addition, the 2006 Form 10-K reported that Citi's had only "limited continuing involvement" with certain VIEs, and thus had no obligation to consolidate them.[77]   The 2006 Form 10-K also reported that the Company's maximum exposure to these off-balance-sheet VIEs was $109 billion as of December 31, 2006.[78]   These statements were false and misleading because, as discussed previously, these unconsolidated VIEs included the SIVs Citi would later disclose and consolidate, as a result of its commitment to prevent them from failing.  As a result, Citigroup was obligated to consolidate those SIVs on its financial statements under GAAP.  Its failure to do so resulted in understatement of the Company's assets and liabilities, and concealed from investors the severity and magnitude of the risk that impairment of the SIVs' assets would impair the Company's capital adequacy.  This undisclosed risk ultimately materialized, and the Company was forced to absorb the $17.4 billion cost of unwinding the SIVs when their assets became so impaired that they could not be sold.

363.    On an analyst conference call on April 16, 2007, Defendant Prince stated that Citigroup was being "very diligent in managing our credit exposures."  He stated further:

> Our fourth big job this year is to manage through the credit cycle. We're a bank; we're in the risk business. We're not immune to credit cycles.  We're not immune to credit deterioration, and we're managing this side of our business very carefully in light of that external environment.  I feel good about the composition of our portfolios, not only in the corporate and sovereign area but especially in the U.S. mortgage area where we have avoided the riskier products at some cost to revenues in prior years, and I think we're seeing that play out in the results we have on the credit side. Gary [Crittenden] will take you through the details of that in a moment including the increase in the reserves to stay ahead of the trends we see in the credit environment, but I assure you that we remain very diligent in managing our credit exposures.

---

[77]  2006 Form 10-K, at 93.

[78]  *Id.* at 147.

These statements were false and misleading when made because Prince knew Citigroup was not "managing this side of the business very carefully" and was not "very diligent in managing [its] credit exposures."  Additionally, Citi did not avoid "riskier products" given its massive exposure to large portfolio of subprime mortgages.

364.    On July 20, 2007, during another analyst conference call, Defendant Crittenden stated that the Company had only $13 billion of direct exposure to subprime assets, and that the Company had materially reduced this exposure from $24 billion at the end of 2006.  This statement was materially false, as Citigroup revealed only a few months later that its subprime-related exposures were approximately $55 billion.  That number grew to $65.1 billion by January 2008.

365.    On September 12, 2007, Defendant Freiberg gave a presentation at the Lehman Brothers Financial Services Conference (the "Sept. 12, 2007 Lehman Conference"), during which he made a number of false and misleading statements, including:

(a)    portrayal of the growth in Citi's subprime lending business as a positive indicator of future value[79]:

> If you look at CitiFinancial, and this again, this is the consumer finance company, it is a subprime lender. It's essentially - about half its portfolio is unsecured, about half its portfolio is secured, and that business is growing at a very nice clip. It was growing again in the low single digits on an organic basis if we look back 1.5 - 2 years ago.  It's now growing its asset base 9 or 10%, maybe a little bit higher on a consistent basis.  It's a good leading indicator of basically future value.;

(b)    boasting that Citi's subprime business was "actually doing quite well" [80]:

---

[79] Sept. 12, 2007 Lehman Conference, at 3.

[80] Sept. 12, 2007 Lehman Conference, at 4-5.

. . . you can look at essentially at CitiFinancial over the last several years and what you see is that it basically was trending between plus or minus couple of percentage points of growth and that would be organic growth because we weren't really acquiring during that period of time. **And if you look over the last three or four quarters, there is a sustained improvement and growth in revenue, and we would expect this to be again highly sustainable trend . . . So very good business for us.** And for those of you who have kind of read the presentation that we put up, what's interesting about this business, I think, has a lot to do along with our history, our competency, but also the business model, it is very much a face to face, I am in my store and get to know your type model that our delinquencies in this business today are actually at the same level or maybe even a little bit lower than they were a year ago, and this is effectively almost exclusively in subprime lending business, and again half real estate, half non-secured. So the characteristic here would have been, god, how is it doing, this is almost $40 billion worth of the lending, **it's actually doing quite well**. (emphasis added);

(c)     stressing that Citigroup's mortgage lending was primarily conducted on a face-to-face basis, and proclaiming that subprime was a "terrific" category that was not experiencing stress[81]:

But again, what's important about these portfolios for Citi because you can see essentially the difference between the industry, which used to be in the 270s is now basically pierced the 400s, on its way to 5% or 500 basis points past due, is that **the model we run, again, it's a face-to-face model**. We underwrite every nickel of this paper. Early stage collections happen in our branches. It's essentially almost exclusively fixed paper. It's not variable, it's not teaser, it's not exotic. **And so, what you can take away is that the subprime is a terrific category**. You can do extremely well, but you can't basically go off the farm and do things that basically make not a great deal of sense. I thought it was an interesting chart for this group because it's squarely in that category and we've been in this business for a long period of time. **And when you would expect stress, we haven't really seen it**. (emphasis added);

(d)     exaggerating about the subprime portfolio's "very good" performance[82]:

---

[81] Sept. 12, 2007 Lehman Conference, at 7.

And then the other extreme, which again is the pleasant surprise, when you think there would be a fire which is in our subprime portfolio, it actually looks very good.;

(e)      underscoring Citigroup's purportedly careful application of "conscious and cautious" lending criteria and its correspondingly low representation in risky high-LTV and subprime second mortgage loans[83]:

If you look at the top left first mortgage, the first mortgage portfolio, the matrix really is loan to value and FICO score as an indicator at least to credit quality as well as how much risk or how much exposure have you taken to the underlying asset. So obviously, what you would like to do is have basically low - **you would like to basically have your loan to value being low and your FICO score being high. And if you look at our first mortgage business, largely speaking, that's how it distributes. And if you were going to basically isolate a row and a category on where you would be most exposed, it would be clearly the LTV greater than 90**, which is the bottom row cascading out across essentially the - cascading out across the FICO range. **And you can see though that we have relatively speaking low representation within those ranges**. But again, we are in a category where you make or lose money on the tail, so you always have to be conscious and cautious of that.

On the second mortgage side, what you can see is that **we tended not to be a lender of basically subprime second mortgages**. (emphasis added).

366.    The foregoing statements from the Sept. 12, 2007 Lehman Conference were materially false and misleading when made, for multiple reasons:

(a)      Contrary to Freiberg's statements, Citigroup's expansion of its subprime business did not lead to true growth; its subprime business was not doing "quite well" and was not a "terrific category"; and its subprime portfolio did not look "very good."

---

[82] Sept. 12, 2007 Lehman Conference, at 10.

[83] Sept. 12, 2007 Lehman Conference, at 7.

(b)     Citigroup was increasingly moving away from the face-to-face retail production, contrary to Freiberg's statement, and toward relying primarily on correspondent channels for loan production.  By 2007, Citigroup relied on correspondent channels for loan production amounting to $94 billion.  As a leading analyst observed, these sources represented the "lowest of the low quality channels," as they regularly involved borrowers with questionable abilities to pay back their mortgages.  Citigroup was not underwriting "every nickel of this paper," and Citigroup's numerous litigations involving deficient loans demonstrates that Citigroup was barely reviewing its loans.

(c)     Citigroup's touted growth rate and revenues were inflated by the Company's delay in recognizing known and probable impairments to its mortgage portfolio, as evidenced in the Company's deliberate delay in enforcing its rights and pursuing litigation arising from blatantly defective loans.  Citigroup, at least as early as mid-2006, was increasingly saddled with defective correspondent channel loans in the form of first payment defaults, early payment defaults, and a slew of other fundamental underwriting problems, which led to Citigroup belatedly and halfheartedly demanding loan repurchases from its shoddy correspondent lenders and, eventually (but belatedly) suing them.  Similarly, Citigroup recklessly purchased $2.7 billion in loans from Accredited Home Lenders on March 15, 2007, with a substantial number of these loans immediately demonstrating impairment and deficiencies, including early payment defaults, yet it did not file suit until May 2008.  Even after attempting to securitize these loans into RMBS, Citigroup was stuck with over $800 million in these Accredited Home Lenders loans, as well as some of the RMBS securities for which Citigroup could not find a willing buyer.

(d)     Citigroup had not applied "conscious and cautious" lending criteria and did not enjoy a correspondingly low representation in risky high-LTV and subprime second mortgage loans.  To the contrary, Citigroup, unbeknownst to the public, had been loosening its lending criteria in the second and third quarters of 2007 without making cost adjustments to compensate for the increased risks.  With respect to second mortgages, Citigroup misled investors by failing to disclose that a majority of those mortgages had very high LTV ratios, leading indicators of loans' riskiness.

367.     On October 15, 2007, Citigroup hosted a conference call to discuss its estimated third quarter earnings, and Defendant Crittenden stated that the Company had reduced its direct exposure to subprime securities from $13 billion.  This statement was materially false.  As detailed herein, Citigroup admitted just three weeks later that its subprime CDO exposure was many times higher.

368.     On October 19, 2007, Citigroup issued a one-page fact sheet about its seven SIVs, stating that it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs."  This statement, while perhaps literally true, was materially misleading because Citigroup omitted to disclose that it had an implicit commitment to provide a liquidity backstop for these SIVs to ensure they would not fail.

369.     In a November 4, 2007 press release, Citigroup disclosed for the first time its "net" exposure to $43 billion of super senior CDO tranches, together with an estimated write-down of $8 billion on those instruments.  In its Form 10-Q for the third quarter of 2007, filed on November 5, 2007, Citigroup stated that the $43 billion in super senior CDO tranches were "not subject to valuation based on observable market transactions," and thus were valued based on estimates of future housing prices.  This statement was misleading, as there were observable,

relevant indicators of the CDOs' value: the ABX indexes at the triple-B tranche level, and the TABX index at the super senior level. Both had indicated a substantial loss of value by February 2007, which Citigroup had ignored until November 2007.

370.     The November 5, 2007 Form 10-Q also stated that the $8 billion in write-downs of the super senior CDO tranches "followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter" – *i.e.*, they attributed the write-downs to events occurring in October 2007. Similarly, on a November 5, 2007 analyst conference call, Defendant Crittenden represented that the November 4, 2007 write-down was a reflection of credit rating downgrades of subprime RMBS and CDOs and declines in the ABX indices at the triple-A level, both of which occurred in October 2007 and purportedly "drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year." These statements were materially false and misleading because, in fact, the values of the super senior tranches had been materially impaired by February 2007, and had suffered additional, significant declines during the months that followed. In addition, Crittenden's attribution of the write-downs to declines in the ABX triple-A index were disingenuous and misleading because that index bears no relationship to the value of the super senior CDO tranches. Rather, that index is a measure of the value of triple-A rated RMBS, whereas the super senior CDO tranches are populated by lower-rated RMBS. The index with relevance to the super senior tranches – the TABX – had been in decline throughout 2007.

371.     The November 5, 2007 Form 10-Q also included statements regarding the Company's CDO and SIV exposure that repeated those made in Citi's 2006 Form 10-K, May 4,

2007 Form 10-Q, and August 4, 2007 Form 10-Q, with minor changes to describe and define the SIVs more precisely, but which otherwise were similarly false and misleading, as follows[84]:

OFF-BALANCE SHEET ARRANGEMENTS

* * *

**Mortgages and Other Assets**

The Company provides a wide range of mortgage and other loan products to its customers.  In addition to providing a source of liquidity and less expensive funding, **securitizing these assets also reduces the Company's credit exposure to the borrowers**.

* * *

**Creation of Other Investment and Financing Products**

The Company has established SIVs, which issue junior notes, medium-term notes and short-term commercial paper to fund the purchase of high quality assets.  The SIVs provide a return to their investors based on the net spread between the cost to issue the short-term debt and the return realized by the medium-term assets. **The Company acts as an investment manager for the SIVs, but is not contractually obligated to provide liquidity facilities or guarantees to the SIVs**.

* * *

The SIVs have no direct exposure to U.S. sub-prime assets and have approximately $70 million of indirect exposure to sub-prime assets through CDOs which are AAA rated and carry credit enhancements.

The Company packages and securitizes assets purchased in the financial markets in order to create new securities offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

* * *

**Typically these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.**

---

[84]  November 5, 2007 Form 10-Q, at 45-46.

At September 30, 2007 and December 31, 2006, unconsolidated CDO assets where the Company has significant involvement totaled $84.2 billion and $52.1 billion, respectively.

See Note 13 on page 68 for additional information about off-balance sheet arrangements.  (emphasis added)

372.    Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the November 5, 2007 Form 10-Q (the "Note 13" referred to in the immediately preceding quote) stated[85]:

**Securitizations and Variable Interest Entities**

The Company primarily securitizes credit card receivables and mortgages.  Other types of assets securitized include corporate debt securities, auto loans, and student loans.

* * *

**The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust.**

* * *

**Variable Interest Entities**

* * *

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under existing guidance and VIEs that the Company became involved with after July 1, 2003:

---

[85]  *Id.* at 68-73.

| In billions of dollars | Sept. 30, 2007 | December 31, 2006[1] |
|---|---|---|
| Cash | $ 1.7 | $ 0.5 |
| Trading account assets | 24.5 | 16.7 |
| Investments | 27.0 | 25.0 |
| Loans | 9.5 | 6.8 |
| Other assets | 4.2 | 5.7 |
| **Total assets of consolidated VIEs** | $66.9 | $54.7 |

(1) Reclassified to conform to the current period's presentation.

\* \* \*

**In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include asset-backed commercial paper conduits, structured investment vehicles (SIVs), collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.**

**The following table represents the total assets of unconsolidated VIEs where the Company has significant involvement:**

| In billions of dollars | Sept. 30, 2007 | December 31, 2006 |
|---|---|---|
| Asset-backed commercial paper (ABCP) conduits | $ 73.3 | $ 66.3 |
| Structured investment vehicles (SIVs) | 83.1 | 79.5 |
| Other investment vehicles | 27.0 | 42.6 |
| **Collateralized debt obligations (CDOs)** | 84.2 | 52.1 |
| **Mortgage-related transactions** | 11.9 | 2.7 |
| Trust preferred securities | 11.7 | 9.8 |
| Structured finance and other | 52.2 | 41.1 |
| **Total assets of significant unconsolidated VIEs** | $343.4 | $294.1 |

\* \* \*

The company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

* * *

**Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.** The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. **These may include: the provision of liquidity or contingent liquidity facilities;** interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

* * *

**As mentioned above, the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs.** The Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $141 billion and $109 billion at September 30, 2007 and December 31, 2006, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs. . . . (emphasis added)

373. The above statements were false and misleading in (a) appearing to draw a distinction between Citi's CDOs and its mortgage-related transactions; (b) indicating the Citi's securitization activities reduced the Company's exposure to mortgage-related risk; (c) indicating that the CDOs diversified the pool of risk; (d) failing to disclose that Citi had been repackaging unsold tranches of CDOs; (e) and stating that Citi had no contractual obligation to support the

SIVs yet also stating that it had provided $10 billion in liquidity to the SIVs, thus demonstrating that the non-contractual obligation to back-stop these entities was the determinative factor that eventually caused the Company to consolidate them.

374.    In a December 13, 2007 press release, later filed with the SEC on Form 8-K, Citigroup announced that it would bring approximately $49 billion of SIV assets onto its balance sheet.  The Company maintained that one of the "key" reasons why it consolidated its SIVs was because "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited."  The Company further assured investors that it expected to incur "little or no funding requirement" for the SIVs, and expected to "return to its targeted capital ratios by the end of the second quarter of 2008."  In the 2007 Form 10-K, the Company claimed that consolidation of the SIVs onto the Company's balance sheet had resulted in an *increase* of Citi's asset base of $59 million.  These statements were materially false and misleading because they led investors to believe that the SIV assets were not impaired, when in fact they were severely impaired and the Company knew that the impairment was likely to deepen during 2008 (which, in fact, it did).

375.    On January 15, 2008, Citigroup issued a press release announcing its preliminary financial results for 2007.  In the announcement, Citi disclosed a $17.4 billion write-down on its subprime-related direct exposures – nearly twice the maximum write-down claimed just two months earlier.  Citi also disclosed that the Company was holding an additional $10.5 billion in exposure to subprime-backed CDOs.  Because the Company had purchased insurance on this $10.5 billion of CDO securities, the Company described them as "hedged exposures."  However, the Company failed to disclose that the hedges depended on the solvency of counterparties such as Ambac and MBIA, and thus investors were not made aware that this counterparty risk

exposed the Company to a much higher risk of additional losses on the newly-disclosed $10.5 billion of exposure.

376.     During the Company's fourth quarter 2007 earnings conference call held on January 15, 2008, when asked by an analyst to estimate the size of the Company's Alt-A portfolio, Crittenden replied:

> So on the Alt-A, we haven't split that out as a separate category.  If it were a category that we anticipated that would be a substantial risk, I would have put it on the list of risks that I stepped down through at the end of the conversation.  So we don't -- given the size of the position and the risk associated with it, we would not put it in the category that went on that list of other issues that I had enumerated.

377.     Crittenden then indicated that the Company's decision not to split out the Alt-A exposure was a function of its size.  These statements regarding the size of Citigroup's Alt-A exposure were materially false and misleading.  In fact, just a few months later, on April 18, 2008, during the first quarter earnings conference call, Crittenden would admit that Citigroup was holding $22 billion in Alt-A RMBS exposure as of December 31, 2007, and $18.3 billion as of March 31, 2008.  The Company also disclosed $1 billion of write-downs on Alt-A mortgages. A Credit Suisse analyst report that day identified the Alt-A RMBS exposure as "newly disclosed."  In addition, in January 2009, when the Company disclosed the breakdown of the $301 billion in loan guarantees, it reported that it had $11.4 billion in Alt-A securities that were covered by these guarantees.

378.     The 2007 Form 10-K did not disclose any exposure to Alt-A mortgages at all, and thus materially understated the Company's losses and materially overstated the value of the Company's assets.

379.     The 2007 Form 10-K also contained numerous statements – similar to those in prior SEC Filings – suggesting that the Company's involvement in mortgage securitization

activities had the effect of *reducing* its exposure to subprime risk.  For example, the Company stated that its involvement in cash CDOs was "typically limited to investing in a portion of the notes or loans issued by the CDO and making a market in those securities."  For synthetic CDOs, the Company stated that "a substantial portion of the senior tranches of risk is typically passed on to CDO investors."  In terms of its mortgage lending activities, the Company stated that "to manage credit and liquidity risk, Citigroup sells most of the mortgage loans its originates, but retains the servicing rights."  Similarly, the Company stated that its mortgage and student loan securitizations were "primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust."  These statements were materially misleading because Citi failed to disclose that it was packaging subprime mortgages into RMBS, and that  Citi's own CDOs – in which it retained significant undisclosed interests – were among the largest purchasers of these RMBS.  Thus, the Company's mortgage securitizations were not truly transferring subprime-related risk away from Citi.

380.    The 2007 Form 10-K and the Company's April 18, 2008 earnings release were materially false and misleading for the additional reason that they failed to disclose the Company's exposure as a result of the ARS market disruption.  The April 18, 2008 earnings release, which was filed as an attachment to a Form 8-K of the same date, disclosed (for the first time) that Citi had accumulated billions of dollars in ARS during the third and fourth quarters of 2007, amounting to $11 billion by February 2008.  This disclosure omitted material information: that the Company faced significant liability exposure based on pending ARS customer lawsuits and regulatory investigations.  Only a few months later, in August 2008, the Company disclosed that it was repurchasing $7.3 billion in ARS from its customers and had reached a settlement with regulators, resulting in a $100 million fine.  As would later become evident when the SEC

136

filed an action against Citigroup in December 2008, Citigroup was aware as early as August 2007 that the ARS market was deteriorating, that it was building an unsustainable inventory of its own ARS, and that its assets would be impaired as a result of the inevitable collapse of the ARS market.

381.     Citigroup's April 18, 2008 earnings release and Form 8-K were also materially misleading because the write-downs Citi announced on that date were inadequate.  Citi had written down its CDO portfolio but just under half, while the relevant indices had lost nearly all their value by early 2008.  While Citigroup had assured investors in its January 15, 2008 earnings release and 2007 Form 10-K that it had "refined" its CDO valuation methodology "to reflect ongoing unfavorable market developments," in actual fact its valuation methodology failed to take into account the substantial decline in these indices.

382.     In an April 28, 2008 article in BusinessWeek, Pandit rejected calls for a breakup of Citigroup.  He stated: "You couldn't design a better footprint or get a better set of assets if you had to build a bank from scratch . . . . This is clearly the right model."  Given the severe impairment of Citigroup's mortgage-related assets at that time, this statement was materially false and misleading.

383.     In the Company's July 18, 2008 earnings release, which was filed as an attachment to a Form 8-K of the same date, the Company announced its second quarter financial results and Defendant Pandit underscored that "write-downs in our Securities and Banking business [which included the Company's CDOs and SIVs] decreased by 42%" and that Citigroup had "reduced legacy assets substantially."  The earnings release further assured investors that the Company's "Tier 1 Capital ratio increased to 8.7%," substantially above the 6% benchmark for "well-capitalized" status.  On August 1, 2008, Citigroup filed a Form 10-Q ("August 1, 2008

Form 10-Q") that reiterated the second quarter financial results and again stated that the Company had maintained its "well-capitalized" status.  These statements were materially false because they portrayed the Company as being on the road to recovery, when in fact the Company's mortgage-related assets were so severely impaired that it would have to be rescued by the federal government only a few months later.  Contrary to the Defendants' statements, the Company was far from "well capitalized" in the summer of 2008, and its Tier 1 capital ratio would have been less than 6% if appropriate write-downs had been taken.

384.    On September 21, 2008, Defendant Pandit told the New York Times that Citi was "a pillar of strength in the markets," and reported that funds from competitors' coffers had flowed in to Citigroup.  "That's a great place to be', [Pandit said], smiling."  With respect to calls to break up Citigroup, Pandit stated that a stand-alone Citigroup investment bank might not have survived.[86]  Meanwhile, however, Citigroup and Pandit, knew or were reckless in not knowing, that the Company's capital adequacy was in serious jeopardy.

385.    On November 17, 2008, Citigroup announced that it would reclassify $80 billion of assets from the Company's trading portfolio to assets that were "held to maturity," "held for sale," or "held for investment."  This meant that the assets would no longer be marked to market in each reporting period, and the Company would not be required to take large write-downs with each decline in market value.  In essence, this reclassification was an acknowledgment that the reclassified assets had so little value that the Company could not afford to write them down.  Nevertheless, Defendant Pandit assured employees and investors during the Town Hall meeting that Citigroup had "significantly reduced [its] risky assets while putting the company in a very strong capital position," and was "very well positioned from a capital standpoint to weather

---

[86]  Julie Criswell & Eric Dash, *Citigroup Above the Fray*, New York Times, Sept. 21, 2008.

future potential challenges." These statements were materially false and misleading because, in fact, less than a week later the Company had to be rescued from collapse with a $326 billion federal government bail-out. On November 22, 2008, the New York Times reported that analysts had concluded that the Company had "two remaining options: a federally forced merger or nationalization." As the Wall Street Journal reported on November 24, 2008, "[e]ven as they assured employees and investors last week that the company was on sound financial footing, Citigroup executives and directors knew they needed to do something fast to stabilize their company."

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

386.    The Citigroup Defendants, by virtue of their receipt of information reflecting the improper and fraudulent behavior described above and/or their failure to review information they had a duty to monitor, their actual issuance of and/or control over Citigroup's materially false and misleading statements, and their association with Citigroup, which made them privy to confidential proprietary information concerning Citigroup, were active, culpable, and primary participants in the fraudulent scheme and issuance of material misrepresentations alleged herein. Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the public.

387.    KPMG failed to conduct its audits in accordance with GAAS, and recklessly failed to address – repeatedly over the course of several years – that the Company's financial statements were materially false and misleading and did not comply with GAAP. The falsity of those financial statements, and their non-compliance with GAAP, would have been obvious to any reasonable auditor who conducted its audits in a non-reckless fashion. Indeed, KPMG had been the Company's outside auditor since the 1960s, and was intimately familiar with the

Company's business, the risks it presented, and the fact that those risks were materializing during the Relevant Period.

388.     The Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Citigroup's financial statements and other public statements would adversely affect the integrity of the market for Citigroup's securities and would cause the price of Citigroup's securities to be artificially inflated.  Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

### A.     The Citigroup Defendants Knew That Citi's Mortgage Portfolio Contained High-Risk Subprime Loans That Would Lead To Large Losses

389.     The Citigroup Defendants knew that Citi's loan portfolio was steadily deteriorating, leading to increased defaults and substantial, inescapable losses.

390.     The Citigroup Defendants knew that for the loans Citi had originated, the quality of its underwriting did not protect the Company from significant subprime (and Alt-A) losses. By the end of 2006, subprime borrowers made up 25% of Citi's $160.9 billion mortgage portfolio, with Citi originating roughly $40 billion in subprime loans in the third quarter of 2006 alone.  Moreover, given that the subprime loans originated in late 2006 were, according to Citi, the "poorest credits,"[87] it was clear to the Citigroup Defendants that Citi was likely to suffer major losses from its nonprime loans.

391.     Additionally, as discussed above, Citi's high volume of loans with an LTV ratio of 90% or greater created a further point of vulnerability, which the Citigroup Defendants were aware of, but which was not disclosed.  Similarly, as of December 2007, Citi held roughly $63 billion in second mortgages, with over 50% of these loans having an LTV over 80%, and over one-third having an LTV ratio over 90%.

---

[87]  *See* The Subprime Crisis: An Overview, Citigroup, Mar. 3, 2008, at 21.

392.     The Citigroup Defendants knew that the Company's consumer banking operations were seeing mounting losses as early as mid-2006, and therefore that Citi was required to increase its loan loss reserves as early as the fourth quarter of 2006.  Additionally, the Citigroup Defendants knew that the dollar amount of Citi's reserves had declined during 2006, and that in its consumer banking operations, the loan loss reserve ratio exceed the Company's actual losses throughout 2006.

393.     The trend grew more pronounced during 2007, when Citi's delinquencies (*i.e.*, loans more than 90 days past due) increased substantially.  In its U.S. consumer mortgages, the delinquency rate within its first mortgage portfolio increased from 1.38% in the third quarter of 2006 to 2.54% by the fourth quarter of 2007.  Significantly, the delinquency rate for subprime loans (with FICO less than 620) had jumped to 7.83%; Citi held approximately $24 billion of these high-risk loans.  Similarly, within its second mortgage portfolio, the delinquency rate increased from 0.25% in the third quarter of 2006 to 1.38% at the end of 2007.  For loans with an LTV of 90% or greater, that rate was even higher, 2.48%.  Roughly $21 billion of Citi's $63 billion second mortgage portfolio were these higher-risk loans.[88]

394.     In sum, the Citigroup Defendants knew that Citi's losses were increasing and that due to the composition of its mortgage portfolio, those losses were sure to increase.  Yet they continued to misrepresent the extent of risk and to conceal the need to make larger increases in their loan reserves..

395.     Further, the Citigroup Defendants were aware of mounting losses in mortgages Citi had purchased through correspondent channels, as well as loans purchased from lenders in financial distress, such as Accredited Home Lenders ("Accredited").  Indeed, in its zeal to make

---

[88] *See* Citigroup 2007 Form 10-K, at 50-51.

a quick profit, Citi had set itself up with a portfolio that was destined to suffer large long-term losses, primarily through its greater reliance on correspondent lenders.  The Company had increased the volume purchased through correspondent channels from $69 billion in 2005 to $94 billion in 2007, and these loans exhibited higher delinquency rates.  Accordingly, Citi saw mounting losses through these channels, and in 2007 and 2008 filed more than two dozen lawsuits against these lenders.  Notably, however, the documents filed in these actions reveal that Citi had begun seeing substantial problems with the loans it had purchased by mid-2006.  Thus, while Citi eventually filed suit to force certain correspondent lenders to repurchase defective loans, it waited over a year between making the first demand for repurchase and filing suit.  In the most striking example, Citi filed suit against Michigan Mutual in May of 2008, yet had first demanded repurchase of the loans in July of 2006.

396.    Thus, the Citigroup Defendants knew Citi was seeing mounting losses, but failed to increase its loan loss reserves, which would have signaled to its investors that it expected losses – a message the Company hid for as long as it could.  KPMG, as Citigroup's auditor, recklessly failed to detect the inadequacy of the Company's loan loss reserves, despite having unfettered access to the Company's inside information.

397.    Similarly, in mid-March 2007, Citi purchased a $2.7 billion package of mortgage loans from Accredited, without conduct pre-closing due diligence on the loans in the portfolio.  As it turned out, hundreds of loans had clear deficiencies.  As Citi stated in its complaint filed against Accredited, nearly 7,000 of the 15,000 loans Citi purchased from Accredited were "impaired by missing, incorrect, or defective documentation."[89]  Citi recognized many of the problems with the Accredited portfolio by mid-2007.  For example, Citi claimed in its complaint

---

[89]  *Citigroup Global Markets Realty Corp. v. Accredited Home Lenders, Inc.*, 08-CV-3545 (RJH) (DCF), First Amended Complaint ("Accredited Compl.") at ¶ 39.

that a significant number of the loans suffered early payment default, meaning payments were delinquent in the first 90 days.[90]  Because – by definition – these defaults became apparent quickly, Citi knew of them by mid-June 2007, *i.e.*, 90 days after the mid-March purchase from Accredited.  Additionally, Citi alleged in its complaint against Accredited that "[b]y mid-November 2007, it had become apparent to both Plaintiff and Defendant that the Mortgage Loan Pool transferred eight months before was worth at least $75 million less than what Plaintiff paid for it. . ."[91]  Despite knowing that these problems with Accredited were already percolating, the Citigroup Defendants continued to conceal those problems – and associated losses likely to occur – and Citi did not bring suit against Accredited until April 2008.

398.    Upon information and belief, during the November 5, 2007 conference call, when Defendant Crittenden discussed $4.2 billion in subprime loans that had been purchased at "appropriate prices" during the prior six months, which were "performing loans,"[92] the $4.2 billion improperly included the loans purchased from Accredited.

### B.    The Citigroup Defendants Knew Citi Was Exposed To Losses Via Its Subprime Holdings

399.    From at least the end of 2006, the Citigroup Defendants knew that the downturn in the subprime market would adversely affect the assets created with the underlying subprime loans.  First, they knew Citi could not sell the warehoused RMBS that were awaiting securitization, but repeatedly avoided disclosing this exposure to Citi's investors.  Second, they knew Citi held unsold tranches of the CDOs it had sponsored, yet quarter after quarter, assured the market that Citi had sold off the risk associated with these subprime-related assets.  Third,

---

[90]  Accredited Compl. at ¶ 98.

[91]  *Id.*

[92]  See Bloomberg, Citigroup Earnings Conf. Call, Nov. 5, 2007, at 3.

with its insider knowledge as to how the CDOs were structured, Citi knew that its CDOs could not be sold at face value, and that their value was falling throughout 2007.  Despite this knowledge, the Citigroup Defendants deliberately withheld information regarding Citi's exposure until the last possible moment – when the requisite write-downs were so extreme that Citi could no longer maintain its charade.

      **1.**      **The Citigroup Defendants Knew The CDOs Were Not Structured To Withstand The Collapse Of The Housing Market**

400.     As a company heavily involved in structuring and selling RMBS-backed CDOs, Citi understood the modeling used to create these assets.  The Citigroup Defendants understood that certain assumptions were made in order to assess the likely losses, which were necessary in order to create the different tranches, with each tranche's rating reflecting the expected loss.

401.     The underlying assumptions were premised on optimistic conditions that did not exist.  For example, Citi's model assumed that housing prices would rise by 6% annually, but by late 2005, housing prices had already begun to fall, and that assumption was no longer valid. Nonetheless, Citi continued to use this outdated model in assessing its CDO exposure at least until the end of 2006, although it was clear to others within the Company and the industry that those assumptions were no longer valid.

402.     The Citigroup Defendants knew that the projected losses were only reasonable if the underlying assumptions were accurate.  Thus, once the optimistic assumptions regarding housing prices were no longer operative, the Citigroup Defendants knew that the losses would be far more drastic than those projected when the CDOs were created – and rated.  Thus, the losses would easily spread beyond the BBB-rated tranches, and the so-called super senior tranches were far from immune to the overall market decline.  In essence, the ratings were no longer valid.  The Citigroup Defendants knew they could no longer assume the ratings were a reliable indicator of

the projected losses, but disregarded that fact in order to avoid making the necessary disclosures and taking the necessary write-downs.

403.    Additionally, Citigroup's model was premised on a degree of correlation among CDOs that was unrealistically low.  The reality was that the correlation was much higher than that assumed in the model, and that the losses were more likely to occur, were more likely to be substantial, and were more likely to reach even the super senior tranches.  No later than early 2007, the Citigroup Defendants were aware of how the CDOs were likely to perform and that Citi's portfolio was likely to sustain heavy losses.

## 2.    The Citigroup Defendants Knew Citi's CDOs Were Not Immune To The Market Downturn

### (a)    Citi Publicly Acknowledged Risks Associated With CDOs

404.    Citi knew that its CDOs were likely to suffer from massive defaults in the subprime arena.  No later than April 2007, Citi added new disclosures to the prospectuses for the CDOs it structured and sold.  Aware of its disclosure obligations with respect to potential CDO investors, Citi noted that CDOs were vulnerable to the following factors:  (1) housing price downturn; (2) increasing mortgage defaults; (3) increase in adjustable mortgage rates resetting to levels that would trigger defaults; and (4) inability of borrowers with adjustable mortgages to refinance due to higher interest rates, stricter lending standards, and price declines.  Thus, Citi knew its *own* portfolio was also vulnerable, yet made no disclosures to its investors.

405.    Additionally, Defendant Crittenden acknowledged in November 2007 that CDOs from 2006 or later were particularly weak.  While his comments were made in order to emphasize the relative strength of Citi's pre-2006 holdings, his statement is evidence that he, and the Company, were aware that their 2006 and later vintage CDOs had lost value well before Citi disclosed the exposure and took the write-downs.

**(b)      Aware of Market Developments, Citi Tried To Protect Itself**

406.    The Citigroup Defendants were also aware of the downturn in the TABX index and its utility in predicting losses in the super senior tranches.  Despite this knowledge, Citi repeatedly assured investors that it was not vulnerable to subprime losses.  Even when Citi finally disclosed the existence of the CDOs it had been holding, it continued to deceive the public about the quality of those assets and true likelihood that write-downs would be necessary.  Instead, the Citigroup Defendants relied on the "super senior" label and AAA-rating to justify the delay in disclosing these assets and in taking appropriate write-downs.

407.    In July 2007, the Citigroup Defendants also took steps – belatedly – to monitor Citi's credit risk.  Defendant Prince began daily meetings to assess Citi's CDO exposure.  Defendants Crittenden, Druskin, Klein and Maheras also attended these sessions.  Any risk that merited daily meetings of the highest-level executives to assess Citi's exposure was surely a risk that a reasonable investor would find material.  Yet for four months, the Citigroup Defendants held off on disclosing even the existence of these assets, much less the degree of risk associated with them.

**C.      The Citigroup Defendants Knew Citi Was Obligated To Consolidate The Off-Balance Sheet Entities**

**1.      The Citigroup Defendants Knew Citi Would Not Let The SIVs Fail, And Therefore That Citi Was Required To Consolidate Them Once Trouble Emerged**

408.    The Citigroup Defendants knew Citi never intended to let its SIVs fail, and that it would take whatever steps were necessary to prevent substantial losses for their investors.  Yet Citi repeatedly denied that this was the case, instead emphasizing the absence of a contractual commitment to provide support.

409.     Moreover, Citi's intent was clear, throughout the fall of 2007, despite its repeated protestations that it had no obligation to support its SIVs.  *Before* finally admitting it would consolidate its SIVs and assume their liabilities, Citi took the following actions to support its SIVs:

410.     In mid-October 2007, Citi participated in talks among a group of major banks to create a "super SIV" to rescue the existing SIVs, including Citi's, if the commercial paper market failed; and

411.     In its Form 10-Q for the third quarter of 2007, filed on November 5, 2007, Citi disclosed that it had provided $10 billion to shore up its SIVs and that the SIVs had drawn on $7.6 billion in credit Citi provided.

### 2.     The Defendants Knew Citi Was Obligated To Consolidate The Commercial Paper CDOs

412.     The Defendants also knew, or were recklessly in not knowing, that Citi was obligated to consolidate the Commercial Paper CDOs.  As detailed above, the accounting rules regarding consolidation are clear that Citi's liquidity puts constituted a variable interest, meaning the rules for consolidating a variable interest entity were applicable.   Indeed, it was exactly the circumstances that render the rule applicable – when the put options will be called on to perform in the event expected losses occur – that caused Citi to repurchase those CDOs (rather than deal with the liquidity puts).  Thus, Citi's actions confirmed that Citi was required to consolidate these CDOs all along, and that Citi knew it could be "called on to perform" if the losses were to occur.

413.     Additionally, Citi admitted during the November 5, 2007 conference call that it had repurchased the Commercial Paper CDOs during the summer of 2007, yet the Defendants had made no disclosure at all regarding these assets until November 4, 2007 – revealing nothing

in the October 1, 2007 pre-earnings release or in the October 15, 2007 earnings release (or the conference call held to discuss those results).  Regardless of how the Commercial Paper CDOs were classified prior to the repurchase, Citi knew by the summer of 2007 that it had acquired an additional $25 billion in CDO exposure, and chose to conceal this material fact from its investors.

      **D.**     **Government Investigations Create A Strong Inference Of Defendants' Scienter**

          **1.**     **The SEC's Investigation Into Citi's Accounting Practices**

414.     As the first wave of Citi's negative disclosures hit in the fall of 2007, the SEC launched an investigation into several of Citi's accounting practices, which were implicated in the disclosures of subprime exposure and the consolidation of the SIVs and Commercial Paper CDOs.

415.      Even before Defendant Prince resigned, the SEC had opened an investigation. The SEC was reviewing how Citi accounted for various off-balance-sheet transactions, including the SIVs, which, as of early November 2007, Citi had still not yet consolidated, despite the behind-the-scenes efforts to shore them up.  The SEC was also investigating how Citi had valued subprime-related assets and whether the Company had timely disclosed its exposure, *i.e.*, the very issues at the heart of this lawsuit.

416.     The SEC investigation remains ongoing.  In May 2009, news surfaced in the Wall Street Journal that the SEC was working on reaching a settlement with the Company, but was working out whether any fine could be paid using TARP funds, or other sources of capital.

Sources quoted in the article also reported that the SEC is considering bringing charges against individuals, including top executives.[93]

### 2. The SEC And New York Attorney General Recovered More Than $7.3 Billion From Citi On Its Clients' Behalf

417.    On August 7, 2008, the SEC and New York Attorney General announced a settlement with Citigroup whereby more than $7.3 billion would be paid to thousands of customers who invested in auction rate securities, and Citi would pay $100 million in fines.

418.    The SEC alleged that Citigroup violated Section 15(c) of the Securities Exchange Act by, *inter alia*, marketing ARS as highly liquid securities through mid-February 2008 even though Citigroup employees knew or were reckless in not knowing that the risk of auction failures had materially increased.

419.    Internal Citigroup documents reveal that Citigroup knew its clients who had purchased ARS "might [have] believe[d] that there [was] implied liquidity . . . because [Citi] had marketed the fact that [they had] never had a failed auction as lead manager in twenty years."[94] Citi executives also discussed the "risk of lawsuits initiated by thousands of retail investors, high net worth clients and institutional clients because Auction Rate Securities (ARS) have been marketed as 'money market alternatives' and 'liquid investments' for 20 years.  The hundreds of ARS issuers may also seek litigation against Citi."[95]

420.    Citi knew there was no way to avoid the consequences of the imminent collapse of the ARS market.  Either it would have to increase its purchases to avoid auction failures (and lawsuits from its clients and issuers), which would impact its balance sheet, or it would have to

---

[93]   *See* Susan Pulliam and Randall Smith, *Citi, SEC Are In Talks To Settle Asset Probe*, Wall Street Journal, May 28, 2009, at C1.

[94]   SEC Compl. ¶ 26.

[95]   *Id.*

let the auctions fail and risk facing the wrath of its clients and suitors, which would then create the risk of litigation.  Either way, the ARS situation materially impacted Citi's finances, and Citi knew or was reckless in not knowing that these dangers loomed and should be disclosed to the Company's shareholders.

       **E.**      <u>**Citi's Numerous Violations Of GAAP Support An Inference Of Scienter**</u>

421.      Citigroup violated numerous provisions of GAAP, as well as SEC regulations, in its financial reporting during the Relevant Period.  These violations include, but are not limited to: (i) failing to take adequate loan loss reserves; (ii) failing to write-down to fair value subprime-related assets in the Company's trading and loan portfolios in a timely manner; (iii) failing to adequately disclose risk; and (iv) failing to properly consolidate certain off-balance-sheet entities.  As a result, Citigroup's financial statements failed to accurately portray the Company's financial position and results of operations.

422.      Defendants Prince, Pandit, and Crittenden certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements.[96]  Additionally, Defendant Gerspach signed each of the Company's Form 10-K and Form 10-Q filings during the Relevant Period.  However, the nature and extent of Citigroup's accounting violations, in conjunction with the Citigroup Defendants' own statements, suggest that as senior executives with oversight of the Company's financial reporting, the Citigroup Defendants knew that Citigroup was perpetrating a fraud by concealing mounting losses and hiding its actual holdings of subprime-related assets.

---

[96] Defendant Prince signed a certification for the financial statements in the 2006 Form 10-K and in the Form 10-Q filings that were made during his tenure as CEO.  Defendants Pandit and Crittenden signed certifications for the financial statements in the 2007 Form 10-K and in the Form 10-Q filings made during their respective tenures.

423.     Likewise, given the number, magnitude, and duration of the GAAP violations at Citigroup, it is reasonable to infer that KPMG, the Company's long-time auditor, either knew about or was reckless in failing to detect those violations.

**F.     Motive And Opportunity:  The Citigroup Defendants Avoided The Necessary Disclosures, Write-Downs, And Reserve Increases In Order To Preserve Citi's Tier 1 Capital Ratio**

424.     The Citigroup Defendants' motive to inflate the Company's Tier 1 capital ratio, coupled with their opportunity to commit fraud by virtue of their control over Citi's financial reporting and public statements, raises a strong inference of scienter.  As described below, the Citigroup Defendants knew that properly considering the implications of its subprime exposure and of its commitments to its SIVs would reduce the Company's Tier 1 capital ratio, possibly to levels that would prompt regulatory scrutiny and investor alarm.  Thus, the Citigroup Defendants concealed material information to ensure that this ratio did not cross that line.

425.     A bank's Tier 1 capital ratio provides investors and regulators essential information regarding the Company's overall financial strength, as a measure of its ability to withstand substantial losses.  A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."  Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

426.     Citigroup, like other banks, knew it was essential to maintain its well capitalized status, and repeatedly represented in its public statements that it maintained a well capitalized position.  Thus, it was important to the Citigroup Defendants that Citi's Tier 1 capital ratio stay far above the crucial 6% mark; the Company's internal goal was 7.5%.  In fact, for the years 2002 through 2006, Citi's reported Tier 1 capital ratio averaged 8.7%, with a low of 8.59% in 2006.

427.    As Citi's losses began to increase in 2007, Citi's Tier 1 capital ratio began to slide, decreasing to 8.2% in the first quarter and down further to 7.91% in the second quarter. The Citigroup Defendants knew that additional pending losses would bring the ratio down further.  They also knew that consolidating additional risky assets and adding to loan loss reserves would decrease that ratio even more.  Similarly, they knew that taking appropriate write-downs on the Company's risky subprime-related assets would decrease the Company's asset base materially, putting further downward pressure on the Tier 1 capital ratio.  The Citigroup Defendants also knew that because Citi was highly leveraged, even a small loss in its risky assets could deplete its capital.

428.    Thus, to stave off further damage, the Citigroup Defendants knowingly or recklessly propped up the Company's Tier 1 capital ratio.  They did so by knowingly or recklessly concealing the Company's exposure to toxic subprime assets, making inadequate increases in the Company's loan loss reserves, and failing to consolidate off-balance-sheet entities.  The Citigroup Defendants' motivation to keep the Tier 1 capital ratio above the 6% threshold supports a strong inference of scienter.

## G.    Motive And Opportunity:  KPMG

429.    KPMG was motivated to turn a blind eye to fraud at Citigroup, by virtue of its long-standing and lucrative relationship with Citigroup.  KPMG has served as Citigroup's auditor for nearly forty years, and generates substantial fees for providing both auditing and non-auditing services to Citigroup.   During the Relevant Period alone, KPMG received approximately **$390 million** in fees from Citigroup, as follows:[97]

---

[97]  Information derived from Citigroup's proxy statements for the years 2005 through 2009.

|  | **2004** | **2005** | **2006** | **2007** | **2008** |
|---|---|---|---|---|---|
| Audit Fees | $55,000,000 | $51,900,000 | $52,900,000 | $63,600,000 | $69,800,000 |
| Audit-related Fees | $8,000,000 | $9,900,000 | $11,600,000 | $18,100,000 | $17,400,000 |
| Tax-related Fees | $6,200,000 | $6,000,000 | $4,300,000 | $6,400,000 | $8,900,000 |
| **TOTAL** | $69,200,000 | $67,800,000 | $68,800,000 | $88,100,000 | $96,100,000 |

430.   The financial services sector was historically KPMG's largest and most successful line of business, and within that sector the banking segment was the largest industry practice.[98] Citigroup was a cornerstone client for KPMG, and was one of the most – and likely the most – lucrative client relationships in the firm during the Relevant Period.

431.   Based on the foregoing, KPMG had a strong disincentive to question or challenge Citigroup, and thus had a strong financial motive to look the other way and continue issuing unqualified audit opinions on the Company's financial statements, even in the face of known GAAP violations and/or fraud.

## IX.   LOSS CAUSATION

432.   Plaintiffs were damaged as a result of Defendants' fraudulent conduct as set forth herein.  During the Relevant Period, Defendants engaged in a scheme to deceive the market by issuing a series of misrepresentations (and omitting material facts) relating to, *inter alia*, (i) the credit quality of Citigroup's mortgage and leveraged lending portfolios; (ii) the extent to which Citigroup was protected from subprime losses as a result of the Company's purportedly conservative underwriting standards; (iii) the amount and value of Citigroup's subprime-related holdings in its trading portfolios; (iv) the extent to which Citigroup was exposed to a substantial degree of risk in connection with the downturn in the real estate and capital markets; and (v) the

---

[98]   *See* W. Cholbi, *The Accountants: Maintaining Financial Order in Chaotic Times*, Bank Director Magazine, 3rd Quarter 2002.

extent to which Citigroup was exposed to a substantial degree of risk in connection with its role in sponsoring and selling auction rate securities.

433.    As a result of Defendants' scheme, misrepresentations, and omissions of material facts, the prices of Citigroup's securities were artificially inflated from January 1, 2004 until January 16, 2009.

434.    In reliance on Defendants' materially false and misleading statements and/or omissions, Plaintiffs purchased Citigroup securities at artificially inflated prices.  But for Defendants' misrepresentations, omissions and fraudulent acts, Plaintiffs would not have purchased Citigroup securities at the artificially inflated prices at which they traded prior to January 16, 2009.

435.    As Defendants' various material misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on October 15, 2007, Citigroup stock steadily declined, ultimately declining by a total of 92% as of January 16, 2009.

436.    The declines in Citigroup's securities prices between October 15, 2007 and January 16, 2009, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting Defendants' fraudulent misrepresentations and omissions (and/or the materialization of risks concealed by Defendants).

437.    Plaintiffs suffered economic losses as the price of Citigroup's securities fell in response to the issuance of partial corrective disclosures and/or the materialization or risks concealed by Defendants, as summarized herein.

438.    On October 15, 2007, Citi's stock was battered when news implicating Citi's commitment to the SIVs surfaced and it released its third quarter earnings.  Over the weekend of October 13 and 14, 2007, press reports had circulated regarding the rescue fund that several

major banks, including Citi, were exploring to bail out the SIVs.  The details of the ill-fated plan were announced before the market opened on Monday.  Under the details of the proposed plan, the rescue fund would have purchased highly rated assets from the SIVs and sold short term debt such as commercial paper to help finance the purchases.  However, the sponsoring banks would have been the first to take losses if the new fund suffered losses on its assets.  Thus, Citi effectively admitted that it was liable for the SIV losses all along.

439.     At the Company's third quarter 2007 earnings conference call later that day, Citi indirectly confirmed its financial commitment to its affiliated SIVs.  During the call, Citi revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons Citi's balance sheet had deteriorated.  The call also revealed that despite Citi's assurances just a month earlier that its subprime mortgage portfolio looked "pretty good," its reported net income for the quarter had declined 57% from a year earlier because of, in part, a write-down of subprime mortgage losses totaling $1.56 billion (pre-tax and net of hedges) that Citi had "warehoused for future collateralized debt obligation … securitizations" and a $2.24 billion charge to increase loan loss reserves.[99]

440.     In reaction to all of this news, Citi's stock price plummeted $3.09 per share or 6.45% over the immediately following two trading days, from $47.87 on Friday October 12, 2007 to $44.79 on Tuesday, October 16, 2007, for a loss of market capitalization of over $15 billion.

441.     On October 19, 2007, the New York Times published an article detailing Citi's quiet attempts to shore up the finances of its affiliated SIVs, revealing that Citi had been

---

[99]  Citigroup Third Quarter Earnings Announcement, October 15, 2007.  Citigroup announced a further $5.24 billion in write-downs, relating to losses in other parts of its business, for a total write-down of approximately $6.8 billion.

disguising its commitments.  On October 19, 2007, Citi's stock price declined another $1.47 to close at $42.36, for an additional loss of market capitalization of approximately $7.3 billion.

442.    On Wednesday, October 31, 2007 and Thursday, November 1, 2007, Citi announced it was convening an emergency weekend board meeting, which was followed by the news of that Citi might replace its management team.  As a result, Citi's share price declined 10.4% from the close of $42.11 on Tuesday, October 30, 2007, to $37.73 on Friday, November 2, 2007, representing a loss in market capitalization of nearly $22 billion in two trading days.

443.    On Sunday, November 4, 2007, Citi issued two dramatic press releases.  In the first, Citi disclosed an additional $43 billion in CDO exposure and write-downs of $8 to $11 billion on its CDOs.  In the second, the Company announced the abrupt resignation of Chuck Prince, effective on Monday, November 5.  On the news of Prince's sudden "resignation" and the increased exposure and write-downs, Citi's stock fell 4.85% to $35.90 at the close on November 5.  By the end of the week, on November 9, the stock was down to $33.10.

444.    On January 15, 2008, in announcing its fourth quarter 2007 results, Citi admitted to investors that its subprime losses would result in a fourth quarter loss of nearly $10 billion. During the two month period from October 12, 2007 to January 15, 2008, Citi's stock price had fallen from $47.87 to $26.94.  Over the next four trading sessions after the January 15 capitulation (January 16, 17, 18, and 22, 2008), the price fell further as the market fully digested the details of the fourth quarter loss, temporarily bottoming out at $24.40 on January 22, 2008.

445.    The situation continued to deteriorate, particularly in the second half of 2008.  For example, on August 7, 2008, when the SEC and New York Attorney General announced the settlement regarding the ARS investigation, Citi's stock price declined from $19.70 on August 6 to a closing price of $18.47 on August 7.

446.     Throughout August and September, the stock price hovered between $18 and $22, climbing back up to $23.00 on October 1, 2008 – a high that has not been reached since.  The price then began a steady decline.  Although Citi's stock price briefly increased from $15.75 to $18.62 on October 14, when the first infusion of TARP funds was announced, those gains could not be sustained.  On October 15, 2008, the stock closed at $16.23, down almost 13%.

447.     On October 16, 2008, Citigroup announced its third quarter results: a net loss of $2.8 billion (and $3.4 billion from continuing operations), largely due to another $4.4 billion in write-downs in the Securities and Banking division.  In reaction, the stock price fell from $16.23 to $15.90, and closed at $14.88 on Friday, October 17.  In all, during that week, Citi's stock dropped 20% from a closing price of $18.62 on October 14 to $14.88 by October 17, nearly twice the drop in the S&P financial index during that time.

448.     On November 17, 2008, Pandit held an employee Town Hall meeting where he revealed that $80 billion of assets would no longer be valued, causing the stock price to drop from $9.52 to $8.89, nearly a 7% decline.  The next day, the price dropped further, down to $8.36.

449.     Then, on November 19, 2008, Citi announced that it would have to unwind its SIVs and take a $17.4 billion hit to do so.  On this news, investors dumped Citi stock, causing the price to drop over 23% in *one day*, down to $6.40.  By the end of the week, on Friday, November 21, the stock had fallen to $3.77 from its high on Monday of $9.52 – a 61% drop in five days.  Moreover, the trading volume increased dramatically over the course of the week, from approximately 168 million shares on November 17, to nearly 342 million shares on November 19, up further to almost 725 million on November 20, and finally hitting the 1 billion mark on November 21.

450.    As Citi was on the verge of collapse, the federal government stepped in to engineer a rescue.   On the evening of Sunday, November 23, 2008, the $326 billion rescue package was announced.   The market reacted positively to this news, with the stock closing up from $3.77 to $5.95.

451.    Citi's stock price improved on this rebound over the next two weeks, generally closing between $6.50 and $8.50, yet not enough to return to the $8.89 closing price on November 17.   Then, on December 11, 2008, with the disclosure of the SEC's complaint (which revealed Citi's prior knowledge of the ARS risks), Citi's stock fell from $8.30 per share to $7.57, a decline of almost 9%.

452.    In early January 2009, the situation deteriorated further.   Over the weekend of January 10-11, and then on Monday, January 12, several articles appeared in the business press indicating that Citi's condition was precarious.   First, the articles discussed Citi's upcoming release of its fourth quarter results, noting that some analysts expected Citi to announce a loss of up to $10 billion, far higher than the $4.1 billion previously estimated by analysts, surpassing the $9.8 billion reported in the fourth quarter of 2007, and approximately the amount of the losses incurred in the three previous quarters together.[100]   Additionally, these articles reported that the deal for Morgan Stanley to take a majority interest in Citi's Smith Barney brokerage unit was likely to be announced that week.   This news signaled to investors that Citi was desperate to generate capital, since Smith Barney was still profitable and Pandit had previously indicated that he had no interest in spinning off that part of the Company.

453.    In reaction to this news, Citi's stock price dropped from $6.75 to $5.60, with close to 3 million shares traded, twice the volume of the previous day.   Although the price recovered

---

[100]   *See* David Enrich, *Citi Board Backs CEO as Outlook Worsens*, Wall Street Journal, Jan. 12, 2009.

slightly to close at $5.90 on Tuesday, a Business Week article appearing on Wednesday, January 14, 2009, noted that Citi's key problem – its toxic assets – had yet to be addressed, and could be worth as much as $150 billion.[101]  Citi's investors reacted to this news with another sell-off, with over 500 million shares traded, compared to 274 million the day before.  The stock price dropped from $5.90 to $4.53, a 23% decline, and fell further on January 15, closing at $3.83 per share.

454.     On January 16, 2009, Citi released its results for the fourth quarter of 2008, reporting a loss of $8.29 billion, worse than the $4 billion predicted.  In response to this news, Citi's stock price fell again, down to $3.50 per share.

455.     Between December 11, 2008, and January 15, 2009, Citi's stock price fell approximately 54%, from $8.30 to $3.83, more than double the drop experienced by Citi's peers in the Standard & Poor's financial index during that time.  Citi also achieved the dubious distinction of having the worst performance for two years in a row (2007 and 2008) among large U.S. banks, according to the KBW Bank Index.[102]

456.     In total, from October 12, 2007 through January 16, 2009, Citigroup's stock fell almost 93%, from $47.87 to $3.50.  In comparison, the stock prices of its peers, as measured by the Standard & Poors financial index, fell only 72%.

457.     Over the entire Relevant Period, from January 19, 2007 through January 16, 2009, Citi's stock fell 93%, while the S&P Financial Index fell only 73.2% and the Dow Jones Industrial Average (of which Citi was component during this period) fell only 34.6%.  Over the same period, JP Morgan fell 50.1% and Goldman Sachs declined by 64.9%.  Even another troubled bank, Bank of America, did not fare as poorly as Citi, with its stock falling by 84.5% –

---

[101]  Mara Der Hovanesian, *Citigroup: Let the Breakup Begin*, BusinessWeek, Jan. 14, 2009.

[102]  *See* Bradley Keoun & Christine Harper, *Citi May Book $10 Billion Gain on Morgan Stanley Deal*, Bloomberg, Jan. 12, 2009.

still 900 basis points better than Citi. The following charts illustrate these differences in performance:





## X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

458.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concern Citigroup's financial statements and historical and/or current conditions affecting the Company.   Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.   To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

459.     Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Citigroup who knew that the statement was materially false and misleading when made.

## XI.     PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

460.     At all relevant times, the market for Citigroup securities was an efficient market for, *inter alia*, the following reasons:

     a.     Citigroup's common stock met the requirements for and was listed on the New York Stock Exchange;

     b.     Citigroup's trading volume was substantial, trading at an average of more than 40 million shares per day during the Relevant Period;

     c.     As a regulated issuer, Citigroup filed periodic public reports with the SEC and NYSE;

      d.      Citigroup regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

      e.      The market reacted swiftly to public information disseminated regarding Citigroup; and

      f.      Citigroup was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

461.     As a result of the foregoing, the market for Citigroup securities promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in Citigroup's securities prices at all relevant times. Under these circumstances, Plaintiffs, as purchasers of Citigroup securities, suffered injury through their purchase or acquisition of Citigroup's securities at artificially inflated prices and a presumption of reliance applies.

462.     In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Citigroup's business, financial results and business prospects.

## XII.   TOLLING OF THE STATUTE OF LIMITATIONS

463.     Plaintiffs did not discover or have reason to discover the facts necessary to assert the claims herein, including Defendants' false and misleading statements, more than two years before the filing of this action. As a result, Plaintiffs' claims are brought within the applicable statute of limitations

464.     Further, with respect to all Defendants except KPMG, the statutes of limitations on Plaintiffs' claims has been tolled since November 8, 2007, by virtue of the filing on that date

of a putative class action, which was later consolidated with certain related class actions under the caption *In re Citigroup Inc. Securities Litigation*, Master File No. 07 Civ. 9901 (SHS) in the United States District Court for the Southern District of New York.  The consolidated class action asserts the same or substantially similar claims to those asserted herein, and all Defendants in this action except KPMG are defendants in the putative class action.  Plaintiffs fall within the definition of the class members on whose behalf that putative class action was filed and remains pending.

## XIII.  COUNTS

### COUNT ONE

#### For Violation Of Section 10(b) Of The Exchange
#### Act  And Rule 10b-5 Promulgated Thereunder Against All Defendants

465.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.  This Count is asserted against all Defendants.

466.    From January 1, 2004 through January 15, 2009, Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Citigroup's securities; and (c) caused Plaintiffs to purchase or otherwise acquire Citigroup securities at artificially inflated prices.

467.    Each of the Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiffs, in an effort to maintain the artificially inflated price of Citigroup's securities.  Defendants' false and misleading statements (and omissions of material facts) are set forth in Section VII, *supra*.

468.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made the of, untrue statements of material fact as set forth herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

469.     The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter.  Each of the Defendants knew or with extreme recklessness disregarded that their statements were materially false and misleading for the reasons set forth herein.

470.     Defendants carried out a deliberate scheme to misrepresent the value of Citigroup's assets, the Company's profitability, the risks to which the Company's investors were being exposed, the effectiveness of the Company's internal risk management procedures and controls, and its compliance with applicable laws.

471.     In addition to having actual knowledge of, and/or extreme reckless disregard for, the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive and opportunity to engage in the fraudulent scheme set forth herein.

472.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Citigroup's securities was artificially inflated throughout the Relevant Period.  Unaware that the market price of Citigroup's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the markets in which Citigroup's securities traded, and the truth of any representations made to appropriate agencies and to the investing public, Plaintiffs purchased or acquired Citigroup's securities at artificially inflated prices.  At the time they purchased these securities, Plaintiffs did not know and had no reasonable basis to know of the false and misleading nature of Defendants' statements.

473.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and sales of Citigroup securities.

474.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with their transactions in Citigroup's securities during the Relevant Period.

## COUNT TWO

### For Violation Of Section 20(a) Of The Exchange Act Against Defendants Prince, Pandit, Crittenden, Druskin, Maheras, Klein, Gerspach, Jordan, Kleinfeld, and Mecum Based On Citigroup's Violation Of Section 10(b)

475.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein. This Count is asserted against Defendants Prince, Pandit, Crittenden, Druskin, Maheras, Klein, Gerspach, Jordan, Kleinfeld, and Mecum (the "Section 20(a) Defendants").

476.     As alleged above, Citigroup violated Section 10(b) and Rule 10b-5, promulgated thereunder, and Plaintiffs suffered damages as a direct and proximate result of Citigroup's Section 10(b) violations.

477.     The Section 20(a) Defendants acted as controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers of Citigroup, their ability to approve the content and issuance of Citigroup's public statements, and their control over Citigroup's day-to-day operations.   The Section 20(a) Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein.  Each of the Section 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

478.     The Section 20(a) Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts.  They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

479.     As alleged herein, the Section 20(a) Defendants culpably participated in Citi's violations of Section 10(b).

480.     By virtue of their positions as controlling persons of Citigroup, the Section 20(a) Defendants are jointly and severally liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act for Citigroup's violations of the federal securities laws.

### COUNT THREE

**Common Law Fraud For Inducing RRS To
Purchase Citigroup Stock Against All Defendants**

481.     Plaintiff City of Richmond repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.  This Count is asserted by Plaintiff City of Richmond only, against all Defendants based on common law principles of fraud and conspiracy.

482.     As alleged herein, each of the Defendants made material misrepresentations, and the Citigroup Defendants omitted to disclose material facts, to RRS about Citigroup and its financial condition.

483.     In addition, the Citigroup Defendants each conspired with each other for the purpose of misleading RRS and the investing public regarding Citigroup's financial condition and prospects, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

484. The aforesaid misrepresentations and omissions by the Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by RRS and the investing public when making investment decisions.

485. The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under applicable state law.

486. The aforesaid conduct by the Citigroup Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

487. RRS and/or its agents reasonably relied on the Defendants' misrepresentations when deciding to purchase Citigroup's common stock.

488. At the time Citigroup's common stock was purchased by RRS, RRS did not know of any of the false and/or misleading statements and omissions.

489. As a direct and proximate result of the fraud and deceit of the Defendants, RRS suffered damages in connection with its purchases of Citigroup's common stock.

490. The fraud and deceit committed by Citigroup and Freiberg was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only RRS but the investing public.  As a result, Citigroup and Freiberg should be required to pay punitive damages to RRS.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Awarding compensatory damages in favor of Plaintiffs against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged

herein, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be determined at trial, together with interest thereon;

      B.      Ordering that Defendants Citigroup and Freiberg pay punitive damages to RRS in connection with Plaintiff City of Richmond's claim for common law fraud;

      C.      Awarding Plaintiffs their fees and expenses incurred in this action, including attorneys' fees and expert fees;

      D.      Awarding Plaintiffs prejudgment interest and/or opportunity cost damages; and

      E.      Granting such other and further relief as the Court may deem just and proper.

Dated: October 14, 2009

**GRANT & EISENHOFER P.A.**

*Stuart M Grant*

Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
David A. Straite
Natalia Williams
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Attorneys for Plaintiffs*

OF COUNSEL:

Alexander Reus
DIAZ, REUS, ROLFF & TARG, LLP
100 SE Second Street, Suite 2610
Miami, FL 33131

*Counsel for Plaintiffs International Fund Management S.A., Deka International S.A. Luxemburg, Deka FundMaster Investmentgesellschaft mbH, Deka Investment GmbH, Bayerninvest Kapitalanlagegesellschaft mbH, HansaInvest Hanseatische Investment-GmbH, Metzler Investment GmbH, Nord/LB Kapitalanlagegesellschaft AG, and Swiss Life Investment Management Holding AG*